**Mark A. HOPKINSON, a/k/a Mark Allen Hopkinson, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 5733.**

Supreme Court of Wyoming.

May 27, 1983.

Leonard D. Munker, State Public Defender (argued), and Sylvia Lee Hackl, Appellate Counsel, Wyoming Public Defender Program, Cheyenne, for appellant.

Edward P. Moriarity, Sp. Asst. Atty. Gen., argued, for appellee; Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Bruce A. Salzburg, Allen C. Johnson, Mary B. Guthrie, Senior Asst. Attys. Gen., and Sharon A. Lyman, Asst. Atty. Gen., on brief.

Before RAPER, THOMAS and ROSE *, JJ., and SAWYER and McEWAN, District Judges.

RAPER, Justice.

In *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), this court affirmed the convictions of the appellant for conspiracy and first degree murder of four victims but reversed the death penalty sentence and remanded the case to the district court for a new sentencing trial by a jury to determine whether the appellant should be sentenced to death or life imprisonment for the murder of Jeff Green. The new trial on the death penalty issue only was held, and as a result appellant was sentenced to death. In the appeal now before us the issues, as formulated by the appellant, are:

"1. Whether the Wyoming death penalty provisions are unconstitutional in that they usurp the supervisory and rule-making power of the Supreme Court and expand its jurisdiction in violation of the Wyoming Constitution.

"2. Whether it is speculation to infer that Mark Hopkinson intended or had knowledge of the aggravating circum-

---

* Chief Justice at time of oral argument.

stances surrounding the death of Jeff Green.

"3. Whether the admission into evidence of non-statutory aggravating circumstances violated Appellant's rights to due process of law.

"4. The proportionality argument—whether Appellant was denied due process and equal protection.

"5. Whether the death penalty provisions violate Article 1, Section 15 of the Wyoming Constitution.

"6. Whether there was any evidence of waiver of the attorney/client privilege which would allow an attorney to testify against a former client in the penalty phase of a capital case.

"7. Whether reversal is required if an aggravating circumstance used as a basis for imposing the death penalty is found to be invalid.

"8. The double jeopardy argument—whether the consideration by the jury of evidence concerning the Vehar deaths, and the submission to the jury of those aggravating circumstances deemed inapplicable in the first penalty hearing, violated Appellant's constitutional protection against double jeopardy.

"9. Whether Section 6–4–102(h)(vii) of the 1977 Wyoming Statutes is unconstitutional.

"10. Whether the trial court erred in refusing Defendant's Proposed Instruction A and in denying to the jury the opportunity to pass on the issue of due process.

"11. Whether Appellant was afforded effective assistance of counsel.

"12. Whether the prosecution has used the Uinta County grand jury improperly as an investigative tool.

"13. Whether Section 6–4–103 abrogated the plain error rule of appellate review.

"14. Whether a jury is properly involved in resentencing in a death penalty case."

To those fourteen, we add three more issues required to be answered by § 6–4–103(d) and (e), W.S.1977:

15. Was the sentence of death imposed under the influence of passion, prejudice, or any other arbitrary factor?

16. Does the evidence support the jury's findings of aggravating circumstances enumerated in § 6–4–102, W.S.1977 and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances?

17. Was the sentence of death excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, to include a reference to those similar cases taken into consideration? (This is an approach different from that contemplated by appellant's issue 4.)

We will affirm the death penalty imposed by the district court.

### NARRATIVE

A review of the facts surrounding the crimes of which appellant was convicted may be found in *Hopkinson v. State,* supra, pp. 93–97. We will just restate them with some brevity at this point.

As a result of litigation between appellant and his family versus some of their neighbors over water rights and the Fort Bridger Sewer and Water Board in Uinta County, appellant developed a dislike for Vincent Vehar, an Evanston lawyer who represented appellant's adversaries in those disputes. These disputes had reached violent proportions. Appellant first tried, in 1976, to hire for $600, Harold James Taylor to kill Vehar as he was leaving his office, but Taylor backed out.

Appellant then turned to his friends Jeff Green and Mike Hickey for ideas on how to get rid of Vehar. Hickey was a young alcoholic whom the appellant knew had murdered a fifteen-year-old girl, Kelly Wyckhuyse. The appellant had long discussions with Green on how to get rid of Vehar.

During this planning period, appellant engaged Green to drive to Arizona to plant a bomb in the automobile of one Mariscal by way of a persuasive measure to force pay-

ment of money allegedly owed by Mariscal to appellant. Green, while enroute to Arizona, was caught speeding in Utah. When arrested on April 4, 1977, he was driving appellant's Lincoln Continental Mark IV and the bomb was discovered. Appellant and Hickey drove to Utah where they bailed Green out of jail. Since Green was hot, appellant no longer discussed with him plans to kill Vehar.

Thereafter appellant promised Hickey $2,000 plus expenses and help in covering up Hickey's murder of a young girl by the name of Wyckhuyse, to kill Vehar. After much scheming on the method, it was decided that the best way was to toss a bomb through the basement window of the Vehar residence in Evanston.

Appellant received notice in early August 1977, that his deposition in the sewer board's lawsuit would be taken on August 9, 1977. On August 6, appellant ordered Hickey to blow up the Vehar home that night; Hickey did. Vehar, his wife and one son were killed by the explosion—another son was seriously injured.

Hickey and a Jamey Hysell, previous to the Vehar bombing, had plotted together to kill the Wyckhuyse girl because she had implicated Hysell on a marijuana charge. Hickey was to pick her up and then Hysell was to meet them in an isolated spot and together they would kill her. After Hickey picked her up and drove to the appointed place, he told her their plan. However, Hysell did not show up, and Hickey, having revealed their intentions, went ahead and killed her by hitting her on the head with a rock. He cut out her privates as proof of her death to show Hysell and buried the rest of her body.

After the Vehar bombing, Hickey went to California. While Hickey was gone, Hysell was picked up by police for questioning about some larcenies. Hysell, by way of distraction from his own crimes, informed on Hickey by disclosing the Wyckhuyse murder and took authorities to the grave site, previously pointed out to him by Hickey. The body was recovered. After questioning, Hickey was charged with the girl's murder.

In order to rescue Hickey and avoid the conviction of the Vehar murders, appellant, Jeff Green and Hickey concocted stories which pointed to Hysell. Charges of the Wyckhuyse murder against Hickey were dropped and Hysell was charged. During Hysell's trial, Jeff Green broke down. He implicated appellant and Hickey in the Vehar bombing, confessed that his testimony incriminating Hysell was not the truth and that Hickey had murdered the Wyckhuyse girl. Green's testimony led to dismissal of the charges against Hysell and extensive media publicity. Appellant promised Green's sister that he would get Jeff for that.

In March 1979, appellant and Hickey were tried in the United States District Court on federal charges relating to transportation and possession of explosives arising out of Green's aborted attempt to place a bomb in Mariscal's car. As an unindicted conspirator, Jeff Green testified as to appellant's involvement. Hickey was acquitted. Appellant was convicted and sentenced and confined in a federal prison facility at Lompoc, California for not only those offenses but also parole violation on the previous federal drug violations. On appeal, that judgment and sentence was affirmed after the first 1979 trial in the case now before us. *United States v. Hopkinson*, 631 F.2d 665 (10th Cir.1980), cert. denied 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981).

At Lompoc, appellant had unlimited access to a telephone from which he made at least 114 calls over a period of 51 days between April 8 and May 29, 1979. These calls were traced and, through the testimony of the witnesses called, the State was able to establish a plan to murder Jeff Green. Appellant raised and paid to hired killers, through a series of transactions, some $15,000. He arranged by phone the procurement of a photo of Jeff Green cut from a high school year book to identify Green for his murderers whose identities to this date, if known, have not been revealed. Some of the calls made on May 16, 17, 19, and 20 by appellant were to inquire about

Green's whereabouts. On the May 20th call, he was advised that Green was dead, his mutilated body having been found on that day. On May 21, $15,000 showed up in the account of one of the witnesses, Kristi King. The next day a "Joe" inquired of her whether $20,000 had showed up in her account. She refused to have anything to do with it and protested to appellant. At appellant's request, she sent the money to appellant's brother, Scott Hopkinson.

Hickey testified in the first trial of appellant as to appellant's participation with him in the Vehar murders. In exchange for Hickey's testimony relating to the Vehar murders, a plea bargain was entered into whereby Hickey was granted complete immunity from prosecution pertaining to the Vehar murders and a plea of second degree murder was accepted for the murder of the Wyckhuyse girl. He was sentenced to a term of 20–21 years on the State of Wyoming charge for killing Wyckhuyse, to run concurrently with a sentence of 20 years Hickey had received on a federal charge. As set out in *Hopkinson v. State,* supra, there are many more facts supporting the convictions of appellant. Additional facts will be presented during our discussion of the issues.

The new jury did not have the benefit of hearing the evidence produced during the guilt phase. In order to appropriately deal with the sentence phase, it was necessary that the new jury be familiarized with most of the circumstances surrounding the various murders, all of which bear a relationship to each other. That was done through live testimony, introduction into evidence of excerpts from the transcript of the first trial and exhibits.

I

■■■ Appellant's first issue is unique and asks: are the Wyoming death penalty provisions unconstitutional in that they usurp the supervisory and rule-making power of the supreme court and expand its jurisdiction in violation of the Wyoming Constitution? Significantly, this issue was not raised in the district court. We will not

ordinarily consider the unconstitutionality of a statute if the question is not raised in the trial court, *Nickelson v. People,* Wyo., 607 P.2d 904 (1980); *Knudson v. Hilzer,* Wyo., 551 P.2d 680 (1976), or any constitutional question for that matter, *Nisonger v. State,* Wyo., 581 P.2d 1094 (1978); *Apodaca v. State,* Wyo., 571 P.2d 603 (1977), unless plain error is thereby present, *Edwards v. State,* Wyo., 577 P.2d 1380 (1978). Not even all errors of constitutional dimension justify reversal under the plain-error doctrine which should only be applied where the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Hays v. State,* Wyo., 522 P.2d 1004 (1974); *Chapman v. State of California,* 386 U.S. 18, 87 S.Ct. 824, 827, 17 L.Ed.2d 705, 24 A.L.R.3d 1065, reh. denied 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967).

Only because this is a death penalty case do we explore the question. This court is sensitive to its posture when it views the carefully protected doctrine of separation of powers in the democratic form of government which we enjoy and such as exists nationally and in this state. Section 1, Art. 2, Wyoming Constitution preserves that concept:

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted."

■■■ This court has approved the proposition that the power to determine what acts are crimes, and the punishment for prohibited acts belongs to the legislative branch as an absolute, exclusive and inherent power not shared with the courts. *Sorenson v. State,* Wyo., 604 P.2d 1031 (1979). We have, on more than one other occasion, held that punishment for crime is within the province of the legislature. *Stambaugh v. State,* Wyo., 613 P.2d 1237 (1980); *Chavez*

*v. State,* Wyo., 604 P.2d 1341 (1979), cert. denied 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980); *Hicklin v. State,* Wyo., 535 P.2d 743, 79 A.L.R.3d 1050 (1975).

While a town ordinance was the subject matter of *Town of Green River v. Bunger,* 50 Wyo. 52, 58 P.2d 456 (1936), appeal dismissed 300 U.S. 638, 57 S.Ct. 510, 81 L.Ed. 854, reh. denied 300 U.S. 688, 57 S.Ct. 752, 81 L.Ed. 889 (1937), this court in citing *Lawton v. Steele,* 152 U.S. 133, 143, 14 S.Ct. 499, 503, 38 L.Ed. 385 (1894), observed that the power of the legislature to declare acts unlawful along with all the incidents of a criminal offense is unlimited except insofar as it is restrained by constitutional provisions and guarantees. Section 37, Art. 1, Wyoming Constitution declares that "[t]he State of Wyoming is an inseparable part of the federal union, and the constitution of the United States is the supreme law of the land."

In our previous opinion, we at length reviewed the ongoing struggle that took place in the Supreme Court of the United States to reach constitutionally acceptable "standards to guide and control the exercise of discretion by the sentencing authority in its determination of the propriety of the application of the death sentence, or the alternative of a term of life imprisonment." *Kennedy v. State,* Wyo., 559 P.2d 1014 (1977), as quoted in *Hopkinson v. State,* supra at 152. The statutory scheme eventually adopted by the Wyoming State Legislature and under which appellant was sentenced was patterned after portions of the

Georgia and Florida statutes which received approval in *Gregg v. Georgia,* 428 U.S. 153, 428 U.S. 227, 96 S.Ct. 2909, 96 S.Ct. 2971, 49 L.Ed.2d 859, 49 L.Ed.2d 904, reh. denied 429 U.S. 875, 97 S.Ct. 197, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976) and *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, reh. denied 429 U.S. 875, 97 S.Ct. 197, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976) respectively.[1] We approved the Wyoming system in *Hopkinson v. State,* supra.

The point we make is that the Wyoming Legislature in providing for the death penalty as a sentence in the case of first degree murder was "restrained by [federal] constitutional provisions and guarantees." This necessitated incorporating into the death penalty sentence constitutional restraints as a condition to its availability. We do not consider that to be an encroachment upon our rule-making power, but only an incident to the police power of the legislature to legislate a sentencing system.

We should briefly examine the history of rule making by this court. Until 1947, it was apparently taken for granted that the rules of procedure in the courts of this state would be and were prescribed by the legislature. There was a Code of Civil Procedure, § 3–101 et seq., W.C.S.1945 and a Code of Criminal Procedure, § 10–101, et seq., W.C.S.1945. In 1947 the legislature, by ch. 53, Session Laws of Wyoming, 1947, passed an act authorizing the Supreme Court of Wyoming to adopt rules governing practice and procedure in all courts of this

---

1. The public defender, representing appellant in this appeal, has written the Justices and District Judges sitting on this case asking us to consider *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982). We have considered it as requested, but find nothing in it that will be of any assistance to appellant, appellee, or to this court. That case represents one of the many procedures utilized by defendants after final decisions imposing the death penalty of the state's highest court and the highest court in the land, the Supreme Court of the United States, to delay and perhaps somewhere along the line find a sympathetic ear. It is the familiar effort to frustrate final judicial decrees even after repeated careful judicial consideration.

The legislature of the state of Wyoming has made a good-faith effort to craft legislation which conforms to the holdings of the United States Supreme Court in its decisions in *Proffitt* and *Gregg* and other of *its* decisions dealing with the death penalty. We have taken every care to meticulously conform to *Proffitt* and *Gregg* and the other pertinent cases of that Court of last resort in death cases. We accept its decisions as the standard. We rely on them and shape our death penalty jurisprudence accordingly. Certainly there must be somewhere some dependable solidity—some finality. *Proffitt* should be considered closed by the opinion and decision upon which we have placed confidence.

state.[2] These provisions are now §§ 5–2–114 through 5–2–117, W.S.1977. This court, on September 23, 1947, did appoint the committee as provided by § 4 of the Act to revise the rules and forms governing pleadings, practice and procedure in the courts of this state to conform them to the federal rules of procedure insofar as might be deemed practicable. The committee drifted along practically inactive through departures and resignations until, on October 9, 1956, it was reactivated with additional new members, including the author of this opinion. Within the memory of some of those presently on this court, there was opposition to giving up code practice and adopting the innovative procedures of the federal rules. Nevertheless, on July 2, 1957, by order of this court, the Wyoming Rules of Civil Procedure, patterned after the Federal Rules of Civil Procedure, were adopted. Statutes in conflict listed by section number were declared superseded by Rule 87, W.R.C.P.

Thereafter a subcommittee of the permanent rules committee was appointed and on November 21, 1968, by order of this court, the Wyoming Rules of Criminal Procedure, patterned after the Federal Rules of Criminal Procedure, were adopted. Statutes in conflict listed by section number were, by Rule 56, W.R.Cr.P., declared superseded.

This court has never previously considered, nor has it been inclined to decide, what would be no more than an academic question as to whether it had the inherent right to adopt rules of procedure without the blessing of the legislature.

It should be noted that § 2 of the 1947 Act, now § 5–2–115, W.S.1977, provides that "[s]uch rules shall neither abridge, enlarge nor modify the substantive rights of any person nor the jurisdiction of any of the courts nor change the provisions of any statute of limitations." This court has recognized that it is not always easy to distinguish between procedure and substance in that these terms are not mathematically exact. In *State, ex rel. Frederick v. District Court of Fifth Judicial District In and For County of Big Horn*, Wyo., 399 P.2d 583, 585, 12 A.L.R.3d 1 (1965), this court recognized that substantive law includes those principles which fix and declare the primary rights of individuals as respect their persons and property, and procedure provides the method of enforcing those rights created by substantive law. We hold that the system of determining whether the penalty for first degree murder shall be death or life imprisonment is something more than procedure and is substantive law circumscribing the personal rights of the

2. Chapter 53, Session Laws of Wyoming 1947, provides:

"*Section 1.* The Supreme Court of Wyoming may from time to time adopt, modify and repeal general rules and forms governing pleading, practice and procedure, in all courts of this State, for the purpose of promoting the speedy and efficient determination of litigation upon its merits.

"*Application of Rules Adopted.*

"*Section 2.* Such rules may govern:

"(a) the forms of process, writs, pleadings and motions and the subjects of parties, depositions, discovery, trials, evidence, judgments, new trials, provisional and final remedies and all other matters of pleading, practice and procedure; and

"(b) any review of or other supervisory proceedings from the judgment or decision of any court, board, officer, or commission when such review is authorized by law.

"Such rules shall neither abridge, enlarge nor modify the substantive rights of any person nor the jurisdiction of any of the courts nor change the provisions of any statute of limitations.

"*Effective Date.*

"*Section 3.* Upon the adoption of any rule or form the Supreme Court shall enter it in its proceedings and shall fix the date upon which such rule or form shall become effective but such effective date shall be at least sixty days after notice thereof has been published by the Supreme Court in such publication as it may designate. From and after the effective date of any such rule or form all laws in conflict therewith shall be of no further force or effect.

"*Advisory Committee.*

"*Section 4.* The Supreme Court shall appoint an Advisory Committee to make recommendations from time to time with respect to pleading, practice and procedure. Such Committee shall hold hearings upon proposed rules in such manner and upon such notice as the Supreme Court prescribes and report to the Court from time to time such recomemndations [sic] as it deems proper."

accused as pronounced by the Supreme Court of the United States by which the legislature is bound.

The appellant asserts that the legislature has in some way encroached upon powers belonging to the Wyoming Supreme Court in violation of § 1, Art. 2, Wyoming Constitution, supra, because of the enactment of §§ 6–4–102(g) and 6–4–103, W.S.1977.[3] For several reasons we will hold that we do not construe the action of the legislature as exercising any powers belonging to this court.

**3.** Section 6–4–102(g), W.S.1977, provides:

"If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment."

Section 6–4–103, W.S.1977, provides:

"*(a) The judgment of conviction and sentence of death is subject to automatic review by the supreme court of Wyoming within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the supreme court for good cause shown. Such review by the supreme court shall have priority over all other cases.*

"(b) Within ten (10) days after receiving the transcript, the clerk of the trial court shall transmit the entire record and transcript to the supreme court of Wyoming together with a notice prepared by the clerk and a report prepared by the trial judge. The notice shall set forth the title and docket number of the case, the name of the defendant and the name and address of his attorney, a statement of the judgment, the offense and punishment prescribed. The report shall be in the form of a standard questionnaire prepared and supplied by the supreme court of Wyoming.

"(c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.

"(d) With regard to the sentence, the court shall determine if:

"(i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;

"(ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances;

"(iii) *The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.*

With respect to the automatic appeal, we find from the record that the appellant filed a timely notice of appeal (R. 20) pursuant to Rules 2.01 and 2.02, Wyoming Rules of Appellate Procedure[4], and did not depend upon the automatic appeal feature of § 6–4–103(a), supra fn. 3. Nor do the provisions of § 6–4–103(e)(i), (ii), and (iii), supra fn. 3, vary from Rule 1.04, W.R.A.P. which provides:

"A judgment rendered or final order made by

"*(e) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, may:*

"(i) Affirm the sentence of death;

"(ii) Set the sentence aside and impose a sentence of life imprisonment; or

"(iii) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel." (Emphasis added.)

**4.** Rule 2.01, W.R.A.P., in pertinent part, provides:

"An appeal, civil or criminal, permitted by law from a district court to the Supreme Court, shall be taken by filing a notice of appeal with the clerk of the district court within fifteen (15) days from entry of the judgment or final order appealed from and concurrently serving the same in accordance with the provisions of Rule 5, W.R.C.P., unless a different time is provided by law * * *.

 \* \* \* \* \* \*

"Concurrently with filing the notice of appeal, the appellant shall order and either arrange for the payment of a transcript of the portions of the evidence deemed necessary for the appeal or make application for payment thereof as provided in Rule 10.6, W.R. A.P.; a certificate of compliance therewith shall be filed in the case or endorsed upon the notice of appeal. If an appeal has not been docketed, the parties, with the approval of the district court, may dismiss the appeal by stipulation filed in that court, or that court may dismiss the appeal upon motion and notice by the appellant."

Rule 2.02, W.R.A.P., provides:

"The notice of appeal shall specify the parties taking the appeal; shall designate the judgment or final order or part thereof appealed from; and shall name the court to which the appeal is taken."

a district court *may be reversed* in whole or *in part,* vacated or modified by the Supreme Court for errors appearing on the record." (Emphasis added.)

And, of course, in the absence of error, we may always affirm. It is nothing new to reverse and remand for further proceedings a part of the final judgment of a district court where it is divisible, as here. *Sorenson v. State,* supra, 604 P.2d 1031; *Martinez v. State,* 80 Wyo. 325, 342 P.2d 227 (1959).

When this court is presented with a constitutionally based challenge to a statute, it presumes the statute constitutional. Any doubt must be resolved in favor of constitutionality. Before we strike it down we must find that it clearly violates some constitutional principle, state or federal. *State v. Laude,* Wyo., 654 P.2d 1223 (1982); *Thomson v. Wyoming In-Stream Flow Committee,* Wyo., 651 P.2d 778 (1982); *Nickelson v. People,* supra, 607 P.2d 904; *Washakie County School District No. One v. Herschler,* Wyo., 606 P.2d 310, cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Sanchez v. State,* Wyo., 567 P.2d 270 (1977). The Supreme Court of the United States has said that, even when a serious doubt of constitutionality is present, courts should "ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932).

The most important reason for holding that §§ 6–4–102(g) and 6–4–103 are constitutional is that they are an important and necessary part of the total sentencing structure. In that regard, the opinion of Justices Stewart, Powell and Stevens in *Gregg v. Georgia,* supra, 428 U.S. at 198, 96 S.Ct. at 2937, in announcing the judgment of the Court said:

"As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. § 27–2537(c) (Supp.1975).

"In short, Georgia's new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant. Moreover, to guard further against a situation comparable to that presented in *Furman* [*v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)], the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate. On their face these procedures seem to satisfy the concerns of *Furman.* No longer should there be 'no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' 408 U.S., at 313 [92 S.Ct. at 2764] (WHITE, J., concurring)."

Again, 428 U.S. at page 204, 96 S.Ct. at 2939, the Court explained:

"Finally, the Georgia statute has an additional provision designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. The new sentencing procedures require that the State Supreme Court review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and '[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.' § 27–2537(c)(3) (Supp.1975). * * * "[5]

---

5. Fn. 56 of *Gregg* explains that the Georgia statute, § 27–2537(e) (Supp.1975) requires the supreme court to specify in its opinion the similar cases which it took into consideration,

Then at page 206, 96 S.Ct. at 2940, the Court went on to say:

"The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death."

Finally, at page 207, 96 S.Ct. at 2941, the Court said:

" * * * In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here."

The concurring opinion of Justice White, with whom Chief Justice Burger and Justice Rehnquist joined, also stressed the state supreme court review of the death penalty as "[a]n important aspect of the new Georgia *legislative scheme* * * *." (Emphasis added.)

In *Proffitt v. Florida,* supra, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, the Court, in approving the Florida death penalty statutes, called attention to the provision § 921.141(4), F.S.A.[6], by stating that this automatic review provision is designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. While the provision is not structured in the same fashion as that of Georgia, it was held by the United States Supreme Court that the manner in which the Florida Supreme Court reviews each death sentence does ensure similar results in similar cases, citing *State v. Dixon,* Fla., 283 So.2d 1, 10 (1973).

The certiorari petition in *Proffitt* asserted that such a skimpy provision made the role of the state supreme court necessarily subjective and unpredictable. The United States Supreme Court responded to that by stating:

" * * * While it may be true that that court has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary. In fact, it is apparent that the Florida court has undertaken responsibly to perform its function of death sentence review with a maximum of rationality and consistency. For example, it has several times compared the circumstances of a case under review with those of previous cases in which it has assessed the imposition of death sentences. See, e.g., *Alford v. State,* 307 So.2d [433], at 445; *Alvord v. State,* 322 So.2d [533], at 540–541. By following this procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute. Cf. *Gregg v. Georgia,* ante [428 U.S.], at 204–206 [96 S.Ct. at 2939–41]. And any suggestion that the Florida court engages in only cursory or rubber-stamp review of death penalty cases is totally controverted by the fact that it has vacated over one-third of the death sentences that have come before it. * * * " Id., 428 U.S. at 258–259, 96 S.Ct. at 2969.

We conclude and hold that the action of the Wyoming State Legislature in specifying the nature of our review does not purport to take away any of our powers or

---

just as required by § 6–4–103(d)(iii) and (e), W.S.1977, fn. 3, supra.

**6.** Section 921.141(4), F.S.A. (Supp.1982), provides:

"The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within sixty (60) days after certification by the sentencing court of the entire record, unless the time is extended for an additional period not to exceed thirty (30) days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases and shall be heard in accordance with rules promulgated by the Supreme Court."

jurisdiction. The judicial function of making the requisite determinations on review are left to this court. It would be something else if the legislature enacted a statute whereby the legislature would review the trial proceedings; it then would be exercising powers properly belonging to the courts. We consider the challenged statutory sections to be a proper exercise of legislative power to provide for the sentencing of convicted first degree murders. This does not mean that under the Wyoming Rules of Criminal Procedure we could not conduct the same review as that directed by the legislature. If we disregarded the legislative directions, we would still be required to conduct a review within the standards set out in *Gregg* and *Proffitt,* as did the Supreme Court of Florida.

We will not reconsider the holding in *Hopkinson v. State,* supra, with respect to the admissibility of hearsay evidence. We exhaustively discussed the subject in its applicability to not only the guilt but the penalty phase, 632 P.2d 79 at Part VIII, pp. 127–137. There is no need for repetition; but, as a remainder, § 6–4–102(c), W.S. 1977, pertaining to the sentencing hearing provides:

"The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible."

We consider this part of the sentencing conditions within the power and authority of the legislature. We find by the record that extensive notice of the evidence, whether hearsay or not, the prosecution proposed to produce at the sentencing hearing was given by the State to the appellant. We also find that for the most part it was admissible under the exceptions to the hearsay rule and not excluded by those rules, all as set out in our previous opinion.

As said in *Gregg,* 428 U.S. at 189–190, 96 S.Ct. at 2932:

"It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We have long recognized that '[f]or the determination of sentences, justice generally requires * * * that there be taken into account the circumstances of the offense together with the character and propensities of the offender.' *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 [58 S.Ct. 59, 60, 82 L.Ed. 43] (1937). See also *Williams v. Oklahoma,* 358 U.S. 576, 585 [79 S.Ct. 421, 426, 3 L.Ed.2d 516] (1959); *Williams v. New York,* 337 U.S. [241], at 247 [69 S.Ct. 1079, at 1083, 93 L.Ed. 1337 (1949)]. Otherwise, 'the system cannot function in a consistent and a rational manner.' American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 4.1(a), Commentary, p. 201 (App. Draft 1968). See also President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 144 (1967); ALI, Model Penal Code § 7.07, Comment 1, pp. 52–53 (Tent. Draft No. 2, 1954).

"The cited studies assumed that the trial judge would be the sentencing authority. If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

"Jury sentencing has been considered desirable in capital cases in order 'to maintain a link between contemporary com-

munity values and the penal system—a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society."' * * * " (Footnotes omitted.)

It was essential that the jury have the information it received as a part of its sentencing function under the conditions of the sentencing structure which we hold was a proper legislative power.

## II

As to his second issue presented, appellant asserts that " * * * it is speculation to infer that Mark Hopkinson intended or had knowledge of the aggravating circumstances surrounding the death of Jeff Green." He argues that it is difficult to conceive the sufficiency of evidence in substantial quantum to determine: one, the murder was committed for the purpose of avoiding or preventing a lawful arrest; two, the murder was committed for pecuniary gain; and three, the murder was especially heinous, atrocious or cruel, all as found by the jury.[7] These are three out of the five aggravating circumstances the jury found to exist. The jury was instructed that aggravating circumstances must be found beyond a reasonable doubt. It is observed that the trial judge heeded the admonition of our opinion in the first appeal that any statutory aggravating circumstance unsupported by evidence should not be submitted for consideration by the jury, i.e., § 6–4–102(h)(iii), (iv), and (viii), fn. 7.

The claim of appellant under this issue is that the evidence is insufficient under the

7. Section 6–4–102, W.S.1977, in part reads:

"(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foremen of the jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In nonjury cases the judge shall make such designation. If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

 * * * * * *

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney or former county and prosecuting attorney, during or because of the exercise of his official duty. [Subsection (h)(viii) was amended 4/1/82.]"

The jury's verdict found the aggravating circumstances to be:

"We, the jury, empaneled and sworn in the above entitled case, do, upon our oaths, find as follows:

"PART I: AGGRAVATING CIRCUMSTANCES

"1. The murder was committed by a person under sentence of imprisonment.

 Yes_X_ No___

"2. The defendant was previously convicted of another murder in the first degree.

 Yes_X_ No___

"3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

 Yes_X_ No___

"4. The murder was committed for pecuniary gain.

 Yes_X_ No___

"5. The murder was especially heinous, atrocious or cruel.

 Yes_X_ No___

"(If you have answered all of the above 'no' sign the Verdict and call the bailiff. If you have answered any of the above 'yes' go to Part II.) [Part II of the verdict form covers mitigating circumstances which, in this opinion, we will cover under Part XVI.]"

standard set by *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reh. denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). The standard is there articulated to be:

"After *Winship* [*In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)] the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS,* 385 U.S. [276], at 282, 87 S.Ct. [483], at 486 [17 L.Ed.2d 362] (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson v. Louisiana,* 406 U.S. [356], at 362, 92 S.Ct. [1620], at 1624–1625 [32 L.Ed.2d 152]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." (Emphasis in original and footnotes omitted.) 99 S.Ct. at 2788–2789.[8]

Applying that standard, then, to the three aggravating circumstances, we find them more than supported by the evidence.

Preliminary to a short review of the evidence, we first must dispose of any question about *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In that case, the United States Supreme Court held that under the circumstances there, the imposition of the death penalty was inconsistent with the Eighth and Fourteenth Amendments. In that case the aider and abettor to a felony (robbery) did not himself kill, attempt to kill or intend that a killing take place or that lethal force be employed in the commission of a robbery. He was a lookout and driver of the getaway car several hundred yards from where the crime was committed and where the killing was done by accomplices.

■ The case before us is considerably different from the *Enmund* facts. In the appeal before us the evidence is that the first degree murder of Green was planned by appellant, he intended that the killing take place, he arranged for hired triggermen to do the execution and intended that torture and lethal force be utilized. From the beginning the underlying felony is premeditated murder. The rule of *Enmund,* therefore, for our purposes, is that in order to justify the death penalty for one who does not do the actual killing, there must be present an intent that a killing will take place or that lethal force will be employed. The jury found such intent, and we cannot disagree.

■ Using the standard heretofore set out from *Jackson,* supra, there was substantial evidence that the murder of Jeff Green was for the purpose of avoiding or preventing a lawful arrest. The testimony of Green in the aborted Mariscal bombing case was recounted. In that episode Green was

---

8. The Wyoming Supreme Court follows the same standard on review in determining whether there is substantial evidence to justify the jury's finding of guilt. *Richter v. State,* Wyo., 642 P.2d 1269 (1982); *Russell v. State,* Wyo., 583 P.2d 690 (1978). We apply this to both direct and circumstantial evidence. This court adopted the rule of *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), reh. denied 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731 (1955), referred to in fn. 9 of *Jackson,* supra, 99 S.Ct. at 2788, in *Blakely v. State,* Wyo., 542 P.2d 857, 861 (1975).

a key witness who provided evidence of some of the circumstances connecting the appellant with the dynamite used in the bombing of the Vehar home. The bomb he was carrying when arrested in Utah had appellant's fingerprints on it and Green had testified about it and disclosed to investigators where the bomb had come from. He had knowledge of appellant's arrangement with Hickey whereby the latter would toss a bomb into the Vehar home and thus was able to and did materially assist in untangling what was a long-time mystery as to the murderer or murderers of the Vehars. He may have even been the one holding the key to unlock the indispensable missing parts. There was evidence of threats made by appellant on the life of Green. The telephone activity by appellant to acquire a picture of Green, along with keeping track of Green's activities, was in evidence, all of which took place shortly before Green's scheduled appearance before a grand jury investigating the Vehar murders. The climax was, of course, the murder of Green and the condition of his body evidencing a methodical manner in which it was accomplished, designed to elicit information of what Green knew, what he would testify about to the grand jury, and culminating in a gunshot wound into his head thereby silencing him from testifying. This line of direct and circumstantial evidence established for the jury beyond a reasonable doubt the aggravating circumstance of murder to avoid or prevent a lawful arrest. A rational juror could come to that conclusion when viewing the evidence in the light most favorable to the prosecution.

There was substantial evidence present from the testimony of Kristi King revealing the attempts to use her to transfer $15,000 actually placed into her possession from and to various people. This would establish for the jury beyond a reasonable doubt within the *Jackson* standards that the murder was committed for pecuniary gain, appellant furnishing the funds to hired killers in exchange for Green's torture and death.

The extensive evidence relating to the aggravating circumstance that the murder was especially atrocious, heinous and cruel, is of the most convincing nature. The evidence of threats against Green and others, the evidence of the character and disposition of appellant to take care of persons with violence, weapons and explosives, and his inquiry about the availability of welding equipment, laid a foundation for the capability of appellant to cause the horrible torture of Green which took place. The photographs of Green's body are expressive even beyond the words of the testimony of the pathologist who detailed for the jury the various brutal wounds inflicted before Green's being put to death.

The testimony was that there were some 140 burns on the body of Green such as would be caused by cigarette burns and hot metal, thus connecting the welder which could be used as a heating tool. One of Green's eyes was burned out, there was an ugly burn behind one of Green's ears, explained by the pathologist to be an especially sensitive area. There were cuts on the throat and chest. There were bruises on his body consistent with having been caused by kicking with a boot or by striking with a baseball bat or hammer. There were abrasions on Green's body probably caused by his being bound by ropes and resulting from an agonizing struggle during the torture.

This evidence explained this to have been consciousless or pitiless far beyond the normal murder, *Hopkinson v. State,* supra, which crime, of course by its nature, is possessed of some of the elements of being heinous, atrocious and cruel. But this one was "especially" so within the meaning of the statutory language. Any rational juror could reach this conclusion beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution.

### III

The appellant claims that the admission into evidence of non-statutory aggravating circumstances violated appellant's rights to due process of law. Section 6–4–102(h), W.S.1977, supra, fn. 7, provides that "[a]ggravating circumstances are limited to the following." The allegedly non-

statutory aggravating circumstances as conceived by appellant are contained in various remarks made by the prosecutor in his opening statement that the death penalty is justified on the basis of community survival and that evidence would be introduced to show appellant's "propensity for violence." The argument goes on to maintain that evidence was introduced to demonstrate such propensity and that finally in closing argument, the prosecutor reiterated the need for community survival and appellant's propensity for violence.

This court observed in the first *Hopkinson* opinion that § 6–4–102(h), supra, fn. 7, specifically limits the aggravating circumstances to those listed. 632 P.2d at 157. It was also there recognized that we must not compromise the weighing process between permissible aggravating circumstances and mitigating circumstances. The scales must not be tipped by impermissible factors leaving us in a quandary as to what the jury would have done had impermissible factors not been present. 632 P.2d at 170–172.

The appellant cites us to *Brown v. State,* Fla., 381 So.2d 690 (1980).[9] We accept the proposition that improper aggravating circumstances cannot go into the calculus of the decision of the sentencing authority. In *Brown,* it is interesting to see that the Florida Supreme Court did not reverse the death sentence though an improper aggravating circumstance was present. The court reasoned that ample other statutory aggravating circumstances existed to convince it that the weighing process was not

endangered even in the presence of a mitigating circumstance (age—23 years—of the felon). The court further held that it must test for reasoned judgment in the sentencing process, rather than "a mechanical tabulation to arrive at a net sum." It is noted that the Florida statute, § 921.141(5), F.S.A. (Supp.1982), opens with: "Aggravating circumstances shall be limited to the following," only slightly different than that of Wyoming's § 6–4–102(h), supra, fn. 7.

The other case cited to us by appellant is *Henry v. Wainwright,* 661 F.2d 56 (5th Cir. 1981). There, on the application for writ of habeas corpus, the situation was that the Florida trial court in a death case had received evidence of a non-statutory aggravating circumstance and instructed the jury, in pertinent part:

"In considering aggravating circumstances, you shall consider all factors which are aggravating, including, but not limited to, the following * * *."

The Florida Supreme Court affirmed Henry's conviction and sentence.[10] The federal court disagreed with the Florida Supreme Court and held that the jury instruction contravened *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), constitutionally directing that jury discretion in capital sentencing be sufficiently guided so as to avoid arbitrary and selective imposition of the death penalty. Failure of guidance increased the risk that the death penalty would be imposed in an arbitrary and capricious manner.[11]

**9.** Shepardizing discloses that certiorari was denied by the Supreme Court of the United States on January 19, 1981, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847, with Justices Brennan and Marshall dissenting, adhering to their views that the death penalty is cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. A writ of habeas corpus was denied Brown in *Brown v. Wainwright,* Fla., 392 So.2d 1327 (1981). The death penalty stands.

**10.** *Henry v. State,* Fla., 328 So.2d 430, cert. denied 429 U.S. 951, 97 S.Ct. 370, 50 L.Ed.2d 319, reh. denied 429 U.S. 1124, 97 S.Ct. 1164, 51 L.Ed.2d 576 (1976). That court also denied a motion to vacate the judgment and death

sentence. *Henry v. State,* Fla., 377 So.2d 692 (1979).

**11.** The status of the federal case of *Wainwright v. Henry* is most uncertain. Certiorari was granted, —— U.S. ——, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982), the judgment of the court of appeals was vacated and the case remanded for further consideration in the light of *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). On remand, the circuit court considered *Engle,* found it made no difference and again vacated Florida's death sentence. *Henry v. Wainwright,* 686 F.2d 311 (5th Cir.1982). A

However, the same instruction as that given in *Henry* was not given in this case. The trial judge in the case before us instructed the jury that the aggravating circumstances "in this case *are limited* to the following." (Emphasis added.) See fn. 7 for the jury's verdict form. In that connection the trial judge gave jury Instruction No. 7:

"If you do not find that one or more sufficient aggravating circumstances exist as previously instructed, you should sign the verdict recommending life imprisonment.

"If, on the other hand, you find one or more of the sufficient aggravating circumstances set forth in these instructions, then in order to find that the death penalty is justified, you must find that the aggravating circumstances outweigh any mitigating circumstances found to exist.

"In making this determination you must use your reasoned judgment. You must weigh the mitigating circumstances against the aggravating circumstances and in so doing to consider the following:

"1. No numerical weight is assigned to any of the mitigating or aggravating circumstances.

"2. The enumeration of the aggravating and mitigating circumstances does not indicate the weight to be given to any such circumstance.

"3. One mitigating circumstance may be of such a nature as to outweigh one or more aggravating circumstance.

"4. One aggravating circumstance may be of such a nature as to outweigh one or more mitigating circumstance."

The instructions forcefully and with clarity limited the jury to only a consideration of the aggravating circumstances listed, and there is no indication that they found any other aggravating circumstance. The instructions clearly channeled the jury into only a consideration of permissible aggravating circumstances.

The appellant's objection goes to the opening statement and the closing argument of the prosecutor. The jury, through Instruction No. 1, was warned that any statement made by counsel in its presence concerning the facts of the case must not be regarded as evidence. When objections were made by appellant's counsel during the course of the opening statement and argument of the counsel, the jury was again reminded of this admonition. Further, the jury was directed, through Instruction No. 2, that the case be governed solely by the evidence in determining the questions before it.

There was much evidence of threats made by the appellant to various persons against Green prior to his scheduled grand jury appearance; there was evidence of the threats made by the appellant against members of the sewer board; and there was evidence of threats made by appellant against Vincent Vehar as a result of the sewer board litigation. All of this evidence was part and parcel of the total picture. All of it was introductory and relevant to the eventual murder of Jeff Green to avoid or prevent appellant's arrest, as well as to the motive of appellant in engineering the especially atrocious, heinous and cruel aggravating circumstances. As so emphatically explained in *Gregg* and *Proffitt,* the jury must be fully informed of all the pertinent facts in order to adequately exercise the trust of discretion placed upon it. The State must have some leeway in giving the whole story to the jury. The prosecution was only doing what it was authorized to do by § 6–4–102(c), W.S.1977:

"(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any

petition for certiorari is now pending in the Supreme Court of the United States, filed

11/17/82, No. 82–840, 51 L.W. 3421. We thus see the federal system in conflict with itself.

hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible."

The statute was meticulously followed in lengthy notice of the evidence in aggravation the State planned to and did produce.[12]

The community survival theme of argument was one used by the prosecution in its closing argument during the penalty phase of the first trial. See 632 P.2d at 160–166. This court explained there and we repeat it here:

"Prosecutors cannot and should not be muzzled. It must be kept in mind that the prosecuting attorney is a representative of the State whose obligation is to govern impartially, whose aim is not that it win a case but that justice be done. It is his mission that guilt shall not escape or innocence suffer. He is duty bound to prosecute with earnestness and vigor. While he may strike hard blows, he is not free to strike foul ones. *Singer v. United States,* 1965, 380 U.S. 24, 85 S.Ct. 783, 791, 13 L.Ed.2d 630; *Berger v. United States,* 1935, 295 U.S. 78, 55 S.Ct. 629, 633, 79 L.Ed. 1314." 632 P.2d at 166.

No foul blows were struck.

### IV

█ The appellant raises as an issue what he refers to as "[t]he proportionality argument—whether Appellant was denied due process and equal protection." He relates the not less than 20 nor more than 21 years sentence given Mike Hickey for the murder of Kelly Wyckhuyse as a part of a plea bargain arrangement to the death sentence given Hopkinson. (R.Vol. X pp. 853–854) Appellant concludes that the sentence of appellant should be measured against that of Mike Hickey on equal protection and due process grounds.

The agreement was that Hickey be given immunity from prosecution for his part in the bombing of the Vehar home and murder of the Vehars and other crimes " * * * except the Kelly Wyckhuyse murder for which no immunity of any kind is offered or granted; and should said Michael J. Hickey wish to plead guilty to the Kelly Wyckhuyse murder charge as principal or accessory, the Court will accept a plea of second degree murder with a sentence of not less than twenty (20) years nor more than twenty-one (21) years." The agreement was signed by Hickey, Hickey's attorney, the special prosecutor for Uinta County and the district judge. This agreement was read into the record for the benefit of the jury at the penalty hearing now before us. The record also discloses that as a result of the plea bargain, five crimes were solved and convictions obtained: the Wyckhuyse homicide, the three Vehar homicides, and the conspiracy between Mark Hopkinson and Mike Hickey to murder William Roitz, a member of the sewer board.

The appellant accuses the district judge of improper behavior for participating in the plea bargain which was struck, citing what appears to be from the Approved Draft, 1968, ABA's Minimum Standards for the Administration of Criminal Justice, Standards Relating to Pleas of Guilty, § "3.3(a) The trial judge should not participate in plea discussions." Counsel have apparently not acquainted themselves with the provisions relating to Pleas of Guilty, approved by the ABA House of Delegates, February 12, 1979, ch. 14 (Little, Brown and Company 2nd ed. 1980). The stringent provision cited has been deleted. Standard 14–3.3 now permits a limited role for the trial judge. He may indicate what charge or sentence concessions would be acceptable.

The final approved standard 14–1.8, in regard to consideration of a plea of guilty in final disposition, provides that

" * * * [i]t is proper for the court to grant charge and sentence concessions to defendants who enter a plea of guilty or nolo contendere *when consistent with the*

---

12. Rule 802, W.R.E., provides:

"Hearsay is not admissible except as provided by these rules or by other rules adopted by the Supreme Court of Wyoming or by statute."

*protection of the public* * * * when there is substantial evidence to establish that:

\* \* \* \* \* \*

> "(iv) the defendant has given or offered cooperation when such cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct." (Emphasis added.)

The comments to the standard, 14–1.8, supra, p. 14–49, point out that consideration has been given to the contingency that those defendants, as a class who plead guilty because of one of the considerations listed in 14–1.8(a)(i) through (iv), will receive more favorable treatment than the class of defendants who stand trial and are convicted, but "[b]ecause each of the foregoing considerations is related to legitimate objectives of the criminal law, this disparity in treatment is in no sense unfair or inconsistent with the goal of uniformity in sentencing." The idea is that under such circumstances the one who goes to trial receives excessive punishment.

We add two thoughts. It is not unconstitutional for the State to extend a benefit to a defendant who pleads guilty and who in turn extends a substantial benefit to the State. *Brady v. United States,* 397 U.S. 742, 750–753, 90 S.Ct. 1463, 1470–1471, 25 L.Ed.2d 747 (1970).

The argument of appellant is not unlike one advanced by petitioner Gregg that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute or to plea bargain with. The Court, 428 U.S. at 199, 96 S.Ct. at 2937, declared that the existence of these discretionary stages is not determinative, but the specific individual convicted of a capital offense must be separately dealt with in the decision to impose the death penalty; there is nothing unconstitutional about affording mercy to an individual defendant. In other words, leniency in one case does not invali-

date the death penalty in others. Justice White in his concurring opinion discussed this aspect, 428 U.S. at 224–226, 96 S.Ct. at 2948–2949, where he declined to interfere with the manner in which Georgia chose to enforce its laws on the basis of a charge of lack of faith in its system. Accomplices in crime need not be sentenced alike; a sentence should be patterned to the individual defendant. *Beaulieu v. State,* Wyo., 608 P.2d 275 (1980); *Daellenbach v. State,* Wyo., 562 P.2d 679 (1977).

The second closing determination dispositive of this issue is that Mike Hickey was not a principal or aider and abettor or conspirator with the appellant in the murder of Jeff Green.

It should be pointed out that, at a later point, we will separately dispatch our statutory responsibility under § 6–4–103(d)(iii) and (e), W.S.1977, to determine if the sentence of death is disproportionate to the penalty imposed in similar cases and to make reference to those cases we take into consideration.

**V**

We have at length dealt in *Hopkinson v. State,* supra at 149–157, with the constitutionality of Wyoming's death penalty statutes under the Eighth Amendment to the United States Constitution and § 14, Art. 1, Wyoming Constitution, the latter containing near identical language as that in the Eighth Amendment.[13] We found and held them constitutional as to those provisions. Appellant now claims their unconstitutionality under § 15, Art. 1, Wyoming Constitution:

> "The penal code shall be framed on the humane principles of reformation and prevention."

By their silence, the majority in the previous opinion rejected the stance of the dissent to the previous opinion of the majority, *Hopkinson v. State,* supra, that § 15, Art. 1 in any way modifies § 14, Art. 1.

---

**13.** We do not consider it of any materiality that in the Wyoming Constitution, § 14, Art. 1, the words "cruel" and "unusual" are separated by the word "or" whereas in the United States

Constitution they are separated by the word "and." We held the death penalty to be neither cruel nor unusual.

We have heretofore, in Part II of this opinion, pointed out the heavy burden assumed by one who would seek to overcome the presumption of constitutionality which a legislative enactment enjoys. We have held that the death penalty is neither cruel nor unusual under § 14, Art. 1. We have held that life may be taken by due process of law under § 6, Art. 1, Wyoming Constitution[14] and that due process of law contemplates the careful adherence to the statutory procedure structured to avoid arbitrary and capricious action by a jury as the sentencing authority in the case of first degree murder. We consider that we are giving effect to § 15, Art. 1 and the penal code by including the death penalty as framed on the humane principles of reformation and prevention.

As pointed out in *Gregg,* 428 U.S. at 170–176, 96 S.Ct. at 2923–2926, cruel and unusual punishment as contemplated in the constitutional sense proscribes torture and other barbarous methods but " 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a *humane* justice.' " (Emphasis added.) The Court went on to say that the punishment may not involve the unnecessary and wanton infliction of pain or be grossly out of proportion to the enormity of the crime. "We may not require the legislature to select the least severe penalty possible as long as the penalty selected is not cruelly *inhumane* or disproportionate to crime involved. * * * [T]he constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards." (Emphasis added.)

All of the foregoing paragraph from *Gregg* represents our views of §§ 14 and 15, Art. 1, of the Wyoming Constitution. We would consider the death penalty inhumane if administered in the same fashion as the murder of Jeff Green. They must be read together. Neither prohibits the death penalty. Wyoming as a state has never been without the death penalty except as noted in the next paragraph. It carried forward the territorial capital crime of murder.[15] Section 1, ch. 35, Session Laws of Wyoming, 1890, First State Legislature. It was picked up in the Revised Statutes of Wyoming, 1899. Section 1, ch. 87, Session Laws of Wyoming 1915, authorized the jury to qualify their verdict by adding "without capital punishment" in which event the sentence was life imprisonment.

By § 1, ch. 136, Session Laws of Wyoming 1973, the legislature attempted to conform to *Furman v. Georgia,* supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, but failed. This court held the legislative effort unconstitutional on January 27, 1977. *Kennedy v. State,* Wyo., 559 P.2d 1014 (1977). On February 28, 1977, the Governor approved § 1, ch. 122, Session Laws of Wyoming 1977, our current death penalty statutes under which appellant was sentenced. Wyoming has only been without the death penalty for a period of one month since statehood. This legislative interpretation of the constitution is entitled to great weight, though not binding on this court. *Coronado Oil Co. v. Grieves,* Wyo., 603 P.2d 406 (1979); *State ex rel. Irvine v. Brooks,* 14 Wyo. 393, 418, 84 P. 488, 6 L.R.A.N.S. 750, 7 A & E Ann.Cas. 1108 (1906). The legislature, representing the people of this state, has retained a legitimate interest in the death penalty, and we defer to its wisdom in that regard in the absence of any express prohibition of the death penalty.

## VI

This issue raised by appellant involves the attorney-client privilege. The county and

**14.** Section 6, Art. 1, Wyoming Constitution provides: "No person shall be deprived of life, liberty or property without due process of law."

**15.** Section 13, ch. 73, Session Laws of the Territory of Wyoming 1890, provided:

"Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree and shall suffer death."

Wyoming was admitted as a state on July 10, 1890, 26 United States Statutes at Large, ch. 664, p. 222.

prosecuting attorney in Wyoming, as a public officer, is authorized to privately practice the civil law. Appellant claims that when the county and prosecuting attorney represents in his private practice a person who becomes a criminal defendant, the prosecutor's lips are sealed forever as to any and all relationships between them, whether or not it involved private or public business. We must keep the relationship as it appears in context in this case and not in the broad sweeping terms advocated by the appellant. In order to do that, some detail of the facts is essential.

James E. Phillips, the then county and prosecuting attorney, became acquainted with appellant when employed by the latter in the handling of three matters. One was a petition to the Fort Bridger Sewer District for annexation of the trailer park for sewer service, which appellant was constructing; another a divorce case; and finally an appeal to the Wyoming Supreme Court in a civil ditch case which was settled. Phillips was actually, in the latter, representing appellant's parents. Two families, the Sweats and Roitzes, complained to him as a county prosecutor about a fight they had with appellant and which they wanted him to prosecute. Appellant approached him about the same fight seeking to have the Sweat and Roitz families prosecuted. The sheriff was asked to investigate with the result that all prosecution was declined for what appeared to be an unmeritorious feud between families.

Later, the sewer board sued appellant for fees for the sewer hookup and appellant approached Phillips and requested that he represent him in the case. Phillips read the complaint, a matter of public record which was in evidence in this case, and outlined its contents for the jury. One of the counts of the complaint alleged that appellant had conducted a campaign to discredit and frighten the sewer board with some suggested "Vegas connections" to get the board to reduce its sewer hookup fees. Phillips refused to privately represent ap-

pellant because of the implications arising from the Sweat/Roitz complaints and because a conflict of interest seemed apparent because of that, some festering criminal aspects and the public status of the sewer board.

All of the foregoing events occurred before the Vehar murders. Upon that occurrence, a grand jury was convened to investigate the occurrence. Phillips was the prosecutor presenting evidence to that body. The same grand jury upon the basis of evidence presented by Phillips as prosecutor returned an indictment against Mike Hickey for the murder of Kelly Wyckhuyse. Appellant approached Phillips several times thereafter demanding that he dismiss the indictment against Hickey. During one of those occasions, appellant stepped toward Mr. Phillips' desk where he had a picture of his wife and family, handled the photograph, and indicated that it would be terrible if anything were to happen; it was a nice looking family; it would be terrible if anything happened to his wife, or his family, or with respect to his new home which was being built. Phillips became concerned.[16]

In his testimony, Phillips admitted that the threat had some influence on his later decision to drop the charges against Hickey, though Hickey's attorney had presented him with evidence, including the testimony of Jeff Green (for which appellant had arranged) that Jamey Hysell murdered the Wyckhuyse girl. In fact the trial against Hysell was underway when Jeff Green broke down and admitted that his testimony was a fabrication.

At this point in Phillips' testimony, a transcript in evidence of an in-chambers proceeding with Jeff Green was reviewed for the jury. During the course of that in-chambers proceeding Jeff Green indicated that he was under pressure by the appellant and if he testified against appellant, appellant would go to any lengths to get rid of him. Green stated that appellant had told him of other persons, including an

---

16. Out of sequence, Phillips later testified he asked the sheriff for security around his house on weekends and arranged to have his family out of town as much as possible.

FBI agent, whom he had eliminated. Jeff Green was emphatic that he believed appellant had done those things and that was why he was afraid. Phillips as prosecutor was present and observed Green make these statements.

Phillips testified from the trial transcript and his recollection that during the course of the Hysell trial Jeff Green implicated the appellant and Mike Hickey in the Vehar bombing. Jeff Green's testimony at the Hysell trial was that appellant had orchestrated Hickey's testimony and Green's testimony. Appellant even testified in the Hysell trial that Hysell had approached him to buy drugs and in order to establish his trustworthiness had told him that he had killed Kelly Wyckhuyse.

On cross-examination, Phillips testified that on one occasion he had filed a complaint against Green for bribery. Green had offered to fix up his basement if Phillips would drop some charges of burglary and receiving stolen property. On redirect, it was developed that this charge was later dropped, along with some others, as part of a written plea bargain agreement, Exh. 604, whereby Green agreed to testify in the Hysell trial and cooperate in the Vehar investigation. Green's testimony in the Hysell trial was read into evidence whereby he disclosed the details of Hickey's narrative to him of just how Hickey killed the Wyckhuyse girl and what he had done with the body. The appellant was present during these revelations. It was after these disclosures that appellant worked out all the details to shift the blame from Hickey to Hysell.

Green testified the reason appellant wanted Hysell charged was because Hysell had signed a statement that Green and appellant had tried to pick up some dynamite from Hysell and appellant wanted Hysell dead because of that knowledge. Eventually Hickey produced some dynamite for the bomb that was to be used to blow up the Mariscal car for appellant.

It seems apparent from the record that the evidence is that appellant made no attorney-client disclosures to Phillips to which Phillips testified. His testimony was entirely related to matters arising after he had terminated his attorney-client relationship with appellant and in the course of his duties as county prosecutor. Much of his testimony involved the identification and reading of documents and testimony arising out of the prosecution of Jamey Hysell.

Rule 501, W.R.E., provides:

"Except as otherwise required by constitution or statute or by these or other rules promulgated by the Supreme Court of Wyoming, the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the State of Wyoming in the light of reason and experience." [17]

The Supreme Court of Wyoming has adopted for the government of the Wyoming State Bar the Code of Professional Responsibility of the ABA. Canon 4 provides that "[a] lawyer should preserve the confidences and secrets of a client."

This same question came up in a different context during the first trial of this case. The prosecutor at that trial in his opening statement said that the evidence would show that Phillips had been threatened by appellant and would reveal the pressures brought to bear on Phillips by appellant. However, the trial judge would not permit the evidence because it was his reasoning that it fell within the attorney-client privilege. This court was somewhat quizzical about the privilege going so far that a prosecutor must be the silent victim of threats against his family and property.

We are now satisfied that an attorney is not forever within the bondage of a former client. The occasion for the threat against Phillips was not made to him in a matter in which he was an attorney for the appellant.

---

**17.** The Wyoming Permanent Rules Committee note reveals: "This is the federal rule modified to adapt it to state practice and to eliminate a reference to the 'Erie Doctrine.' *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)."

It was made to him on an occasion when he was acting as an attorney for the State of Wyoming, and appellant was aware of that because he was seeking the dismissal of murder charges against Hickey. Even if by any conceivable way it could be conjured up that an attorney-client relationship existed between appellant and Phillips at the time of the threats and demand for dismissal of the Hickey charges, there comes a time when a necessary exception comes into play. We find an acceptable doctrine in 2 Louisell and Mueller, Federal Evidence § 213, p. 578 (1978):

> " * * * Society could hardly afford to protect the confidentiality of conversations with counsel which look toward commissions of crimes or frauds; to extend the privilege so far would be to make it cost too much. Thus an important exception is made, and one which is encountered with increasing frequency in practice.
>
> "The exception comes into play when the client knowingly seeks to further a criminal or fraudulent endeavor through consultation with counsel. It is the client's knowledge alone which counts; the exception may apply, and the privilege may be denied, regardless of the attorney's understanding. In fact, since the client holds the privilege, the attorney's understanding or intent should be immaterial. As proposed-but-rejected Rule 503(d)(1) would have had it, the privilege would not apply where 'the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud.'" (Footnotes omitted).[18]

All of the statements or communications which Phillips attributed to appellant were made in the furtherance of criminal endeavor. We hold appellant's position on this issue to be completely without merit.

---

**18.** The words of Rule 501, W.R.E., "in the light of reason and experience" are not without meaning. See *Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), divesting in part an accused of the privilege to bar adverse spousal testimony in criminal cases. See in addition, *Wyatt v. United States,* 362 U.S. 525, 528, 80 S.Ct. 901, 903, 4 L.Ed.2d

## VII

The appellant asserts that reversal is required if an aggravating circumstance used as a basis for imposing the death penalty is found to be invalid. He then proceeds to cite *Zant v. Stephens,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982), in which the following sequence of events had occurred:

1. Stephens was convicted in a Georgia trial court of murder for which the death penalty was authorized.

2. In the sentencing phase, the jury found there to be three statutory aggravating circumstances and imposed the death penalty. The Georgia statute provides for the death penalty if one of the listed aggravating circumstances is present.

3. The Georgia Supreme Court set aside one of the three aggravating circumstances but affirmed the death penalty stating the rule to be that the death sentence is not impaired because in *Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (1976), it upheld the death sentence where there was present only one aggravating circumstance. The Georgia Supreme Court had applied this rule in many death cases, *Zant,* supra fn. 2, 102 S.Ct. at 1857, but had never explained its rationale.

4. The federal fifth circuit reversed a federal district court which had denied habeas corpus and set aside the death penalty. The Supreme Court granted certiorari.

5. Under a state statute the Georgia Supreme Court will decide questions of state law upon certification from the United States Supreme Court. Accordingly, the Court did certify the following question: "What are the premises of state law that support the conclusion that the death sen-

931 (1960), where a spousal privilege exception was recognized for cases in which one spouse commits a crime against another. In *Trammel,* Mr. Justice Stewart in his concurrence, fn. 1, pointed out that "[a]ny rule that impedes the discovery of truth in a court of law impedes as well the doing of justice."

tence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?" 102 S.Ct. at 1859.

We do not know at the moment what response the Georgia Supreme Court will make or what the United States Supreme Court's decision will ultimately be in that case. Appellant merely here raises a question, drops the issue, and moves on to a next issue which he refers to as "the double jeopardy argument." We do not know what that issue has to do with proof of aggravating circumstances not listed, and we will say now that we do not find that to be the case. All the facts presented are related to the statutory aggravating circumstances as a fact thereof. This will be dealt with in more detail though it has already partly crept in.

For this to be an issue which we must decide, we must hold that one or more of the aggravating circumstances have no validity in fact or in law. Our holding will eventually be that all aggravating circumstances are sustainable in fact and in law.

## VIII

By the eighth issue appellant argues that the consideration by the jury of evidence concerning the Vehar deaths and the submission to the jury of those aggravating circumstances deemed inapplicable in the first penalty hearing, violated appellant's constitutional protection against double jeopardy. The Fifth Amendment to the Constitution of the United States, amongst other proscriptions, provides " * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *." Through the Fourteenth Amendment, it is applicable to the states. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Section 11, Art. 1, Wyoming Constitution also provides " * * * nor shall any person be twice put in jeopardy for the same offense. * * * " These provisions have the same meaning and are coextensive in application. *Vigil v. State*, Wyo., 563 P.2d 1344 (1977). In *Vigil* this court noted with approval, *North Caro-*

*lina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 89 S.Ct. 2089, 23 L.Ed.2d 656 (1969), wherein it was capsulized that three protections were afforded: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense."

Appellant asks that since the State could not reprosecute appellant for the Vehar deaths since he was found guilty of those first degree homicides, and the convictions were affirmed, what conceivable purpose is served by introducing all the evidence of those homicides in the retrial of the sentencing phase. It is appellant's position that it was only necessary to establish the fact of convictions through introduction into evidence of the judgment and sentence reflecting the convictions for the murder of the three members of the Vehar family, which was done, in order to establish the statutory aggravating circumstance that "[t]he defendant was previously convicted of another murder in the first degree * *." Section 6–4–102(h)(ii), supra.

Were that to be done, the jury would not have the rest of the story. It cannot be emphasized enough that the murder of the poor little Wyckhuyse girl, as an example, had something to do with the mutilation murder of Jeff Green. The threats against the county prosecutor were part of the script of the Wyckhuyse drama which burst the bubble of mystery of who blew up the Vehar home, who was behind that, and why. We can, and probably will more than we have already done, put together all the parts of an intricate formula justifying the death penalty beyond a reasonable doubt within every restriction of a statutory scheme designed to minimize the risk of wholly arbitrary and capricious action or action in a freakish manner.

As explained in *Gregg v. Georgia*, 428 U.S. at 189, 96 S.Ct. at 2932–2933:

"It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We

have long recognized that '[f]or the determination of sentences, justice generally requires * * * that there be taken into account the circumstances of the offense together with the character and propensities of the offender.' [Citations.] Otherwise, 'the system cannot function in a consistent and a rational manner.' [Citations.] [38]" [19] (Footnote omitted.)

A significant feature of this case, perhaps different than will be seen in many instances, is that the crime of appellant for which the death penalty is sought and all of the circumstances leading up to it are part of a single bundle which lends itself to a complete picture that lays bare the character, propensities, and individual circumstances of the appellant as an offender.

The appellant claims that the submission of aggravating circumstances found not to exist in the first trial amounts to double jeopardy. At the first trial, the jury found the following statutory aggravating circumstances not applicable:

"5. The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.

"6. The murder was committed for pecuniary gain." 632 P.2d at 168.

In the second trial the jury found such circumstances to exist. The principal reason is probably because the jury was inadequately instructed in the first trial, but we need not guess any further or even at all.

In the first decision it was held that there could be a new trial on the issue of punishment under the provisions of § 6–4–102(g), W.S.1977.[20] The explanation was that:

"The guarantee against double jeopardy, secured by the Fifth Amendment to the Constitution of the United States and § 11, Article 1, Wyoming Constitution,

does not prohibit a remand to the trial court for a redetermination of sentence. *United States v. DiFrancesco*, 1980, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328. In death penalty cases the U.S. Supreme Court has authorized remanding for a resentencing hearing where the death penalty was imposed originally but because of some defect in the proceeding has been reversed on appeal. *Estelle v. Smith*, 1981, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359. Only where a judge or a jury refused to impose the death penalty in the first instance is a state barred from seeking it a second time. *Bullington v. Missouri*, 1981, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270. There can be no new penalty trial as to the Vehar murders in that the jury failed to impose the death penalty as to those crimes." 632 P.2d at 172, fn. 46.

*United States v. Ball*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), pretty much settled the proposition that a defendant who procures a conviction and judgment against him to be set aside for an error of law, may be tried anew upon the same indictment for the same offense for which he had been convicted. In *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), it was said:

"While different theories have been advanced to support the permissibility of retrial, of greater importance than the conceptual abstractions employed to explain the *Ball* principle are the implications of that principle for the sound administration of justice. Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high price indeed for society to pay were every

---

19. Footnote 38 to *Gregg* provides: "Indeed, we hold elsewhere today that in capital cases it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence." *Woodson v. North Carolina*, 428 U.S. 280, 303–305, 96 S.Ct. 2978, 2991–2992, 49 L.Ed.2d 944 (1976).

20. Section 6–4–102(g), W.S.1977, provides:
"If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment."

accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution. In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest. The underlying purpose of permitting retrial is as much furthered by application of the rule to this case as it has been in cases previously decided." 377 U.S. at 466, 84 S.Ct. at 1589.

As pointed out in *United States v. DiFrancesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), there is an exception to the allowance of a new trial. That is when a conviction is reversed because of an insufficiency of evidence. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

The Supreme Court of the United States in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), made a similar comparison to *Burks v. United States,* supra. The Missouri jury had returned a verdict of life imprisonment. The Supreme Court simply said that he could not, in the light of the sentencing procedures which have the hallmarks of a trial on guilt or innocence, be tried again with the risk of a sentence enhanced to death. *Bullington* is inapplicable in our case because the first jury did return the death sentence as to the Jeff Green murder. Two juries have now found the appellant a suitable subject for the death penalty.

█ We are unaware of any authority that, on retrial of a person following reversal, there is any restriction on the evidence that can be produced, or that a verdict of guilty cannot be found, or that all the incidents of a new trial including statutorily required findings cannot be pursued in every respect as though upon original trial,

less, of course, the errors found in the first trial. At one time the Wyoming statutes defined a new trial as "a re-examination, in the same court of an issue of fact, after a verdict by a jury * * *," § 3–3401, W.C.S. 1945, but was superseded by the Wyoming Rules of Civil Procedure, Rule 87, W.R.C.P. That is consistent with Black's Law Dictionary (5th ed. 1979). The issues of fact on retrial are the same as those in the original trial, including all the aggravating and mitigating circumstances. There is no such thing as an "acquittal" from an aggravating circumstance in the penalty phase. *Knapp v. Cardwell,* 667 F.2d 1253, 1263–1265 (9th Cir.1982).

*State v. Silhan,* 302 N.C. 223, 275 S.E.2d 450 (1981), cited by the dissent here, is a peculiar case. There, only one aggravating circumstance was submitted to the jury for consideration in the sentencing phase. The court held that particular aggravating circumstance to be improper (it was the underlying rape for felony murder), but it held that the aggravating circumstance that "[t]he capital felony was especially heinous, atrocious, or cruel" should have been the one submitted to the jury for consideration of the death penalty, because that circumstance surrounding the murder was just that. Other statutory aggravating circumstances were also suggested as appropriate. The court then remanded the case for a new sentencing hearing.

The dissent has taken from that case a discussion of double jeopardy as to aggravating circumstances which was engaged in by the court and completely unnecessary to its decision—as pure an example of dicta as can be found. It may be advisory to the lower courts of North Carolina, but it was expounded without citation of any applicable authority and apparently expressed as its own view. It is not ours.

We reversed the death penalty in *Hopkinson v. State,* supra, purely as a matter of law. The evidence is clear that Green was murdered to avoid the arrest of appellant for the Vehar murders and that it was for pecuniary gain both of which reasons were apparent in the evidence in the first trial,

which evidence was also used in the second trial. If properly instructed, the jury could have come to no other finding. We would further point out that these were the hypotheses of the prosecution upon which guilt was based and are an inseparable part of the total circumstances.

■ Nor can we avoid the statutory direction, § 6–4–102(c), W.S.1977, (quoted in Part III of this opinion but set out again as a matter of convenience) that:

> "The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible."

This applies to both the original trial and the retrial of the sentencing stage. Without the inclusion of these aggravating circumstances as factors to be considered, the second jury is deprived of the whole background necessary to its determination.

As can be expected, the only mention *State v. Silhan* has received was in the dissent of Justice Marshall, joined by Justice Brennan, in *Jones v. Florida,* —— U.S. ——, 103 S.Ct. 189, 74 L.Ed.2d 153 (1982), when certiorari was appropriately denied on the same issue in *Jones v. State,* Fla., 411 So.2d 165 (1982), *McClure v. McClure,* 363 So.2d 1334.

■ We prefer to adhere to the more traditional and accepted view expressed in *State v. Gilbert,* 277 S.C. 53, 283 S.E.2d 179 (1981), cert. denied 456 U.S. 984, 102 S.Ct. 2258, 72 L.Ed.2d 863, application to suspend effect of order denying cert. denied —— U.S. ——, 102 S.Ct. 2294, 73 L.Ed.2d 1299. In *Gilbert,* at the first trial, two aggravating circumstances were submitted to the sentencing jury, but they found only one of them to be the aggravating circumstance. On retrial, the jury found both to be aggravating circumstances. On appeal after the retrial, the court held that not to be double jeopardy on retrial of the sentencing phase only. *Gilbert* was followed in *State v. Woomer,* 277 S.C. 170, 284 S.E.2d 357 (1981) (appeal from retrial of the sentencing phase).

In a series of appeals in which the Supreme Court of Georgia ultimately affirmed the death penalty, this issue was dealt with. *Davis v. State,* 240 Ga. 763, 243 S.E.2d 12 (1978); 242 Ga. 901, 252 S.E.2d 443 (1979); 246 Ga. 432, 271 S.E.2d 828 (1980). In *Davis,* at 242 Ga. 901, 252 S.E.2d 443, the Georgia court affirmed the death sentence reached at retrial in the sentencing phase where an additional aggravating circumstance was found by the jury which in the first trial the trial judge did not submit to the jury because it was not supported by the evidence. Certiorari was denied, —— U.S. ——, 103 S.Ct. 189, 74 L.Ed.2d 153. Justice Marshall, joined by Justice Brennan, dissented citing *State v. Silhan,* supra.[21] The majority of the Supreme Court at this point apparently rejects *State v. Silhan.*

In any case, *State v. Silhan,* supra, has not found any favor except in a dissenting posture.

---

21. The double jeopardy issue was raised in Georgia in *Godfrey v. Georgia,* 248 Ga. 616, 284 S.E.2d 422 (1981). In that case a conviction for murder and the imposition of the death penalty had been affirmed by the Georgia Supreme Court, 243 Ga. 302, 253 S.E.2d 710 (1979). As to the death sentence, the United States Supreme Court reversed and remanded the case back to the Georgia Supreme Court who in turn remanded the matter for retrial of the penalty phase or the entry of a sentence of life imprisonment, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398, reh. denied 455 U.S. 1038, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1980), and 246 Ga. 359, 274 S.E.2d 339 (1980). The death penalty was again imposed on two counts (one of which was reduced to life imprisonment on appeal) and on appeal the double jeopardy issue as to aggravating circumstances was raised unsuccessfully.

## IX

Appellant again challenges § 6–4–102(h)(vii), W.S.1977, as unconstitutional. That provision is: "(h) Aggravating circumstances are limited to the following * * * (vii) The murder was especially heinous, atrocious or cruel." The entirety of § 6–4–102(h) is set out in fn. 7, ante. In this court's previous decision we attempted to comprehensively justify the constitutionality of Wyoming's death penalty statutes, as comporting primarily with the standards laid out by the United States Supreme Court in *Furman, Gregg,* and *Proffitt,* supra. 632 P.2d at 149–157. Our statutes are principally from Georgia and Florida.

We held that the particular terms "especially heinous, atrocious or cruel," isolate one type of case in which the death penalty is applicable—a murder which is consciousless or pitiless, which is unnecessarily tortuous to the victim and sets it off from the usual or ordinary murder. One of the purposes was to make the death penalty proportionate to the crime. The standards adopted direct the sentencing authority to focus on the particularized circumstances of the crime and the defendants.

Appellant relies on *People v. Superior Court of Santa Clara County,* 31 Cal.3d 797, 183 Cal.Rptr. 800, 647 P.2d 76 (1982), which considered the phrase "heinous, atrocious, or cruel" as unconstitutionally vague and violative of the due process clause. The reasoning of the California court is sophistry—a play on words.

The trial judge instructed the jury with respect to this aggravating circumstance: "One of the aggravating circumstances set forth in this case is that the murder was especially heinous, atrocious or cruel. To assist you in your evaluation of this aggravating circumstance, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included in this circumstance are those capital crimes where the actual commission of the murder was accompanied by such additional acts as to set the crime apart from the normal murder; that is, a consciousless or pityless [sic] crime which is unnecessarily tortuous to the victim."

We have early in this opinion made brief mention of the photographs of Jeff Green after the ugly, pitiless, consciousless, torture death, that clearly reflect a consciousness materially more depraved than that of any of the usual persons guilty of murder. We now particularize the testimony of the pathologist who best describes the abuse and mutilation of the body of Jeff Green before death.

Dr. Stahl had done the pathology on over a thousand murder victims in his career, including twenty-five to forty torture victims. He photographed the body of Jeff Green. As he testified, slides he had taken were projected for the benefit of the jury. There were extensive burns over the face and eyes. On his right upper forehead was a 3 × 2 centimeter bruise with some skin slippage around it, caused by a blow with a blunt instrument. On the inner part of one elbow were third degree burns. Other burns were identified as likely caused by a lighted cigarette. Other deeper burns were explained to be compatible with those done with some type of hot iron—a coat hanger, a soldering iron, a heated knife, or some object such as that.

On the left arm was a T-shaped third degree burn caused by a heated metal object. A photo identified by the doctor showed severe third degree burns in the webbing of the fingers. The top of a knuckle joint also showed a hot-iron type burn.

The right armpit had a series of burns difficult to count, which evidenced smear burns caused by the jerking and struggling of the victim. On the left arm area were not only hot iron burns, but also a rope burn, typically caused by rope tearing the skin while the victim struggles. This particular rope burn was 24 centimeters (2.54 centimeters per inch) long by 5 centimeters wide.

The left eye had multiple contact and close contact burns by a very hot object causing a scleral hemmorhage, defined by the doctor as meaning that the eye itself was touched with a hot object, bled, and, had the victim lived, the damage would have been irreversible. The right eyelid showed severe burns but the hot iron did not touch the eyeball. There was also a series of confluent third degree burns over the bridge of the nose and along both sides of the nose, a most tender spot. The forehead had multiple burns, some of which went into the hair.

On the left side of Jeff Green's neck was a 1½ centimeter bullet entry wound caused by a high-velocity, heavy caliber bullet which passed through muscles, hit a vertebra, deflected upward hitting another vertebra, severed the spinal cord, and exited on the right cheek in the tall part of the jawbone.

The doctor explained the painfulness of burns, the most painful being those of the third degree which penetrate the skin into a layer of nerves which carry pain impulses to the brain. Such burns literally cook the flesh.

As nearly as he could, the pathologist counted approximately 140 burns on the body. There were five knife cuts, three on his neck over the adams apple and two near one of his nipples.

In addition to the bruise on Jeff Green's forehead, there was one 7 × 2 centimeter, located in the right armpit, compatible with a kick by a boot, being struck by a baseball bat, or any type of blackjack. There was also a 3 × 2 centimeter bruise over the left top of his wrist and hand were joined, probably caused by the same means.

Each of the forearms had about 35 burns compatible with cigarette burns. One arm had a T-shaped 6 × 3 centimeter third degree burn. On the palm of one hand is a 1½ × 1 centimeter third degree burn. On one elbow was an oval 1 × 1 centimeter burn. The ears were burned extensively and on the back side of the right ear, a very sensitive part of the body, was a 7 × 2 centimeter burn.

The doctor estimated that it would take several hours to inflict all the burns and other torture techniques employed. He had never before had occasion to examine such an extensively tortured body. It was his further opinion that two men could not hold Jeff Green, a six foot, seven inch man, weighing 190 pounds, so the rope burns indicated he was tied to a table or chair or something else to hold him down. It was his further opinion that the progression of torture was from the least to most severe. He based this opinion from experience in cases in which he was involved and through confessions and testimony; this appeared to be the pattern administered to extract information or to punish.

This must be the "especially heinous, atrocious or cruel" murder that sets it off from the usual, the ordinary, the normal sort of homicide in the typical murder case. If not, then we cannot imagine what would be. The death penalty would be proportionate to the severity of the crime.

The appellant as a part of this ninth issue argues that the aggravating circumstance first discussed was unconstitutionally applied in that no evidence was presented to show that appellant knew or intended that Green would be tortured—that he was not a principal.[22]

---

22. The trial judge instructed the jury in the new sentencing phase:

"INSTRUCTION NO. 3A
"A principal is a person involved in the commission of a felony who directly and actively commits the act constituting the offense.
"A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, counsels, encourages, hires, commands or otherwise procures the illegal act."

The applicable statute is § 6–1–114, W.S. 1977:
"Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed an accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or in-

As in this court's first opinion, we take the position that appellant is a principal. 632 P.2d at 97–100. *Enmund v. Florida,* supra, cited by appellant is not in point as we have previously discussed. There the United States Supreme Court found that Enmund did not kill *or intend to kill,* so his culpability is different from the robbers who killed. In the case before us, the evidence is that the murder of Green was planned by appellant, he intended that it take place, he hired the killers and intended that torture and lethal force be utilized. The moral guilt and personal responsibility of one who commands another to commit murder justifies the death penalty. The evidence is overwhelming that appellant ordered the torture of Jeff Green in order to discover what he had told prosecutors, what his testimony to the grand jury would be, and with the final shot through the neck to silence him. The motive to avoid arrest for the murders of the three Vehars is present.

The circumstance that murder was committed "for the purpose of * * * preventing a lawful arrest" has been recognized. In *Riley v. State,* Fla., 366 So.2d 19 (1978), it was held that the execution-type murder of a witness to avoid identification came within the scope of a statute which is, in this regard, identical to Wyoming's statute.

The circumstance that the murder was committed for pecuniary gain has been upheld. In *Antone v. State,* Fla., 382 So.2d 1205, cert. denied 449 U.S. 913, 101 S.Ct. 287, 66 L.Ed.2d 141 (1980), the defendant was the mastermind who paid the money for the contract murder of the victim. This was murder for pecuniary gain. The defendant was something more than a mere accomplice and without him the murder would not have come to fruition. There is no one else shown to have his same interest.

It is apparent that the legislative intent was that the hired killer concept be a serious enough circumstance that it justify the death penalty and represents society's re-

vulsion with those who employ others for remuneration to do their killing, as well as those who perform the act for hire. If not chargeable against the one who initiates the arrangement, then the business will flourish and the one really responsible will escape punishment. It is inconceivable that it could be any other way.

## X

In this issue appellant urges that the trial judge should have given the following offered instruction:

"Article I, Section 6 of the Wyoming Constitution provides:

" 'No person shall be deprived of life, liberty or property without due process of law.'

"You, in deciding whether Mark Hopkinson is to be deprived of his life, are the final decision-makers. Before you make that decision, however, you must determine that Mark Hopkinson's constitutionally-guaranteed right to due process of law has been adequately protected throughout the course of these proceedings."

He argues that this instruction is necessary, given the jury's role as final arbiters of the decision regarding the sentence to be imposed, in that it is the basic right underlying the entire case and the jury must know that such deprivation of life cannot occur if a defendant's due process rights have been denied. He concedes that this is a question of law but advances the position that, since the trial judge has no discretion, this question of law must fall upon the jury.

This is a novel argument. It was said in *Orcutt v. State of Wyoming,* 308 F.2d 61, 63 (10th Cir.1962):

"It is well settled that 'a criminal prosecution in the courts of a State, based upon a law not in itself repugnant to the Federal Constitution, and conducted according to the settled course of judicial proceedings as established by the law of

formed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

In *Hopkinson v. State,* supra pp. 97–100, the role of an accessory prosecuted as a principal was treated at some length.

the State, so long as it includes notice, and a hearing, or an opportunity to be heard, before a court of competent jurisdiction, according to established modes of procedure, is "due process" in the constitutional sense.' *Frank v. Mangum,* 237 U.S. 309, 326, 35 S.Ct. 582, 586, 59 L.Ed. 969. See also *Alexander v. Daugherty,* 10 Cir., 286 F.2d 645, cert. denied 366 U.S. 939, 81 S.Ct. 1666, 6 L.Ed.2d 849; *Odell v. Hudspeth,* [189 F.2d 300, 301 (10 Cir. 1951), cert. denied 342 U.S. 873, 72 S.Ct. 116, 96 L.Ed. 656]. * * * "

■ Matters of law have traditionally fallen for decision upon the court, and matters of fact have traditionally fallen for decision upon juries. In this case the jury's domain in that regard was delineated by the trial judge by jury instruction numbered "1," which reads in pertinent part:

"The functions of the Court and jury are distinct, and each is supreme in its own domain.

"It is the exclusive province of the Court to determine admissibility of all evidence, permitting proper evidence to go to the jury and excluding from the jury improper evidence, to define the issues and to instruct you as to the law applicable to the issues.

"On the other hand, it is the exclusive province of the jury to weigh and consider all evidence which is presented to it; to determine the credibility of all witnesses who testify before you, and from such evidence and testimony, to determine the issues of fact in this case."

■ Three overseers are created to guarantee due process in a death penalty case. The legislature has detailed a considerable number of safeguarding procedures in accordance with the directions of the ultimate authority on the death penalty—the Supreme Court of the United States. The trial judge must follow those steps plus basic constitutional rights as interpreted by court decision and rules not outlined by the legislature. Then, this court is obligated to not only dispose of the issues raised by the appellant in accordance with guidelines of due process established by the Supreme Court of the United States and the legislature of the State of Wyoming in a death penalty case, but also make an independent review, as provided by § 6–4–103, W.S.1977, set out in fn. 3, ante, under the canopy of a vast array of jurisprudence, about which there is not always agreement even within the hierarchy of the judiciary and craftsmen in jurisprudence.

Courts are presumed to have some expertise in jurisprudence; and to throw that off onto a jury would be to impose a burden upon lay persons which would be unfair to the defendant, as well as the State. The position of the appellant is not well taken.

## XI

The appellant raises the question as to whether he was adequately represented by counsel at his sentencing hearing—the one now before us. At the outset we should point out that counsel who represented appellant at the sentencing hearing is the same counsel who now represents him as appellate counsel, Leonard D. Munker. Mr. Munker is the State Public Defender having under his supervision all public defenders within the State of Wyoming. He is a lawyer of vast public defender experience at the trial level.[23] He is greatly respected by this court.

---

**23.** A brief biography furnished by Mr. Munker at our request reveals:

"D.O.B. July 2, 1933, Ogden, Utah. EDUCATION: Graduate of Reno Senior High School, 1951. Attended the University of Nevada, 1952–54. Joined the U.S. Navy, 1954–58. Designated Naval Aviator, 1955. Attended the University of Kansas, 1958–60. Received a B.A. in History, 1960. Recalled in the Navy during the Cuban Missile Crisis, 1961–62. University of Kansas Law School, 1962–65. Admitted to the Kansas Bar, February 10, 1965, by examination. Admitted to the U.S. District Court for the District of Kansas, February 10, 1965. Admitted to the U.S. Court of Appeals, April 6, 1967. Admitted to the Supreme Court of the United States, December 13, 1976. Admitted to practice in Wyoming, March 21, 1979. LEGAL EXPERIENCE: Legal Editor, Shepard's Citations, 1965. Private Practice in Wichita, Kansas, November, 1965 through March, 1967. Law Clerk to The Honorable Frank G. Theis, March 1967 through September, 1969,

In the first trial appellant was represented by retained counsel; however, during the early stages of the resentencing proceedings, the retained counsel sought and obtained authority to withdraw from the representation of appellant due to the latter's indigency. Mr. Munker selected from his state-wide staff an able assistant to participate in the defense of appellant.

█ It is the posture of counsel, presented with some reluctance, that (1) he and his assistant did not have sufficient time in which to prepare; (2) they had serious disagreements concerning trial strategy; (3) a general atmosphere of anxiety and fear pervaded the trial; and (4) defense counsel in this second sentencing phase did not have the benefit of cross-examining some of the witnesses in that the transcript of their testimony was used, rather than a live appearance.

We appreciate the weight of responsibility resting on the shoulders of defense counsel in representing one charged with a capital crime—any crime for that matter—but more particularly where the ultimate punishment is at stake. We are mindful of the attorney-client relationship and the stresses that must exist when differences arise in that relationship with respect to the tactics to be employed in representation and the skills necessary in their presentation in the best possible light for the client. We are unable to detect in the transcript any serious rupture of the attorney-client bond that must necessarily exist. However, note the colloquy appearing at pages 962–976, Vol. XI of the record, which we will discuss later.

In two recent decisions this court has had occasion to set out the standard to be employed to test the adequacy of a criminal defendant's assistance of counsel. It was said in *Hoskovek v. State,* Wyo., 629 P.2d 1366, 1367 (1981):

"A criminal defendant is entitled to an 'effective' assistance of counsel. [Citations.] The standard which we have established to determine whether or not the assistance of counsel is effective is one of 'reasonableness.' Is the assistance rendered by counsel that which would reasonably be rendered by a reasonably competent attorney under the facts and circumstances of the case? If it is, it is effective. If it is not, it is ineffective. [Citations.] The burden rests upon appellant to establish the ineffectiveness of counsel's assistance inasmuch as there is a presumption that counsel is competent and that he performed his duty. [Citations.]"

Continuing on, it was further there laid out, 629 P.2d at 1368, that:

"At page 1196 of *Galbraith v. State* [Wyo., 503 P.2d 1192 (1972) ], 503 P.2d, we quoted the following from *United States v. Rubin,* 433 F.2d 442, 444 (5th Cir.1970), cert. denied 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228:

" ' "Taking a hindsight view, many convicted defendants may condemn their counsel as ineffective. But the command of the constitution is for a battle, not a victory, as Judge Goldberg pointed out for us in *Odom v. United States,* 5 Cir., 1967, 377 F.2d 853, 859. The

for the U.S. Dist. Ct. of KS. Private Practice in Wichita, Kansas, 1969–71. Chief Deputy in the Office of the Attorney General for the State of Kansas, January, 1971 through April, 1971. Appointed Municipal Judge for Wichita, Kansas, April, 1971 through April, 1973. Private Practice during this period. Appointed as the Federal Public Defender for the District of Kansas, July, 1973 through December, 1981. Senior Staff, Office of the Wyoming Attorney General, September, 1978 through January, 1979. Appointed as the Wyoming State Public Defender, January of 1982 to present. WORK EXPERIENCE: Extensive work in criminal litigation, both trials and appeals in the District of Kansas; responsibilities included both administrative and trial work before the United States District Court for the District of Kansas in Wichita, Topeka, and Kansas City, Kansas, and approximately 3500 cases were handled by this office. Appellate work for both the Kansas Supreme Court, and the Wyoming Supreme Court and the Court of Appeals for the 10th Circuit in approximately 85 to 100 cases. National Chairman of the Federal Public and Community Public Defenders, 1980–82. Committee member and lecturer in training Federal Public Defenders."

standard was articulated by Judge Wisdom in *MacKenna v. Ellis,* 5 Cir., 1960, 280 F.2d 592, 599: 'We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance.' We have never deviated from these principles. * * * " ' "

See also *Spilman v. State,* Wyo., 633 P.2d 183 (1981) to the same effect. It was added there that:

" * * * Thus, appellant must demonstrate the unreasonableness of trial counsel's actions. Seemingly, this would include a showing of some injury which a reasonable attorney's conduct would have avoided. * * * " 633 P.2d at 185.

We consider now those areas in which counsel suggests he may have been ineffective. With respect to point (1), insufficient time to prepare, the public defender was, by court order, appointed on March 15, 1982, though he had been notified of the assignment by telephone a week earlier. On March 18, 1982, counsel moved for at least a sixty-day extension to review the file and confer with the appellant. It was granted. (A number of pretrial motions had already been taken care of prior to the appointment of the public defender.) The trial was set for May 17, 1982. At the request of appellant's counsel, on April 9, 1982, the trial judge entered an order directing that appellant be transferred from the Wyoming State Penitentiary to the county jail at Cheyenne, so that he would be available for conferences with his attorney, whose headquarters are in Cheyenne.

No continuances were thereafter sought. Without a motion for continuance, it is difficult to claim inadequate time for preparation particularly in the absence of a showing of actual prejudice. *State v. Bretz,* Mont., 605 P.2d 974, 985, cert. denied 444 U.S. 1104, 100 S.Ct. 1073, 62 L.Ed.2d 791 (1979). There is nothing in the record which would indicate that, if requested, a continuance would not have been granted, nor, if granted, that the defense of appellant would have been any different than it was.

With respect to point (2), that there were conflicts between appellant and his counsel which made his representation ineffective, it is not unusual that such differences arise. Attorneys are often faced with the dilemma of satisfying a client and proceeding based upon professional judgment, which interests may not be in harmony.

After the commencement of the appellant's case, an in-chambers conference was held. (R.Vol. XI, pp. 962–976) Appellant was present. It opened with defense counsel advising the trial judge that they were there because appellant had an objection to the witnesses being called and an objection to witnesses not being called. It was then explained by appellant's counsel that for tactical reasons it would open up much of the original guilt if witnesses desired by appellant were called which counsel considered disadvantageous because of the involvement of purchased perjured testimony. If that was done, then the State could come back in rebuttal and make an even more devastating case than already present. It was further considered that by calling the type of witnesses counsel recommended—character witnesses, including appellant's mother—the scales could be tipped against the death penalty in that appellant did have some good qualities. It was disclosed that appellant had been so informed, and that counsel in their professional capacity had made those decisions.

Appellant then explained, in a lengthy, disjointed discourse, that he wanted the "whole thing" opened up again, that somewhere in the testimony there would be mitigating circumstances. He wanted that so there would be someone backing up his story if he took the stand and begged for his life. (Appellant did not testify in his own behalf.)

Counsel for defendant, in putting the foregoing before the trial judge, explained that they were not asking him to do anything or to make any ruling, nor did they want him to, but they wanted it in the

record. The prosecutor requested that the court enter into the record the court's views as to the competency of counsel because he could see the competency of counsel coming up as an issue on appeal.

Appellant then said:

" * * * I think Mr. Munker and Mr. Skaggs are probably the two best attorneys I have had through my problems, but there's no way on God's green earth that they can even read all my transcripts in 60 days, let alone get a concept of what went on here." [24]

Mr. Skaggs responded to this:

"I would like to say something on that. There was no motion for continuance. Leonard felt he was prepared. I read everything I had from collateral sources and Mr. Van Sciver. I had the jury investigation of the jury members and whatnot. But Mr. Hopkinson did not want a continuance. He did not want a continuance. He wanted to go in there and get it over with."

It is apparent that counsel for appellant were well aware of the responsibilities encompassed by the lawyer-client relationship and had advised appellant of their need for the control they must have and that it would be exercised. The control and direction of a case is well-expressed by Standard 4-5.2, ABA Standards for Criminal Justice, The Defense Function (Little, Brown and Company 2nd ed. 1980):

"(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:

"(i) what plea to enter;

"(ii) whether to waive jury trial; and

"(iii) whether to testify in his or her own behalf.

"(b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.

"(c) If a disagreement on significant matters of tactics or strategy arises between the lawyer and the client, the lawyer should make a record of the circumstances, the lawyer's advice and reasons, and the conclusion reached. The record should be made in a manner which protects the confidentiality of the lawyer-client relationship." [25]

---

[24] At a later in-chambers conference, R.Vol.XI, pp. 1009–1010, the trial judge commented:

"Mr. Hopkinson also said this morning that these were the two best lawyers he's ever had in this case, even after he quarreled with them about who to call as witnesses and who not to call. I find their judgment in that regard to be extremely wise. They would be extremely unwise to call Hap Russell or Johnny Suesata, or whatever that little fart's name was, that refused to testify last time. He would be annihilated. And to call him or Hap Russell after what I saw in the courtroom during the last trial, would indicate incompetency of counsel. It would be stupid. And for counsel to acquiesce to the defendant's desire to call them would just compound that injury. And I'm, you know, going to tell the defendant, however, and the record, but I'm going to tell it in front of him about how I fell about his counsel during this trial."

[25] It is important as a matter of convenience that the comment to the rule appearing at pages 4–67 through 4–68 with citations be incorporated into this opinion:

"*Allocation of Decision-making Power*

"As established by the history of the criminal justice process and the rights vested in an accused under the Constitution, certain basic decisions have come to belong to the client while others fall within the province of the lawyer. The requirement that the defendant personally enter a guilty plea and that it be voluntary and informed carries the implication that it is the defendant who must make the choice.[1] Similarly, the decision whether to waive a jury trial has been considered as belonging to the defendant.[2] With respect to the decision whether the defendant should testify, the lawyer 'should give his client the benefit of his advice and experience, but the ultimate decision must be made by the defendant, and the defendant alone.'[3] In making each of these decisions—whether to plead guilty, whether to waive jury trial, and whether to testify—the accused should have the full and careful advice of counsel. Although counsel should not demand that the defendant follow what counsel perceives as the desirable course, counsel is free to engage in fair persuasion and to urge the client

to follow the proffered professional advice. Ultimately, however, because of the fundamental nature of these three decisions, so crucial to the accused's fate, the accused must make the decisions.

"Some other significant decisions fall into a gray zone. The Supreme Court has indicated, for example, that on a petition for habeas corpus the federal courts should hold the petitioner to have waived a constitutional right only if it is established that the petitioner deliberately bypassed the available state procedure. The court emphasized that the waiver would be found only if the defendant made the choice.[4] The Court also has stated that the defendant would be bound by the attorney's deliberate choice of a trial strategy to forego an objection available on constitutional grounds.[5]

"*Strategy and Tactics*

"In general, however, it may be said that the power of decision in matters of trial strategy and tactics rests with the lawyer.[6] The lawyer must be allowed to determine which witnesses should be called on behalf of the defendant.[7] Similarly, the lawyer must be allowed to decide whether to object to the admission of evidence,[8] whether and how a witness should be cross-examined,[9] and whether to stipulate to certain facts.[10] Cases that have reversed convictions for failure of counsel to call certain witnesses, cross-examine, object to evidence, and the like, have been decided not on the ground that counsel should have heeded the client's wishes on such matters, but on a determination that these actions of counsel in these cases were not strategic or tactical decisions but, rather, revealed ineptitude, inexperience, lack of preparation, or unfamiliarity with basic legal principles amounting to ineffective assistance of counsel.[11]

"Many of the rights of an accused, including constitutional rights, are such that only trained experts can comprehend their full significance, and an explanation to any but the most sophisticated client would be futile. Numerous strategic and tactical decisions must be made in the course of a criminal trial, many of which are made in circumstances that do not allow extended, if any, consultation. Every experienced advocate can recall the disconcerting experience of trying to conduct the examination of a witness or follow opposing arguments or the judge's charge while the client 'plucks at the attorney's sleeve' offering gratuitous suggestions. Some decisions, especially those involving which witnesses to call and in what sequence and what should be said in argument to the jury, can be anticipated sufficiently so that counsel can ordinarily consult with the client concerning them. Because these decisions require the skill, training, and experience of the advocate, the power of decision on them

must rest with the lawyer, but that does not mean that the lawyer should completely ignore the client in making them. The lawyer should seek to maintain a cooperative relationship at all stages while maintaining the ultimate choice and responsibility for the strategic and tactical decisions in the case.

"It is also important in a jury trial for the defense lawyer to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury. Indeed, because this decision is so important as well as so similar to the defendant's decision about the charges to which to plead, the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses. For instance, in a murder prosecution, the defendant, rather than the defense attorney, should determine whether the court should be asked to submit to the jury the lesser included offense of manslaughter."

Footnotes 1 through 11 of the above quoted material provide:

"[1] See *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *Machiroda v. United States*, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927).

"[2] See *Patton v. United States*, 281 U.S. 276, 298, 50 S.Ct. 253, 258, 74 L.Ed.2d 854 (1930).

"[3] Levy, *Some Comments on the Trial of a Criminal Case*, 10 Rec.Assn.B. City N.Y. 203, 213 (1955), accord, Steinberg & Paulsen, *A Conversation with Defense Counsel on Problems of a Criminal Defense*, 7 Prac.Law. 25, 37 (May 1961).

"[4] *Fay v. Noia*, 372 U.S. 391, 438–439, 83 S.Ct. 822, 848, 9 L.Ed.2d 837 (1963).

"[5] *Henry v. Mississippi*, 379 U.S. 443, 451–452, 85 S.Ct. 564, 569, 13 L.Ed.2d 408 (1965); *Curry v. Wilson*, 405 F.2d 110 (9th Cir.1968), cert. denied, 397 U.S. 973, 90 S.Ct. 1090, 25 L.Ed.2d 268 (1970).

"[6] See *Henry v. Mississippi*, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); *Nelson v. California*, 346 F.2d 73 (9th Cir.1965), cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965).

"[7] See *Vess v. Peyton*, 352 F.2d 325 (4th Cir. 1965).

"[8] See *Hester v. United States*, 303 F.2d 47 (10th Cir.1962); *People v. Rideaux*, 61 Cal.2d 537, 393 P.2d 703, 39 Cal.Rptr. 391 (1964).

"[9] See *O'Malley v. United States*, 285 F.2d 733 (6th Cir.1961).

"[10] See *People v. Woods*, 23 Ill.2d 471, 179 N.E.2d 11 (1961).

"[11] See *Bell v. Georgia*, 554 F.2d 1360 (5th Cir.1977); *Pinnell v. Cauthron*, 540 F.2d 938 (8th Cir.1976); *United States ex rel. Rosner v. Commr., N.Y. State Dept. of Correction*, 421 F.Supp. 781 (S.D.N.Y.1976)."

As can be seen, counsel for appellant meticulously followed the appropriate standard in case control and should not be charged with incompetency on that ground.

We add to this part of the opinion consideration and disposition of appellant's pro se "Motion of Proof, For Consideration In Showing Palin [sic] Error Existed, Which Was Not Properly Shown In Briefs Or Argument." Attached to the motion is a purported transcript of conversations between Jeff Green and his attorney, as well as some other unidentified colloquy. It was filed with this court on February 3, 1983, after the regular time for filing briefs, following oral arguments, and subsequent to this court taking the appeal under advisement. While untimely, we nevertheless give it our attention.

The appellant's pro se motion alleges that the trial judge "denied a taped telephone conversation into evidence, and the subject matter of taped conversation." As we will develop in this part, neither the recorder tape nor a transcript of its content was offered into evidence, though, during the sentencing trial, it was discussed in chambers. That discussion appears verbatim at pages 787 through 799, Vol. IV of the transcript of proceedings (Vol. X of the record on appeal). Since it was not offered, the district court had no occasion to rule on its admissibility.

It is the argument of appellant that the taped conversations, if in evidence, would have discredited the testimony of James Phillips, county and prosecuting attorney, which we have heretofore considered in Part VI of this opinion; would have shown that it was Phillips and Jeff Green's counsel who wanted Green to testify against Jamey Hysell not appellant; would damage the testimony of Jeff Green in evidence by showing Green and Hickey were covering for each other; and would show the "stupidty [sic], incompentance [sic], and the mess Phillips was in, * * * why Phillips was testifying, reason for lying, personel [sic] involvement, and that he was trying to pass the 'Buck' for his own incompentance [sic]." Other similar relevance of the tape is argued by appellant.

At the in-chambers conference to which we refer, there was present the trial judge, Ford Bussart—subpoenaed to appear—who had been Jeff Green's attorney, defense counsel, and the State prosecutor. Defense counsel opened the purpose of the meeting by stating he had with him a tape and a transcript of the recording which he related had been picked up from appellant's room in Salt Lake City by appellant's mother, had been turned over by her to appellant's brother, who gave it to appellant's attorneys in the first trial in this case. From there, it was delivered to appellant's counsel in this case and placed by him in safekeeping until this occasion. Defense counsel explained its contents to show Green's fear of Hysell, not appellant, and the negotiations Green wanted his attorneys to engage in with the county attorney over prosecutions pending or threatened against Green.

The prosecutor's response with regard to the tape was that there was no proper chain of evidence, and there would be difficulty in laying foundation because it had surreptitiously been made in some way by appellant or at his instance as well as being only one of some nine such tapes. It had apparently long been known of by all counsel and investigators, for both the prosecution and defense. The prosecutor in this case advised its use by the State had been contemplated in the first case, but no foundation could be laid.

It appears that Ford Bussart did not know the conversation with Green was being recorded though he learned of it later and pointed out that those parts of it showing his telephone conversation with Green had taken place while he was in Cheyenne as a member of the State Legislature. He also observed that part of the conversation was missing, probably because one side of the tape ran out and had to be turned over. He knew nothing of any of the other conversations on the tape to which he was not a party.

After all various points of view were expressed by everyone at the chambers conference, the trial judge advised all present to work out their positions and advise him

the next morning at 8:30. Nothing further about the tape recording appears anywhere in the record. Ford Bussart was not called to testify. No other witness identified or laid any foundation for its introduction into evidence. Neither the tape nor a transcript was ever offered or appear even as identified exhibits.

We conclude that defense counsel abandoned all thoughts of use of the tape, not only because of foundational problems but also because of strategic and tactical considerations under their control and direction of the case which we have explored earlier in this part. Defense counsel made the decision not to pursue the matter any further. We cannot consider material which is not part of the record. *Burns v. State,* Wyo., 574 P.2d 422 (1978). We cannot go outside the record. *Valerio v. State,* Wyo., 429 P.2d 317, 319 (1967).

With respect to plain error, this court has recently reiterated the test to determine whether it exists:

" * * * First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced. * * * " *Bradley v. State,* Wyo., 635 P.2d 1161, 1164 (1981).

Appellant's pro se motion fails in all respects.

Regarding (3), there is nothing in the record to disclose that a general atmosphere of anxiety and fear pervaded the trial. Tempers flared in the heat of contest but that occurred in chambers, outside the presence of the jury. There is no doubt that anxiety was felt by the trial judge and counsel because of their heavy responsibilities. Appellant, as the subject, could be expected to have anxiety. One instance of a threatening phone call by an unknown person to the wife of a witness who had testified in the former trial was entered into the record, in chambers and outside the presence of the jury. She received two phone calls in the morning and no one responded when she answered. In the afternoon there was another call from a man who said, "Is your husband going to testify?" She responded, "Who is this?" The man's voice then told her, "You had better keep him home." She hung up the phone. The record was made to protect the witness. The call could not be tied to appellant. (R.Vol.XI, pp. 999–1000)

(4) In regard to counsel not having the benefit of cross-examining witnesses whose testimony from the previous trial was read into the record, it appears they were at liberty to subpoena and could have done so. (R.Vol.IX, p. 604) Record references in appellant's brief indicate that this issue pertains to the testimony of Kristi King (handling of $15,000 payment) (R.Vol.IX, pp. 597–640) and Jennifer Larchick (to obtain a picture of Jeff Green, a welder, and inquiries as to Green's whereabouts) (R.Vol.X, pp. 703–751). The cross-examination of each witness, as well as direct testimony, was read. Appellant had been confronted by these witnesses in the first trial in the light of the circumstances here. *Grable v. State,* Wyo., 649 P.2d 663, 673 (1982), citing *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). We are unable to determine how this demonstrates ineffective assistance of counsel. Appellant does not point that out. Whether to subpoena as a witness for cross-examination was a tactical choice and in all likelihood would have reopened testimony demolishing to appellant. These two witnesses provided circumstances linking appellant to the hiring of killers, furnishing a picture of Jeff Green, discussing the availability of a welder, which was a circumstance explaining the heating of hot irons to torture Jeff Green, and keeping track of Green's whereabouts for assurance that he had been destroyed.

## XII

We now concern ourselves with appellant's claim that the prosecution had used the Uinta County grand jury improperly as an investigative tool in a continuing investi-

gation of the Mark Hopkinson matter and that certain witnesses were there examined prior to the second penalty phase. The reasons given are that:

"1. Judge Troughton, a witness in the first trial, is now a district court judge for the Third Judicial District, and thus the convening authority in Uinta County.

"2. The special prosecutors, had not been properly appointed so as to enable them to appear before the Uinta County Grand Jury.

"3. There never has been a proper showing that the grand jury was properly convened or whether and when its term expires."

■ We find nothing in the record to support the proposition that Judge Troughton convened the grand jury, though he may have. There are two district judges having jurisdiction in and serving Uinta County; either could have convened that body. Other than the bare allegations and innuendos of appellant, there is nothing in the record nor any offers of proof which would indicate any impropriety relating to the convening of the Uinta County grand jury. The role of a judge regarding a grand jury, other than convening, instructing on their duties, and receiving the indictments or no true bills, is slight. Section 7–5–101, et seq., W.S.1977.

■ With respect to the appointment of special prosecutors, a resolution of the Board of County Commissioners taking that

action appears.[26] Even if material or relevant, there is no basis in fact for the allegation.

Section 7–5–206, W.S.1977, Cum.Supp. 1982, gives broad powers of investigation through the grand jury:

"The district attorney, or the deputy or assistant district attorney, shall be allowed at all times to appear before the grand jury for the purpose of giving information relative to any matter cognizable by them, or giving them advice upon any legal matter when they may require it; and he may be permitted to interrogate witnesses before them when they or he shall deem it necessary; but no such attorney, nor any other person shall be permitted to be present during the expression of their views or the giving of their votes on any matter before them."

The grand jury is an ancient and honored institution which originally stood between the people and the crown to prevent oppressive prosecution through the power of the crown and the right to have one's peers determine who should be brought to trial. *United States v. Olmstead,* 7 F.2d 756 (D.C. W.D.Wash.1925). When this country was formed, it became an informing and accusing tribunal, designed not only as a means of protecting citizens against unfounded prosecutions but to bring to trial persons accused of public offenses upon just grounds. *Ex Parte Bain,* 121 U.S. 1, 10–12, 7 S.Ct. 781, 786–787, 30 L.Ed. 849 (1887);

26. The resolution of the Board of County Commissioners appointing the special prosecutors, adopted May 18, 1982, reads:

"WHEREAS, on December 1, 1978, the law firm of Spence, Moriarity and Schuster was appointed by District Court Judge C. Stuart Brown to act as special prosecutors in the matter of the State of Wyoming vs. Mark Allan [Allen] Hopkinson; and

"WHEREAS, the law firm of Spence, Moriarity and Schuster has acted in that capacity ever since that appointment and have gained special and unique knowledge about that matter; and

"WHEREAS, the Wyoming Supreme Court ordered a retrial of the death penalty phase of the State of Wyoming vs. Mark Allan [Allen] Hopkinson which requires the special and unique knowledge obtained by the firm

of Spence, Moriarity and Schuster making it necessary for their continued employment.

"NOW, THEREFORE, BE IT RESOLVED by the Board of County Commissioners of Uinta County, Wyoming, that:

"1. The law firm of Spence, Moriarity and Schuster is hereby appointed and employed to act as special prosecutors on behalf of Uinta County in the matter of the [S]tate of Wyoming vs. Mark Allan [Allen] Hopkinson.

"2. That Uinta County does hereby reaffirm the original appointment by District Court Judge C. Stuart Brown of the law firm of Spence, Moriarity and Schuster by and through one of its partners, Edward Moriarity, to act as special prosecutor in all matters involving the case of the State of Wyoming vs. Mark Allen Hopkinson."

*Maley v. District Court of Woodbury County,* 221 Iowa 732, 266 N.W. 815 (1936) (overruled on unrelated grounds, 2 N.W.2d 741, 744).

▮ The investigative power of the grand jury must necessarily be broad if its public responsibility is to be adequately discharged. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). The role of the grand jury is an important instrument of effective law enforcement and necessarily includes investigatory functions which can be triggered by all manner of means. *Branzburg v. Hayes,* 408 U.S. 665, 700–701, 92 S.Ct. 2646, 2666–2667, 33 L.Ed.2d 626 (1972).

For many witnesses the grand jury room engenders an atmosphere conducive to truth telling. Being brought before neighbors and fellow citizens and placed under a solemn oath to tell the truth seems to obligate many witnesses to do just that where they may not have done so in less solemn surroundings. *United States v. Washington,* 431 U.S. 181, 188–189, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977).[27] The prosecutor has a no more effective tool than the grand jury for the witness unwilling to discuss what he knows with an investigator, without the power of subpoena and the oath. The secrecy of the proceeding is a relief for reluctant witnesses, many of whom provide only leads.

▮ We hold that a continuing grand jury investigation even after investigation of an indictment is proper. We consider it the right of the prosecuting attorney to "interrogate witnesses before them when they or he shall deem it necessary," § 7–5–206, supra. The oath of the foreman and jurors, §§ 7–5–203 and 7–5–204, W.S. 1977[28] implies as much. The charge by the judge, § 7–5–205, W.S.1977[29], along with the prevailing jurisprudence pertaining to the grand jury function, goes far to authorize continuing investigations. An investigation does not end until the State rests at the end of all the evidence. The State has every right to interrogate witnesses on subjects relevant to a continuing grand jury investigation even when the evidence received may also relate to a pending indictment. *United States v. Braasch,* 505 F.2d 139 (7th Cir.1974), cert. denied 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975). We gather from the record that grand jury investigation is still underway as to those who carried out appellant's orders to torture and kill.

27. For more on the function of the grand jury, see 1 Hastings Const.Law Quarterly 63, Grand Juries, Grand Jurors and the Constitution (1974); 14 Idaho L.Rev. 545, The American Bar Association's Grand Jury Principles: A Critique from a Federal Criminal Justice Perspective (1978); 10 Am.Crim.L.Rev. 671, A Symposium: The Grand Jury (1972).

28. Section 7–5–203, W.S.1977, provides:
"When the foreman shall be appointed, an oath or affirmation shall be administered to him in the following words: 'You, as foreman of this grand inquest, do solemnly swear (or affirm) that you will diligently inquire and true presentment make all of such matters and things as shall be given you in charge, or otherwise come to your knowledge touching the present service. The counsel of the state, your own and your fellows you shall keep secret, unless called on in a court of justice to make disclosures. You shall present no person through malice, hatred or ill will, nor shall you leave any person unpresented through fear, favor or affection, or for any reward or hope thereof; but in all your presentments you shall present the truth, the whole truth and nothing but the truth, according to the best of your skill and understanding.'"
Section 7–5–204, W.S.1977, provides:
"Thereupon the following oath (or affirmation) shall be administered to the other grand jurors: 'The same oath which A.B., your foreman, hath now taken before you on his part, you and each of you shall well and truly observe and keep on your respective parts.'"

29. Section 7–5–205, W.S.1977, provides:
"The grand jury after being sworn, shall be charged as to their duty by the judge, who shall call their attention particularly to the obligation of secrecy which their oaths impose, and to such offenses as he is by law required to specially charge. After the charge of the court, the grand jury shall retire with the officer appointed to attend to them, and shall proceed to inquire of, and present all offenses whatever committed within the limits of the county in and for which they were impaneled and sworn or affirmed."

## XIII

In this question to the court, appellant claims that § 6–4–103, supra fn. 3, abrogates the plain error rule of appellate review. Rule 7.05, W.R.A.P., declares that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Rule 49(b), W.R.Cr.P., is the same.

■ For there to be plain error, there must be: (1) a clear record of what happened at the hearing; (2) a clear and unequivocal rule of law shown to exist; and (3) the facts of the case must clearly and obviously transgress the rule of law. Once this three-part test is satisfied, it still must be shown that a substantial right of the accused has been adversely affected. These criteria apply even when a constitutional question is involved. *Mason v. State*, Wyo., 631 P.2d 1051 (1981); *Bradley v. State*, Wyo., 635 P.2d 1161 (1981).

Not having in this opinion found error which could be denominated plain, or any other sort of error, we need not consider this issue, though we consider it a part of our review function in a death case to find plain error if it exists.

## XIV

The appellant claims that a jury is not properly involved in resentencing in a death penalty case. Section 6–4–103(e), W.S.1977, provides that upon review, this court "may":

"(i) Affirm the sentence of death;

"(ii) Set the sentence aside and impose a sentence of life imprisonment; or

"(iii) Set the sentence aside and remand the case for resentencing by the trial judge based on the record and argument of counsel."

Section 6–4–102(a), W.S.1977, provides that upon conviction for murder in the first degree a sentencing hearing to determine life imprisonment or death shall be conducted by the judge alone if:

"(i) The defendant was convicted by a judge sitting without a jury;

"(ii) The defendant has pled guilty; or

"(iii) The defendant waives a jury with respect to the sentence."

None of these conditions exist.

We consider that when this court in the first appeal remanded to the trial court for a new resentencing trial, we were restoring the case to the status described in § 6–4–102(a). There was a conviction, and now there must be a sentencing trial. There could be no resentencing trial before the same jury that tried the guilt issue. Section 6–4–102(b) provides for a new sentencing trial "with a new jury impaneled for that purpose." It would not be very sensible to hold the first jury until the disposition of all appeals, so there was cause to dismiss the first jury.

■ We find nowhere in the record that the appellant ever exercised his right to waive a jury in the resentencing phase. A reading of the statutes makes it clear that the sentencing trial must be before a jury unless waived.

■ We gather from *Gregg* that trial of the sentencing phase before a jury is the most desirable of all methodologies because the jury is "a significant and reliable objective index of contemporary values because it is so directly involved. [Citations.] The Court has said that 'one of the most important functions any jury can perform in making * * * a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system.' * * *" 428 U.S. at 181, 96 S.Ct. at 2929. Then, again, in *Gregg*, this important consideration is mentioned, 428 U.S. at 190, 96 S.Ct. at 2933. In *Proffitt* it is pointed out, however, that it has never been suggested that jury sentencing is constitutionally required and that there are some advantages to judge sentencing because of his experience in that field. 428 U.S. at 252, 96 S.Ct. at 2966. We view the legislative choice in Wyoming to be that the right to a trial by jury in

Wyoming shall remain inviolate,[30] unless the defendant shall waive it or one of the other conditions set out in § 6–4–102(a), supra, exist, but we hesitate to finally decide as to the other conditions until actually confronted with the issue in a proper case. It appears that the sentencing phase in capital cases has become comparable because of constitutional implication in many respects to the guilt versus innocence phase. A serious constitutional question might arise if we were to direct a trial without a jury in the absence of the appellant's consent. The death sentence is unlike any other punishment. We are saved that risk by what we consider to be a clear statutory direction that the sentencing phase requires trial by jury unless waived when the guilt phase was tried by jury. We hold a jury trial on the retrial of the penalty phase was proper in this case.

### XV

 In addition to the issues raised by appellant, we have the obligation in our review of the death sentence to determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 6–4–103(d)(i), supra fn. 3. The appellant in connection with his eleventh issue complained of a general atmosphere of anxiety and fear created by the prosecution's theatrics during the presentation of the case. It was added that:

"* * * The courtroom was turned into an armed camp by the presence of a bodyguard and an exaggerated security force, and the wearing of bullet-proof vests by members of the prosecution team. * * * Nevertheless, the theatrics of a circus were present throughout the hearing; there is little doubt that counsel was faced with an unfavorable atmosphere for purposes of trying a case that attracted the attention of the media, the entire state and the community where it was tried."

None of this is anywhere shown in the record. Our examination shows the trial to have been carried on in an extremely low key. This court cannot consider any matter upon which the record is silent. *Mountain Fuel Supply Company v. Emerson,* Wyo., 578 P.2d 1351, 1354 (1978); *Johnson v. State,* Wyo., 562 P.2d 1294, 1298 (1977); *Moss v. State,* Wyo., 492 P.2d 1329 (1972); *Elmer v. State,* Wyo., 466 P.2d 375, 376, cert. denied 400 U.S. 845, 91 S.Ct. 90, 27 L.Ed.2d 82 (1970).

The jury was specifically instructed that it was to perform its duty uninfluenced by "passion or prejudice for or against any of the litigants in this case, or by public opinion or public feeling." (Instruction No. 1, R.Vol. V, p. 687) The jury was sequestered during the entire trial. On the standard questionnaire required to be completed and returned to this court by the trial judge in death cases, one of the questions is, "[w]as there any evidence that the jury was influenced by passion, prejudice, or any other arbitrary factor when imposing sentence?" The answer of the trial judge, in the blank provided, was "[No]." We thus have an additional source of information. In the absence of any showing to the contrary, we have this safeguard of the view of the presiding judge which we must assume is correct. There was not the slightest hint of any outside pressure or the presence in the courtroom of distracting and influential elements such as in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, reh. denied 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).

We note that the voir dire of the jury in the selection process does not appear in the record. We must, therefore, assume that the appellant was satisfied that a fair and impartial jury sat on the case. We further notice that all witnesses were excluded from the courtroom. No juror misconduct

---

**30.** Section 9, Art. 1, Wyoming Constitution provides: "The right of trial by jury shall re-

main inviolate in criminal cases. * * * "

or jury irregularity appears anywhere in the record.

The jury went out at 5:20 p.m. on Wednesday, May 26, 1982, and returned at 9:00 p.m. on Thursday, May 27, 1982; thus the verdict was not considered and returned in haste; no deadlock was reported.

We will consider under a separate heading the adequacy of the evidence to support the aggravating circumstances as well as consider where there was a basis for the findings of the jury that there were no mitigating factors which outweighed the aggravating factors. It is within the evidence and the jury's verdict that passion and prejudice are sometimes revealed. If not supported by the evidence, then there is the possibility of passion and prejudice; but that does not exist here, as will be seen from the review of the evidence.

■ There were no television cameras or other photography taking place in the courtroom. There is no showing of pretrial publicity in any way affecting the outcome of the trial. *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). We are unable to conclude that the defendant did not receive a fair trial before an impartial jury. There was nothing about the setting in which the trial was conducted that was inherently prejudicial or susceptible of any inference of passion, prejudice, or any other arbitrary factor.

## XVI

By § 6–4–103(d)(ii), W.S.1977, we must determine if "[t]he evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–54.2 [§ 6–4–102] and a lack of sufficient mitigating circumstances which outweigh the aggravating circumstances." We have already favorably considered in Part II of this opinion the sufficiency of the evidence to sustain three of the five aggravating circumstances found by the jury in its verdict, fn. 7 ante:

"3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

Yes_X_ No___

"4. The murder was committed for pecuniary gain.

Yes_X_ No___

"5. The murder was especially heinous, atrocious or cruel.

Yes_X_ No___

The evidence fully supported these aggravating factors.

There is no question, as found by the jury, that "1. The murder was committed by a person under sentence of imprisonment. Yes_X_ No___." The appellant was, at the time of Green's murder, in a federal penitentiary at Lompoc, California, for federal parole violation and charges relating to transportation and possession of explosives.

There is further no question but that "[t]he defendant was previously convicted of another murder in the first degree. Yes X_ No___." The previous "murder" was actually three murders, Vincent, Beverly, and John Vehar by blowing up their residence while they were sleeping. Appellant was convicted in the first trial in the guilt phase of this case.

■ All aggravating circumstances are measured as to the sufficiency of the evidence beyond a reasonable doubt according to the standard set by *Jackson v. Virginia,* supra, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. We hold that, within this standard, there is no reasonable doubt that all five of the aggravating circumstances were proven.

■ With respect to the mitigating circumstances not found to exist by the jury, the evidence is most clear in that regard. These can best be summarized in the same manner as the prosecutor did in his closing argument, where he took each of the mitigating circumstances which the district judge had incorporated into his Instruction

No. 5 [31] and went through each one by one to show they were not present.

"1. The defendant has no significant history of prior criminal activity." The appellant had an uncontradicted, significant history of prior criminal activity. While appellant had minor scrapes with the law as a youth—stole some guns while in high school and was placed on probation—his first major conviction was in the United States District Court for the District of New Hampshire where, following trial upon a plea of not guilty, he was found guilty of possession of 286,984 grams of marijuana with intent to distribute and with conspiracy to smuggle that amount of marijuana from Mexico for which, on May 14, 1973, he received two concurrent five-year sentences, which were later modified. After serving some time in confinement, he was paroled. While on parole he was charged with and found guilty in the United States District Court for Wyoming of six criminal counts: interstate commerce of a destructive device; two counts of possession of a firearm after felony conviction; making a firearm; receiving, concealing and storing explosives; conspiring, confederating, and agreeing to commit an offense against the United States. He was sentenced on March 16, 1979, to serve five ten-year concurrent sentences and one five-year concurrent sentence for such violations. He was then, of course, convicted of the four murders connected with this case.

"2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." The appellant put in no evidence on this

matter, it was not argued as present, nor does the record disclose the presence of such circumstance.

"3. The victim was a participant in the defendant's conduct, or consented to the act." It is inconceivable that any man would consent to the torture inflicted on the victim, Jeff Green, nor would the victim participate in his own murder, as here.

"4. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor." The role of appellant was major. He was mastermind, the manipulator, the arranger, and director of the torture-murder of Jeff Green. He arranged for the actual killers and their payment. Without him, the torture-murder of Jeff Green would never have come about. He had the motive to do so, in that Jeff Green was knowledgeable of the triple Vehar murder and appellant's involvement in the planning and directing of those homicides.

"5. The defendant acted under extreme duress or under the substantial domination of another person." The appellant was not under the domination of anyone but himself. He did it for his own benefit, in an attempt to avoid indictment for the murder of the Vehars.

"6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." There is no evidence whatsoever in the record to support any such a mitigating circumstance, nor has the appellant ever contended that

---

31. In trial practice in the State of Wyoming, instructions to the jury are read just prior to closing arguments. Instruction No. 5, as to mitigating circumstances, was:

"* * *

"The other circumstances are called 'mitigating circumstances.' They are as follows:
"1. The defendant has no significant history of prior criminal activity.
"2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
"3. The victim was a participant in the defendant's conduct, or consented to the act.

"4. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.
"5. The defendant acted under extreme duress or under the substantial domination of another person.
"6. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
"7. The age of the defendant at the time of the crime.
"8. Any other circumstances deemed to be mitigating."

he lacked the mental capacity to know right from wrong.

"7. The age of the defendant at the time of the crime." Appellant was an adult, born in October 1949. He knew what he was about and planned what he did.

From the verdict form, we see that the jury in handwriting noted as a mitigating circumstance number 8, "[t]he torture of Jeff Green may not have been ordered by Mark Hopkinson," but then indicated that it was not a mitigating circumstance by checking the answer blank "No." This would go with mitigating circumstance number 4 as to appellant's role as an accomplice. The evidence does not support any conclusion but that the torture was at appellant's direction.

As a final mitigating circumstance, the jury noted in handwriting that "9. Actions of Mark Hopkinson helped save the life of a prison guard." The jury checked the blank "Yes," indicating that it was a plus mitigating circumstance in appellant's favor. The details of this event are that a prison guard was standing watch on a dangerous death row prisoner while the latter was starting to shower. The guard apparently became inattentive and, before he knew it, the prisoner had a homemade knife—a spoon sharpened down—at his throat and a piece of heavy gauge wire poking into his side. Appellant told the attacking prisoner, "You haven't got a chance of escaping out of here." The prisoner thereupon locked the guard in appellant's cell. Appellant, at the guard's direction, threw a towel over the camera watching the area in order to attract the attention of the shift commander. Ten or twelve guards showed up. Appellant told the other prisoner to give him the weapons, which he did. Appellant turned them over to the guard. It was the guard's opinion that appellant saved his life.

Apparently the jury could not see this as a mitigating circumstance which could possibly outweigh the several compelling aggravating circumstances. It is important that the jury introduced this element into the balancing process and thus carried out the controlling legislative and judicial mandates in that regard.

We can find no reason to disagree with the jury in its ultimate verdict that sufficient mitigating circumstances do not exist to outweigh the aggravating circumstances found to exist and its recommendation that the appellant be sentenced to death.

## XVII

█ Finally, as a part of the examination of the record in application of the proportionality test prescribed by *Gregg, Proffitt* and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, reh. denied 429 U.S. 875, 97 S.Ct. 197, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976), under the provisions of § 6–4–103(d)(iii) and (e), W.S.1977, we must " * * * determine if * * * [t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." In doing so we must "include in its [our] decision a reference to those similar cases which it [we] took into consideration."

Since the passage of this statute, there have been no other similar cases in this state. The last death sentence imposed by a court of Wyoming and carried out was in 1965, *Pixley v. State,* Wyo., 406 P.2d 662 (1965). Pixley was prosecuted for murder in the first degree under § 6–54, W.S.1957. The penalty was death unless the jury qualified their verdict by adding "without capital punishment." None of the complexities surrounding the reaching of the death sentence then existed as are now present. While not then appearing in any statute, this court declared that the legislature had left it to jury decision whether in a particular case a "horrible, cruel, heinous" crime was deserving of the extreme penalty. While all the details of the offense do not appear in the opinion, the scant information appearing disclosed that the defendant raped and murdered two girls of tender years. Comparing the circumstances of the case before us to that, we would consider them equally "heinous, atrocious or cruel." In *State v. Brown,* 60 Wyo. 379, 151 P.2d 950 (1944), the defendant was sentenced to death for the murder of a seventy-year-old

woman by striking her on the head, accompanied by a rape. Her body was found on the grave of a dog. Again, this was not a case controlled by the proscriptions of the modern rule.

Following *Furman v. Georgia*, supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the legislature of Wyoming enacted a death penalty statute which it considered to be within the directions of that case. Section 6–54, W.S.1957, Cum.Supp.1975 (§ 1, ch. 136, Session Laws of Wyoming 1973).[32] It was held unconstitutional and the death penalty set aside in *Kennedy v. State,* Wyo., 559 P.2d 1014 (1977). The published case report does not relate any of the specific details of the murder in that case, but by reference to the files of this court, the facts are revealed. Amy, age 11, and Rebecca, age 18, sisters, were kidnapped at knife-point from a parking lot at Casper. They were choked, held down by force, and driven to the vicinity of a bridge crossing a deep canyon near what is known as Alcova Lake. Amy was thrown off the bridge landing with such force on a rock far below that the cervical spinal axis was driven through the skull into the brain. She was then washed into the stream and found in 30 feet of water the next day. Rebecca was raped by both defendants and then also thrown off the bridge. She, however, struck the side of the canyon which broke her fall, ended up in the water, and was able, in spite of a broken pelvis and hip, to pull herself part way up the canyon wall where she was found the next day. The little girl was killed and an attempt made to kill the older girl to prevent detection of the defendants. Under the provisions of

---

**32.** Section 6–54, W.S.1957, Cum.Supp.1975, provided:

"(a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kills any human being, is guilty of murder in the first degree.

"(b) Upon conviction of murder in the first degree, a mandatory sentence of death in the manner provided by law shall be imposed if the trier of fact finds the offense involves the following course of conduct:

"(i) Murder of any peace officer, corrections employee or fireman acting in the line of duty;

"(ii) A murder committed for profit or reward of any kind by a defendant after being hired by any person, or the employment or inducement of another to commit murder;

"(iii) Intentional murder by the unlawful and malicious use or detonation of any explosive;

"(iv) Murder committed by a person who had previously been convicted of murder in the first or second degree;

"(v) Murder committed by a defendant while under the sentence of life imprisonment;

"(vi) Murder committed in the perpetration of or attempt to perpetrate a rape where the defendant had previously been convicted of rape; murder committed in the perpetration of or attempt to perpetrate arson where the defendant had previously been convicted of arson; murder committed in the perpetration of or attempt to perpetrate a robbery where the defendant had previously been convicted of a robbery; murder committed in the perpetration of or attempt to perpetrate a burglary where the defendant had previously been convicted of a burglary;

"(vii) Murder of any person perpetrated in the course of a kidnapping;

"(viii) Murder in the course of the hijacking of a commercial airplane, train, bus, boat or other commercial vehicle;

"(ix) Murder committed by a defendant to conceal his identity or to conceal the fact of the commission of a crime, or to suppress evidence;

"(x) Murder of two or more persons in one series of related events.

"(c) In courses of conduct described in paragraphs (iv), (v) and (vi) above, the determination of prior conviction shall be made by the jury after the jury has returned its verdict of conviction.

"(d) The judgment of conviction and sentence of death shall be subject to automatic review by the supreme court of Wyoming. Such review shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the supreme court.

"(e) Upon conviction of murder in the first degree, if the offense does not involve a course of conduct as described in subsection (b) of this section, the person convicted shall be sentenced to imprisonment for life.

"(f) All offenses committed and all prosecutions commenced under the law providing for first degree murder in force prior to the effective date of this act shall remain punishable and be prosecuted as provided by that act, and to that extent that act remains in full force and effect; and this act shall not affect any rights or liabilities accrued, penalties incurred or proceedings begun prior to the effective date of this act."

the then-existing law, first degree murder committed in the course of a kidnapping and first degree murder to conceal identity, to conceal the fact of commission of a crime or to suppress evidence were considered "a course of conduct" justifying the death penalty. The jury recommended the death penalty. On appeal, the facts and circumstances of the murder were not contested— only the constitutionality of the death penalty. The torture-killing, in the case now before us, was at least as horrendous as the murder of Amy, terrible as that was.

Another first degree murder case, tried under the same law as that under which the *Kennedy* case was prosecuted, was *Cloman v. State,* Wyo., 574 P.2d 410 (1978), in which the jury recommended the death penalty for first degree murder. The case report relates the details of the murder. The two defendants entered the home of the Witts. They complained of the bitter cold outside, their car had broken down, and they had walked several miles. They persuaded Mr. Witt to take them into Cheyenne, some twelve miles away. Mr. Witt picked a friend, Mr. Davis, to go along on the ill-fated journey. Their bodies were found after an extensive search. Each body bore as many as a dozen stab wounds, several of which in each body were testified to by the examining pathologist as sufficient to cause death in that they were of both lungs, accompanied by severe intra-pulmonary hemorrhage.

The jury in the Cloman case found aggravating conduct of murder of any person perpetrated in the course of a kidnapping and murder of two or more persons in one series of related events. This court sustained the verdict of guilty of premeditated murder (there were other questions of felony murder), but again set aside the death penalty, as unconstitutionally imposed, citing *Kennedy v. State,* supra.

It is difficult to compare *Kennedy* and *Cloman* because the death penalty was mandatory if the aggravating circumstances were present, so jury discretion was out of the picture. The cases can only be compared as to circumstances in which a jury was willing to and did return a verdict of the death penalty.

The decisions from the courts of other states, from whence came the legislation under consideration, are very persuasive when applying statutes which are identical or very similar to those enacted by our own legislature. *Woodward v. Haney,* Wyo., 564 P.2d 844 (1977). However, comparing this case to cases in Florida and Georgia—states with statutes upon which ours is modeled— we find that the sentence here is not excessive. The Florida cases which have been cited approvingly by the Supreme Court include:

" * * * *Hallman v. State,* 305 So.2d 180 (1974) (victim's throat slit with broken bottle); *Spinkellink v. State,* 313 So.2d 666 (1975) ('career criminal' shot sleeping traveling companion); *Gardner v. State,* 313 So.2d 675 (1975) (brutal beating and murder); *Alvord v. State,* 322 So.2d 533 (1975) (three women killed by strangulation, one raped); *Douglas v. State,* 328 So.2d 18 (1976) (depraved murder); *Henry v. State,* 328 So.2d 430 (1976) (torture murder); *Dobbert v. State,* 328 So.2d 433 (1976) (torture and killing of two children). * * * " *Proffitt v. Florida,* supra, 428 U.S. at 255, 96 S.Ct. at 2968, fn. 12.

The Georgia cases cited approvingly in *Godfrey v. Georgia,* 446 U.S. 420, 432, 100 S.Ct. 1759, 1766, 64 L.Ed.2d 398, reh. denied 455 U.S. 1038, 102 S.Ct. 2286, 73 L.Ed.2d 1296 (1980), fn. 14, include: *Thomas v. State,* 240 Ga. 393, 242 S.E.2d 1, reh. denied 438 U.S. 908, 98 S.Ct. 3129, 57 L.Ed.2d 1151 (1977) (victim was decoyed and robbed at gunpoint, then struck on the head with a hammer, shot with a pistol, jabbed with the cutting point of a shovel, and buried alive while pleading for his life); *Stanley v. State,* 240 Ga. 341, 241 S.E.2d 173, cert. denied 439 U.S. 882, 99 S.Ct. 218, 58 L.Ed.2d 194 (1977) (Thomas' accomplice in preceding case); *Dix v. State,* 238 Ga. 209, 232 S.E.2d 47 (1977) (defendant's former wife was deliberately and methodically tortured by being cut and carved as well as strangled before being killed); *Birt v. State,* 236 Ga. 815, 225 S.E.2d 248 (1976) (defendant hired

to burglarize house of victims who were tortured by repeated strangulation and burned with cigarette lighters); *McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974), cert. denied 428 U.S. 910, 96 S.Ct. 3223, 49 L.Ed.2d 1218, reh. denied 429 U.S. 873, 97 S.Ct. 190, 50 L.Ed.2d 154 (1976) (seventeen-year-old victim's genitals were burned and cut, she was then raped and strangled, and finally defendant grabbed her head and twisted it in order to break her neck).

 We thus conclude that when comparing the murder in this case to the murders in other cases where the death penalty has been imposed, it is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. This was not the ordinary murder.

We find no circumstances in the record which indicate that "[t]he sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor."

Section 6–4–103(d)(i), W.S.1977. We find no reason at all to reverse the death penalty on any score. In conclusion, after thoroughly examining the record, we have determined that the appellant received a fair trial on the penalty phase in every respect.

Affirmed with directions to the judge of the district court pronouncing the sentence of death to fix a new date therefor and for the taking of all necessary steps in connection therewith pursuant to the provisions of § 7–13–901 et seq., W.S.1977. We provide, however, that the execution shall be stayed pending an opportunity to timely seek certiorari to the Supreme Court of the United States.

ROSE, Justice, dissenting.

In his second sentencing hearing,[1] Mark Hopkinson was sentenced to death under Wyoming's capital-punishment statutes, the pertinent controversial parts of which are contained in § 6–4–102, W.S.1977.[2] Many of the errors that were committed in the

---

1. See our opinion in *Hopkinson v. State,* Wyo., 632 P.2d 79 (1981).

2. Section 6–4–102, W.S.1977, provides in relevant part:

 "Presentence hearing for murder in the first degree; mitigating and aggravating circumstances.

 \* \* \* \* \* \*

 "(b) In all other cases [excepting only those in which the judge presides over the guilt phase of the proceeding] the sentencing hearing shall [after conviction] be conducted before the jury which determined the defendant's guilt or, if the judge for good cause shown discharges that jury, with a new jury impaneled for that purpose.

 "(c) The judge or jury shall hear evidence as to any matter that the court deems relevant to a determination of the sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (h) and (j) of this section. Any evidence which the court deems to have probative value may be received regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements, and provided further that only such evidence in aggravation as the state has made known to the defendant or his counsel prior to his trial shall be admissible.

 "(d) Upon conclusion of the evidence and arguments the judge shall give the jury appropriate instructions, including instructions as to any aggravating or mitigating circumstances, as defined in subsections (h) and (j) of this section, or proceed as provided by paragraph (ii) of this subsection:

 "(i) After hearing all the evidence, the jury shall deliberate and render a recommendation of sentence to the judge, based upon the following:

 "(A) Whether one (1) or more sufficient aggravating circumstances exist as set forth in subsection (h) of this section;

 "(B) Whether sufficient mitigating circumstances exist as set forth in subsection (j) of this section which outweigh the aggravating circumstances found to exist; and

 "(C) Based upon these considerations, whether the defendant should be sentenced to death or life imprisonment.

 \* \* \* \* \* \*

 "(e) The death penalty shall not be imposed unless at least one (1) of the aggravating circumstances set forth in subsection (h) of this section is found. The jury, if its verdict is a recommendation of death, shall designate in writing signed by the foremen of the jury the aggravating circumstances or circumstances which it found beyond a reasonable doubt. \* \* \* If the jury cannot, within a reasonable time, agree on the punishment to be imposed, the judge shall impose a life sentence.

 "(f) Unless the jury trying the case recommends the death sentence in its verdict, the judge shall not sentence the defendant to

first sentencing proceeding have been made again.[3]

Among his various other contentions, Hopkinson argues, and I agree, that his sentence to death should be reversed by this court for the following reasons:

The admission into evidence of nonstatutory aggravating circumstances or aggravating circumstances not supported by the evidence violated appellant's rights to due process of law, thus rendering § 6–4–102(h)(vii), W.S.1977 unconstitutional as applied;

The submission to the jury of those aggravating circumstances deemed inapplicable in the first penalty hearing violated appellant's constitutional protection against double jeopardy;

The death-penalty provisions of the statutes of the state of Wyoming violate Art. 1, § 15 of the Wyoming Constitution.

It is essential to the consideration of my dissenting position in this appeal that these factors be remembered:

*First,* in the second death-penalty trial, the following aggravating circumstances were offered for jury consideration, and the following answers were returned:

"1. The murder was committed by a person under sentence of imprisonment.

Yes _X_ No___

"2. The defendant was previously convicted of another murder in the first degree.

Yes _X_ No___

"3. The murder was committed for the purpose of avoiding or preventing a lawful arrest.

Yes _X_ No___

"4. The murder was committed for pecuniary gain.

Yes _X_ No___

"5. The murder was especially heinous, atrocious or cruel.

Yes _X_ No___ "

In the first sentencing hearing, the jury was permitted to consider aggravating cir-

death but shall sentence the defendant to life imprisonment as provided by law. Where a recommendation of death is made, the court shall sentence the defendant to death.

"(g) If the trial court is reversed on appeal because of error only in the presentence hearing, the new trial which may be ordered shall apply only to the issue of punishment.

"(h) Aggravating circumstances are limited to the following:

"(i) The murder was committed by a person under sentence of imprisonment;

"(ii) The defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person;

"(iii) The defendant knowingly created a great risk of death to two (2) or more persons;

"(iv) The murder was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing or discharging of a destructive device or bomb;

"(v) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;

"(vi) The murder was committed for pecuniary gain;

"(vii) The murder was especially heinous, atrocious or cruel;

"(viii) The murder of a judicial officer, former judicial officer, district attorney, former district attorney or former county and prosecuting attorney, during or because of the exercise of his official duty. [1982 Cum. Supp.]

"(j) Mitigating circumstances shall be the following:

"(i) The defendant has no significant history of prior criminal activity;

"(ii) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"(iii) The victim was a participant in the defendant's conduct or consented to the act;

"(iv) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"(v) The defendant acted under extreme duress or under the substantial domination of another person;

"(vi) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;

"(vii) The age of the defendant at the time of the crime."

**3.** See my dissent in *Hopkinson v. State,* supra n. 1, 632 P.2d at 173–216.

cumstances Nos. 3 and 4 above, and *that* jury found that they were *not* present. Both juries were, of course, contemplating the same facts—namely, those facts which resulted in a verdict of guilty of murder in the first degree, in the first phase of the bifurcated proceeding.

In the second sentencing proceeding, all mitigating circumstances described in § 6-4-102(j)(i), (ii), (iii), (iv), (v), (vi) and (vii), supra n. 2, were offered for the jury's consideration, each of which received a negative response. However, in reply to the court's invitation to list

"*[a]ny other mitigating circumstances.* (Here set forth in writing any other mitigating circumstances you may find to exist in this case. If there is insufficient room, additional paper will be provided for you.)
Yes___ No___"

(Emphasis added.),

the jury answered in one of its members' handwriting, as follows:

"8. The torture of Jeff Green may not have been ordered by Mark Hopkinson
Yes___ No _X_
"9. Actions of Mark Hopkinson helped save the life of a prison guard
Yes _X_ No___"

Therefore, no matter what interpretation we place upon "Mitigating Circumstance" # 8 above (see n. 20 infra), the jury found one other mitigating circumstance against which it was obliged to balance the aggravating circumstances that it also found to be present.[4]

*Second,* in the first appeal we remanded for a new sentencing hearing for the reason that the trial court had added to the aggravating-mitigating balancing process aggravating circumstances which were unsup-

ported by evidence. I would hold that in this appeal the trial court has done the same thing and thus has committed the same error.

We said in the majority opinion of *Hopkinson v. State,* Wyo., 632 P.2d 79, 171–172 (1981):

"When we do not know whether the result of the weighing process would have been different had the impermissible aggravating factor not been present and where a man's life is at stake, we must return the case to the trial court for a new sentencing trial."

*Third,* at the second sentencing trial two of the aggravating circumstances which had been submitted to the first jury and found nonexistent in the first sentencing hearing were again submitted to the jury, based upon the same facts, and were, in the second sentencing hearing, found to have been present. In the first sentencing proceeding, the jury was asked whether, in its judgment, the Green murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an unlawful escape from custody and whether the murder was committed for pecuniary gain. To each of these inquiries the first jury responded that these two aggravating circumstances *were not applicable* to the Green murder. In the second sentencing hearing, a different jury was given the same fact situation and the same two aggravating circumstances to consider and this jury responded that these twice-submitted aggravating circumstances *were applicable* to the Green murder. This second submission is to twice place the defendant in jeopardy in violation of his Constitutional rights[5] as guaranteed by the Fifth Amendment to the Federal Constitution and Art. 1, § 11 of the Wyoming Constitution.[6]

---

**4.** In *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), Chief Justice Burger, writing for the plurality, said:

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer * * * not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character of record and any of the circumstances of the offense that the defendant

proffers as a basis for a sentence less than death."

**5.** See *State v. Silhan,* 302 N.C. 223, 275 S.E.2d 450 (1981), discussed infra.

**6.** The Fifth Amendment to the United States Constitution provides in pertinent part:

## THE SUBMISSION OF AN IMPERMIS-
## SIBLE AGGRAVATING
## CIRCUMSTANCE

"The murder was especially heinous, atrocious or cruel." § 6-4-102(h)(vii), W.S. 1977.

" * * * We must not pile conjecture upon conjecture and posit the decision of life or death upon a pyramid of guesses." *People v. Terry,* 61 Cal.2d 137, 37 Cal.Rptr. 605, 617, 390 P.2d 381, 392, cert. denied 379 U.S. 866, 85 S.Ct. 132, 13 L.Ed.2d 68 (1964).

Providing there is evidence to support it, one of the aggravating circumstances that the sentencing jury may consider in a capital punishment case under Wyoming law is: "[t]he murder was especially heinous, atrocious or cruel." Section 6-4-102(h)(vii), W.S.1977. There is no doubt whatever that the murder with which we are here concerned can and must be described in this fashion. However, the law requires that, in order for this type of murder to warrant the submission of this particular aggravating circumstance to the sentencing authority for death-penalty deciding purposes, there must be legally acceptable evidence capable of establishing, beyond a reasonable doubt (§ 6-4-102(e)), the fact that the defendant ordered or participated in the torturous aspects of the killing. His is the culpability which must be measured. *Enmund v. Florida,* —— U.S. ——, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), discussed infra. Without such evidence, the submission of the heinous-atrocious-or-cruel aggravating circumstance to the jury—especially in a fact situation where the torture was so violently inhuman and the evidence of which is so patently inflammatory—is violative of the defendant's Eighth and Fourteenth Amendments rights. This is so because there is nothing in the words of the controversial aggravating circumstance which—standing alone—implies an inherent restraint upon the arbitrary and capricious infliction of the death sentence under the directive of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972) and *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, reh. denied 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). See *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).[7] In fact, there is nothing in the words "The murder was especially heinous, atrocious or cruel" which would even imply that the defendant must be responsible for the torture which suggests this type of killing.

In the first *Hopkinson* appeal, I said in my separate concurring opinion that I would hope that this particular statutory circumstance would not again be given over to sentencing-jury consideration.[8] In that opinion, I commented that this aggravating circumstance was overbroad as applied and I warned against giving it again.[9]

" * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *."

This amendment is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland,* 397 U.S. 784, 787, 794, 89 S.Ct. 2056, 2058, 23 L.Ed.2d 707 (1969).

Article 1, § 11 of the Wyoming Constitution provides:

"No person shall be compelled to testify against himself in any criminal case, nor shall any person be twice put in jeopardy for the same offense. If a jury disagree, or if the judgment be arrested after a verdict, or if the judgment be reversed for error in law, the accused shall not be deemed to have been in jeopardy."

7. Even though "[a] person of ordinary sensibilities" could fairly characterize almost every murder as "outrageously or wantonly vile, horrible or inhuman," not all murders may be held to fall in this category without violating the standardless sentencing which was criticized in *Furman. Godfrey v. Georgia,* supra.

8. While under Wyoming statute (§ 6-4-102(d)(i)) the jury is charged with recommending a sentence to the judge (e.g., "render a recommendation to the judge"), the "recommendation" of death is binding upon the judge under § 6-4-102(f), where it is provided:

"Where a recommendation of death is made, the court shall sentence the defendant to death."

9. In my dissent in *Hopkinson v. State,* supra, 632 P.2d at 176, I said:

" * * * I would agree with the appellant that the 'especially heinous, atrocious or cruel'

The heinous-atrocious-or-cruel aggravating circumstance was injected into the balancing process again, however, and it continues to be my opinion that the submission—in the circumstances of this case—constitutes reversible error, for the reason that there is no evidence and thus insufficient evidence to establish beyond a reasonable doubt (§ 6–4–102(e)) that Hopkinson was in any way associated with the torture of Green. As I said in the concurring part of my opinion in *Hopkinson v. State,* supra, 632 P.2d at 174:

"Mr. Justice White, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), spoke to the obligation of the Supreme Court of Georgia to oversee the application of the statutory standards in a manner which would comport with the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), reh. denied 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163. He said:

" 'In considering any given death sentence on appeal, the Georgia Supreme Court *is to determine whether the sentence imposed was consistent with the relevant statutes—i.e., whether there was sufficient evidence to support the finding of an aggravating circumstance.* * * *'* (Emphasis added.) 428 U.S. at 223, 96 S.Ct. at 2948."

If I am correct in my assumption that there is insufficient evidence to support the tender of the heinous-atrocious-or-cruel aggravating circumstance, it is then as though the jury had been permitted to consider a nonstatutory aggravating factor. This is—by statute—impermissible.[10]

### Submission of an Improper Aggravating Circumstance Requires Reversal

The majority of the court, in this appeal, concede that an improper aggravating circumstance may not be injected into the balancing process with authorized aggra-

vating circumstances. At 664 P.2d 60, the court says:

"This court observed in the first Hopkinson opinion that § 6–4–102(h), supra, fn. 7, specifically limits the aggravating circumstances to those listed. 632 P.2d at 157. It was also there recognized that we must not compromise the weighing process between permissible aggravating circumstances and mitigating circumstances. The scales must not be tipped by impermissible factors leaving us in a quandary as to what the jury would have done had impermissible factors not been present. 632 P.2d at 170–172.

" * * * We accept the proposition that improper aggravating circumstances cannot go into the calculus of the decision of the sentencing authority."

This conclusion is supported by the current law on the subject. In *Stephens v. Zant,* 631 F.2d 397, 406 (5th Cir.1980), cert. denied 454 U.S. 1035, 102 S.Ct. 575, 70 L.Ed.2d 480, a capital punishment case, the court said:

"The question presented * * * is whether the death penalty was invalid under the Constitution because it was imposed when one of the aggravating circumstances was later held to be unconstitutional even though there were two other aggravating circumstances, either of which by itself would be legally sufficient to permit the jury to impose the death penalty and as to both of which there is no uncertainty.

\* \* \* \* \* \*

"It is impossible for a reviewing court to determine satisfactorily that the verdict in this case was not decisively affected by an unconstitutional statutory aggravating circumstance. The jury had the authority to return a life sentence even if it found statutory aggravating circumstances. It is possible that even if the jurors

---

aggravating circumstances should not have been given to the jury because when applied to the evidence—i.e., *as construed*—it is vague and overbroad. I would remand for this additional reason with the hope that before this aggravating circumstance is sub-

mitted to any future sentencing authority, the matter would first be given careful consideration."

**10.** See § 6–4–102(h), W.S.1977, supra n. 2.

believed that the other aggravating circumstances were established, they would not have recommended the death penalty but for the decision that the offense was committed by one having a substantial history of serious assaultive criminal convictions, an invalid ground. The presence of the unconstitutionally vague circumstance also made it possible for the jury to consider several prior convictions of petitioner which otherwise would not have been before it. The instruction on the invalid circumstance may have directed the jury's attention to those convictions. It cannot be determined with the degree of certainty required in capital cases that the evidence of those convictions, together with the instruction, did not make a critical difference in the jury's decision to impose the death penalty.

"We hold that the jury's discretion here was not sufficiently channeled, see *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and that the process in which the death penalty was imposed in this case was not 'rationally reviewable.' *Woodson v. North Carolina,* 428 U.S. at 303, 96 S.Ct. at 2990. *See also Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393. Petitioner's death sentence therefore cannot stand."

The North Carolina Supreme Court has also acknowledged the impropriety of affirming a death sentence after one aggravating circumstance submitted to the sentencer is invalidated. *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), cert. denied 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980). The court there held that in the sentencing hearing of a defendant convicted of felony murder the jury had improperly been permitted to consider the underlying felony as an aggravating circumstance. Holding that the error required resentencing, the court noted:

"We are unable to say that under the circumstances of this particular case the trial judge's submission of the issue con-

cerning the underlying felony constituted harmless error. Had the jury not considered the underlying felony as an aggravating circumstance, it may well have decided that the remaining aggravating circumstances were not sufficiently substantial to call for imposition of the death penalty." 257 S.E.2d at 568.

See also *Bufford v. State,* Ala.Cr.App., 382 So.2d 1162, 1174–1185 (1980), reh. denied (1981).

Similarly, the Florida Supreme Court has said that where one aggravating circumstance is invalidated,

" * * * regardless of the existence of other authorized aggravating factors we must guard against any unauthorized aggravating factor going into the equation which might tip the scales of the weighing process in favor of death * * *.

$$\ast \qquad \ast \qquad \ast \qquad \ast \qquad \ast \qquad \ast$$

"Would the result of the weighing process by both the jury and the judge have been different had the impermissible aggravating factor not been present? We cannot know. Since we cannot know and since a man's life is at stake, we are compelled to return this case to the trial court for a new sentencing trial at which the [improper] factor * * * shall not be considered. See *Miller v. State,* 332 So.2d 65 (Fla.1976); *Messer v. State,* 330 So.2d 137 (Fla.1976). This result is dictated because, in order to satisfy the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the sentencing authority's discretion must be 'guided and channeled by requiring examination of *specific factors* that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' (Emphasis supplied.) *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913." *Elledge v. State,* Fla., 346 So.2d 998, 1003, reh. denied, —— U.S. ——, 103 S.Ct. 771, 74 L.Ed.2d 984 (1977).[11]

11. The Florida Supreme Court has indicated that it would not follow this rule of reversal

where one but not all aggravating circumstances found below were invalid *and where no*

See also *Menendez v. State,* Fla., 368 So.2d 1278, 1282 (1979):

"There is, therefore, only one properly found aggravating circumstance and one mitigating circumstance. Since the trial judge has committed error in considering matters outside the permissible range of legal standards set by the statute, and because it is impossible for us to evaluate the weight given by the trial judge to those factors which were proper to consider in imposing the death penalty, we can only vacate the sentence of death and remand the case for resentencing."

Properly analyzed, the situation in which an appellate court invalidates one but not all of the aggravating circumstances found by a death-sentencing jury (or trial court) is precisely analogous to the situation in which the appellate court finds that a general verdict of guilty has been returned against a criminal defendant by a jury instructed upon alternative theories of conviction, one but not all of which permitted guilt to rest upon an unconstitutional ground. Under *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed.2d 1117, 73 A.L.R. 1484 (1931), and its progeny, such a conviction must be reversed. In *Stromberg,* the defendant had been tried under a statute and jury instructions making it a criminal offense publicly to display a red flag for any of three enumerated purposes. The Supreme Court held that the description of one of the enumerated purposes violated the First Amendment. Even though there were alternative grounds of unquestioned constitutionality upon which the jurors might have based their general verdict, the Court refused to let the verdict stand:

"* * * The verdict * * * did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury were instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. * * [T]he necessary conclusion from the manner in which the case was sent to the jury is that, if any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld." 283 U.S. at 367–368, 51 S.Ct. at 535.

In support of the impropriety of submitting unauthorized aggravating circumstances to the sentencing jury—the error which brought on reversal in the first Hopkinson appeal and which should have the same result here—I point to *Henry v. Wainwright,* 661 F.2d 56 (5th Cir.1981), where the Fifth Circuit had under consideration the question which asks whether the capital defendant's Eighth and Fourteenth Amendments rights had been violated where the trial court had balanced statutory and nonstatutory aggravating circumstances with mitigating circumstances while weighing the life-or-death sentencing decision. The court held that the insertion of nonstatutory aggravating circumstances into the formula resulted in the deprivation of the defendant's constitutional rights. The author of the *Wainwright* opinion wrote:

"* * * '[O]ur task is not restricted to an effort to divine what motives impelled [this] death penalt[y]. Rather, we deal

mitigating circumstances were found. *Elledge v. State,* supra, 346 So.2d at 1002–1003 (dictum). The theory here appears to be that the Florida statutory scheme requires, rather than merely permitting, the death sentence wherever any aggravating circumstances are found, unless at least one mitigating circumstance is found. Id.; see also *Douglas v. State,* Fla., 373 So.2d 895, 896 (1979). This aspect of Florida law is presently irrelevant (and therefore its dubious consistency with the constitutional

prohibition against mandatory death penalties [see e.g., *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); [*Harry*] *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Lockett v. Ohio,* supra] need not be explored here), because the law of no other jurisdiction in the country makes a death sentence *mandatory* upon a finding of aggravating circumstances and no mitigating circumstances.

with a system of law and of justice that leaves to the uncontrolled discretion of judges and juries the determination whether defendants committing these crimes shall die or be imprisoned.' *Furman v. Georgia,* 408 U.S. 238, 253, 92 S.Ct. 2726, 2734, 33 L.Ed.2d 346 (Douglas, J. concurring). Guarding against the arbitrary and discriminatory imposition of the death penalty must not become simply a guessing game played by a reviewing court in which it tries to discern whether the improper nonstatutory aggravating factors exerted a decisive influence on the sentence determination. The guarantee against cruel and unusual punishment demands more.

"In short, appellant's argument in this case seeks this court's approval of a practice that violates the spirit, if not the letter, of *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In *Proffitt* the Supreme Court held Florida's death penalty statute constitutional on its face inasmuch as it appeared to provide specific and detailed guidance to the judge and jury at the sentencing stage. We are bound to disapprove of the trial court's ignoring the limitations imposed by the statute itself and increasing rather than decreasing the risk that the death penalty will be imposed in an arbitrary and capricious manner through the introduction of nonstatutory aggravating circumstances. The Supreme Court of Florida is, properly, the tribunal to rule on that state's statutory requirement. Here, however, the limitations of the statute make the death penalty constitutional. Ignoring those limitations thus implicates the constitution.

"*Because the state trial court committed constitutional error in admitting evidence of and permitting jury consideration of nonstatutory aggravating circumstances, Henry's death sentence must be vacated.*" (Emphasis added.) 661 F.2d at 59–60.

*Elledge v. State,* supra, is remarkably similar to the case at bar wherein the sentencing jury was permitted to consider our

§ 6–4–102(h)(vii) aggravating circumstance when there was no evidence to support it. In *Elledge* the judge (who does the sentencing under the Florida statute) accepted into the balancing process a statutory aggravating circumstance which is the same as our § 6–4–102(h)(iii),[12] when there was no evidence to support it. That is—there was no supporting evidence in the sense that the judge took into account the defendant's commission of a crime which had been perpetrated *after* the one for which he was being tried. The Supreme Court of Florida identified the consideration of this unauthorized factor by the sentencing authority as constituting the injection of a nonstatutory aggravating circumstance. The court said:

"Admission of evidence of the Gaffney murder is proscribed by our decision in *Provence* [*v. State,* 337 So.2d 783 (Fla. 1976) ], because the charge had not resulted in a conviction at the time of the trial in the instant case. *It was, therefore, a nonstatutory aggravating factor.* But was the error harmless because of the lack of objection and the existence of substantial additional aggravating circumstances? We believe not." (Emphasis added.) 346 So.2d at 1002.

As noted supra, the Florida Supreme Court went on to hold in *Elledge* that once an unauthorized aggravating circumstance is placed in the weighing process the case must be reversed because a court cannot know what effect the improper factor had on the decision to impose the death sentence. *Elledge v. State,* supra, 346 So.2d at 1003.

### *It is Defendant's Heinousness, Atrociousness or Cruelty That § 6–4–102(h)(vii), W.S.1977 Governs*

It is to be remembered that Hopkinson was found guilty of procuring the murder of Green based upon circumstantial evidence only. In the second sentencing proceeding, the trial judge gave the especially-heinous-atrocious-and-cruel aggravating circumstance together with the following instruction, which reads:

---

12. "The defendant knowingly created a great risk of death to two or more persons."

"INSTRUCTION NO. <u>10</u>

"One of the aggravating circumstances set forth in this case is that the murder was especially heinous, atrocious or cruel. To assist you in your evaluation of this aggravating circumstance, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included in this circumstance are those capital crimes where the actual commission of the murder was accompanied by such additional acts as to set the crime apart from the normal murder; that is, a consciousless or pityless crime which is unnecessarily tortuous to the victim."

Hopkinson's murdering of Green by ordering him killed without evidence of the defendant's participation in the actual torture makes the submission of the "especially heinous, atrocious or cruel" aggravating circumstance to the sentencing jury impermissible because the jury's consideration of this highly emotional and inflammable aggravating factor is acceptable only in those circumstances where it has been proven beyond a reasonable doubt [13] that the defendant participated in a special and unusual type of murder which can be described as a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Hopkinson v. State*, supra; *Proffitt v. Florida*, supra.[14] It is only this kind of evidence which, when the "especially heinous, atrocious or cruel" aggravating circumstance is given the sentencing authority, saves the statute from being "impermissible and vague" (*Hopkinson v. State*, supra). In the first *Hopkinson* case, 632 P.2d at 153–154, the majority said:

" * * * [T]he statute requires the jury to find the murder to have been 'especially heinous, atrocious or cruel.' Webster's Third New International Dictionary defines heinous as 'hatefully or shockingly evil.' Thus the term 'especially heinous' is more than just hatefully or shockingly evil. *The murder, to be so classified, must demonstrate that the consciencelessness of the defendant is not only an outrage but also a dangerous and unrestrainable threat to society. Only when this is found can the murder properly be categorized as especially heinous. Since very few murders can be regarded in this manner, the term is NOT impermissible and vague.*" (Emphasis added.)

The majority then adopted the definition of the terms "especially * * * atrocious or cruel" with the following recitation:

"As to the terms especially atrocious or cruel, we adopt the definition of these terms established in the jurisdiction from whence the state legislature borrowed them. See, *Woodward v. Haney*, Wyo. 1977, 564 P.2d 844. In this case the statute was derived from Florida's. Its interpretation of these terms was discussed by Justices Stewart, Powell and Stevens in *Proffitt* as follows:

" ' * * * In particular, the petitioner attacks the eighth * * * statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is "especially heinous, atrocious, or cruel," * * * §§ 921.141(5)(h), * * * (Supp.1976–1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.

Fla., 283 So.2d 1, 9, cert. denied 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1973), where it was said that the statutory provision is directed only at

" ' * * * the conscienceless or pitiless crime which is unnecessarily torturous to the victim."

See also *Alford v. State*, Fla., 307 So.2d 433, 445 reh. denied 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1975); *Halliwell v. State*, Fla., 323 So.2d 557, 561 (1975).

**13.** Section 6–4–102(e) provides:

"The jury, if its verdict is a recommendation of death, shall designate in writing * * * the aggravating circumstance or circumstances which it found *beyond a reasonable doubt*." (Emphasis added.)

**14.** In *Proffitt v. Florida*, supra, the Supreme Court relied upon the decisions of the Supreme Court of Florida which had addressed the meaning of the words contained in the identical aggravating circumstance in *State v. Dixon*,

" 'That court has recognized that while it is arguable "that all killings are atrocious, * * * [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." *Tedder v. State* [Fla.], 322 So.2d [908], at 910. As a consequence, the court has indicated that *the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon* [Fla.], 283 So.2d [1], at 9. See also *Alford v. State* [Fla.], 307 So.2d 433, 445 (1975); *Halliwell v. State* [Fla.], [323 So.2d 557] at 561.' " (Emphasis added.) 632 P.2d at 154.

Clearly, the majority in the first *Hopkinson* appeal held that, in considering whether the heinous-atrocious-or-cruel aggravation should be given over to jury consideration, there must be evidence which addresses itself to the "consciencelessness of the defendant."

The purpose of the "especially heinous, atrocious or cruel" aggravating circumstance is not to seek out the disproportionality of death as a penalty for murder, but is intended to focus upon the conduct of the defendant to see if *his* culpability will warrant the death sentence.[15]

The United States Supreme Court in *Enmund v. Florida,* supra, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152, said:

" * * * The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, * * * for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' *Lockett v. Ohio,* 438 U.S. 586, 605, 57 L.Ed.2d 973, 98 S.Ct. 2954 [2965], 9 Ohio Ops.3d 26 (1978) (footnote omitted) * * *."

In *Godfrey v. Georgia,* supra, 446 U.S. at 428, 100 S.Ct. at 1764–1765, the Court said: "In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Gregg v. Georgia,* supra, reaffirmed this holding:

" '[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' 428 U.S. at 189, 96 S.Ct., at 2932 (opinion of STEWART, POWELL, and STEVENS, JJ.).

"A capital sentencing scheme must, in short, provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' Id., at 188, 96 S.Ct., at 2932, quoting *Furman v. Georgia,* supra, 408 U.S., at 313, 92 S.Ct., at 2763 (WHITE, J., concurring).

Justice O'Connor, concurring in *Eddings,* supra, wrote:

"Because sentences of death are 'qualitatively different' from prison sentences, *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell and Stevens, JJ.), this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." 455 U.S. at 117–118, 102 S.Ct. at 3379.

---

**15.** " * * * '[T]he fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' Id., at 304. See *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976)." Mr. Justice Powell, writing for the Court in *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and quoting from the plurality opinion in *Woodson v. North Carolina,* supra, 428 U.S. at 304, 96 S.Ct. at 2991.

"This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.' *Gregg v. Georgia,* supra, at 196, n. 47, 96 S.Ct., at 2936, n. 47. See also *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' As was made clear in *Gregg,* a death penalty 'system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.' 428 U.S., at 195, n. 46, 96 S.Ct., at 2935."

As I will undertake to demonstrate in this dissent, it is the failure to associate Hopkinson with the heinous-atrocious-and-cruel characteristics which attend upon the killing of Jeff Green that causes the giving of this statutory aggravating circumstance to have the effect of depriving the sentencing process of a meaningful basis for distinguishing this case from the many others where the death penalty is not prescribed. To say it another way, by underwriting the submission of the § 6–4–102(h)(vii) aggravating circumstance, absent supporting evidence that he participated in the torture, is for the courts to deprive the defendant of his right to have the sentencing jury focus upon *his* conduct rather than the conduct of unknown killers who may well have been the sole authors of Jeff Green's torture.[16] Thus, the statute as construed is unconstitutional as it was held to be in *Godfrey v.*

*Georgia,* supra, where no acts of outrage or torture were associated with the murder. In this case, the association of the acts of torture with defendant Hopkinson is a vital and indispensable predicate to the giving of the "especially heinous, atrocious or cruel" aggravating circumstance, and it is the failure on the part of the State to make this connection—as condoned by the trial court and this court's majority opinion—of which I complain and which, I say, constitutes reversible error. Assuming no associating evidence, reversible error is the necessary effect under our previous *Hopkinson* decision where it was said in the majority opinion:

"When it [the sentencing jury] made its findings of aggravating circumstances, it then was required to balance them against the mitigating circumstances and make a recommendation of sentence to the judge. Section 6–4–102(d)(i). *Since its findings under the court's instructions as to 'previous convictions' as instructed by the trial judge was not supported by the evidence, it was an erroneous finding and should not have been considered in the balancing process. We, therefore, are unable to conclude that in the absence of the finding of the improper aggravating circumstance the jury would have found the aggravating circumstances outweighed the mitigating circumstances and returned a sentence of death. When we do not know whether the result of the weighing process would have been different had the impermissible aggravating factor not been present and where a man's life is at stake, we must return the case to the trial court for a new sentencing trial. Elledge v. State,* Fla.1977, 346 So.2d 998, 1003. We agree with the reasoning of the Florida court that:

" ' * * * This result is dictated because, in order to satisfy the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the sentencing authority's discretion must be "guided and channeled by requiring

---

**16.** Just here it should be recalled that the person or persons who inflicted the torture and the

murder upon the person of Jeff Green are to this day unknown.

examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913.' * * *" (Emphasis added.) 632 P.2d at 171–172.

This holding is supported by other state supreme courts where aggravating circumstances such as the one in question here have been considered.

In *State v. Culberth,* La., 390 So.2d 847, 851 (1980), in discussing the applicability of the aggravating circumstance of heinous, atrocious or cruel, the Supreme Court of Louisiana noted:

"Neither does the record support the finding that the offense was committed in an especially heinous, atrocious or cruel manner. Obviously, it was not intended that all murders fall in this category, even though it can be said that murder, itself, is a heinous, atrocious and cruel crime. We have stated that the concept of heinousness must necessarily include 'some idea of torture or the pitiless infliction of unnecessary pain on the victim.' *State v. English,* supra [367 So.2d 815], at 823 [La.1979]. Such a construction is necessary to protect the statute from attack on grounds of vagueness and overbreadth and to provide adequate guidelines for those involved in the sentencing process. *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). *In this case the defendant did not torture or abuse the victim before her death.* The wounds were inflicted to kill, not to maim or to inflict pain." (Emphasis added.)

In *Justus v. State,* 247 Ga. 276, 276 S.E.2d 242, 245, reh. denied 454 U.S. 1093, 102 S.Ct. 661, 70 L.Ed.2d 633 (1981), in discussing the aggravating circumstance that the offense of murder was outrageously or wantonly vile, horrible and inhuman in that it involved torture, depravity of mind and an aggravated battery, the Georgia Supreme Court made the following observations:

" 'Torture' as the term is used in the statute occurs when the victim is subject-

ed to serious physical abuse prior to death. [Citation.] Serious sexual abuse may be found to constitute serious physical abuse. [Citation.]

"Rosemary S. Jackson was not killed instantaneously nor was she the victim of a domestic murder. She gave the appellant no reason whatsoever to assault her and was in no manner threatening. The appellant fled and attempted in every manner to hide his crime. See *Godfrey v. Georgia,* supra. Miss Jackson was abducted and sexually assaulted prior to death. Therefore the murder was outrageously or wantonly vile, horrible or inhuman in that this murder is distinguishable from ordinary murders in which the death penalty is not appropriate. [Citation.] Under the facts of this case, we find that the murder was of the type universally condemned by civilized society as wantonly vile, horrible or inhuman, as it involved *depravity of mind of the defendant* and torture to the victim as set forth above." (Emphasis added.)

Although the Georgia aggravating circumstance is not worded exactly like our corollary statutory provision, it is my opinion that the above quotation stands for the principle that in discussing the applicability of the Georgia aggravating circumstance, the court was concerned with the defendant's participation in those aspects of the crime that made it a torturous or outrageously or wantonly vile, horrible or inhuman murder. In another opinion, the Georgia Supreme Court made the following observations:

"As mandated, we have reviewed the sentence in this case, and this court finds material difference between *Godfrey* and the case under review which distinguish this murder from the murder in *Godfrey* and from other 'ordinary murders' for which the death penalty is not appropriate.

"The evidence in this case shows that unlike *Godfrey,* the victim was not killed instantaneously; he was not a member of the appellant's family, nor was he threatening the appellant in any manner. This

was a cold blooded, planned execution type murder perpetrated for the purpose of robbing the victim, who was known to have a large amount of cash. With that purpose in view, *the perpetrator* severely beat and partially disrobed the victim seeking to find where he kept his money. As was pointed out in the original opinion, the victim was 'cut all to pieces' and gasoline was poured over him before he was shot. When the appellant returned from the killing, he had blood on his clothing, and there was blood in the yard where the victim had been beaten prior to being put in the back of a pickup truck and taken to the actual execution site. Thereafter, the victim's truck with his body in it was burned in order to hide the crime.

"The evidence supports a finding beyond a reasonable doubt of serious physical abuse prior to death. [Citation.] As we held in our original opinion, the jury's finding of Code Ann. § 27–2534.1(b)(7), torture occurs when the victim is subjected to serious physical abuse before death. [Citation.] *A defendant who tortures a victim or subjects the victim to an aggravated battery before killing a victim can be found to have a depraved mind.*" (Emphasis added.) *Hardy v. State,* 247 Ga. 235, 275 S.E.2d 319, 320–321, reh. denied 455 U.S. 929 [102 S.Ct. 1295, 71 L.Ed.2d 474] (1981).

A quote which I find applicable appears in *State v. Lugan,* 124 Ariz. 365, 604 P.2d 629, 636 (1979). There, in discussing the aggravating circumstance that the crime be especially heinous, cruel or depraved, the Arizona Supreme Court stated:

"For a killing to be especially cruel, the perpetrator must senselessly or sadistically inflict great pain on his victim. An example of exceptional cruelty can be found in *State v. Knapp* [114 Ariz. 531, 562 P.2d 704 (1977)], supra, where defendant set fire to the room in which his two infant daughters were asleep and caused them to be burnt to death. We find nothing in the record to establish that the victim suffered pain, and the commission of the offense in this case cannot, therefore, be considered especially cruel within the intent of A.R.S. § 13–454(E)(6).

"In determining whether a murder has been committed in an especially heinous or depraved manner, we must necessarily consider the killer's state of mind at the time of the offense. This state of mind may be shown by his behavior at or near the time of the offense. Thus we have found those additional factors which make murder especially heinous or depraved where the killer not only shot to death the victim of a robbery but also shot two innocent bystanders, killing one, all for no discernable reason. [Citation.] In *Knapp* we characterized the killing of the bystander in [*State v.*] *Blazak* [114 Ariz. 199, 560 P.2d 54 (1977)], as 'particularly unnecessary and conscienceless.'

"We have also considered acts done immediately after the actual killing to determine the murderer's mental state at the time of the killing. We have found an especially heinous or depraved manner of commission where the defendant murdered two victims in a 'barrage of violence,' continuing to shoot and abuse his victims even after he had killed them. [Citation.]"

The record in this case does not disclose any such required evidence of Hopkinson's participation in the torture of Green and thus the only criminal act for which Hopkinson can be held responsible is murder. Absent such attendant "shockingly evil" acts as will successfully insulate the "especially heinous, atrocious or cruel" aggravating-circumstance submission against the charge of impermissible vagueness as contemplated by this court in *Hopkinson v. State,* supra, and the standardless-sentencing concept of *Furman v. Georgia,* supra, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, where the United States Supreme Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner, the trial court erred in permitting the aggravating circumstance to go to the jury.

It cannot be rationally suggested that the jury stood unimpressed by the highly emotional and repulsive evidence of torture that was admitted into evidence in this case, nor can it be argued that it did not, out of impermissible fact assumption, vent its revulsion upon the defendant Hopkinson. The sentencing jury was invited, by Instruction No. 10, to infer that Hopkinson ordered the torture even though there was no evidence to support this fact. In Instruction No. 10 the court defined the meaning of the words "heinous," [17] "atrocious" [18] and "cruel" [19] but failed to instruct that, before the jury could find that the conduct described by those definitions could be assigned to its consideration in contemplating the mitigating-aggravating circumstance process—where human life or death teeters so precipitously in the balance—*such conduct must be found beyond a reasonable doubt to be in fact the conduct of the defendant.* Absent this caveat, the jury was left, without instruction or standard, to speculate upon the question which asks whether or not—having found that Hopkinson had ordered the murder—it even need worry about whether Hopkinson was responsible for Green's torture. The jury might well have reached the conclusion that since it had found guilt in the murder phase of the bifurcated proceeding and since the submitted aggravating circumstance only wanted the jury to answer the question:

Was the *murder* especially heinous, atrocious or cruel?

17. "[M]eans extremely wicked or shockingly evil."

18. "[M]eans outrageously wicked and vile."

19. "[M]eans designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others."

20. For purposes of discussing this particular proposition, I am placing the State's interpretation upon this jury expression but there are quite a few things that cast doubt upon this translation. In the first place, the jury wrote this statement under the heading of "Mitigating Circumstances." This might be glossed over more easily were it not for the fact that the language of the statement—read literally—and taking the double negative into account—means:

it was not necessary for them to be able—with credible evidence—to associate Hopkinson with the torture. This would be a logical conclusion because it is clear to all that the "*MURDER*" could and must be described as heinous, atrocious and cruel but whether or not Hopkinson *ordered* this form of killing is quite another thing.

To be sure, the jury demonstrably reacted to the instruction, the statements of counsel discussed infra and the exhibits which visually described the torture because the jury, out of its own recoil, volunteered a "Mitigating Circumstance" which read:

"The torture of Jeff Green may not have been ordered by Mark Hopkinson

Yes___ No_X_ " [20]

An example of standardless sentencing procedure could hardly be more vividly fantasized than the situation which is presented by this appeal where the sentencing jury was permitted to hear about the shockingly evil and heinous torture of a human being in circumstances in which the evidence fails to connect the conduct of the defendant with the conscienceless and pitiless acts of torture which accompany the murder. The United States Supreme Court said in *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977), that it

"* * * is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

The torture of Jeff Green was *not* ordered by Mark Hopkinson.
In other words—does the statement say:
*No* to the proposition that the murder of Jeff Green was not ordered by Mark Hopkinson, or does it say
We—the jury—react negatively to a statement which says the murder of Jeff Green was not ordered by Mark Hopkinson?
This might not be quite so troublesome were it not the obligation of the jury to find a given aggravating circumstance to be present *beyond a reasonable doubt.* Section 6–4–102(e), supra n. 2. I presume that a natural concomitant of that proposition is that the courts ought to be able to tell from the verdict, *beyond a reasonable doubt,* what it is the jury decided.

Without associating the conduct of Hopkinson with the torture of Jeff Green, the sentencing jury was permitted to hear the State's attorney say in his opening statement:

"The murder was especially heinous, atrocious or cruel. The evidence in this case, and I'll only say it once in the opening, and when I talk to you about the testimony of Dr. Stahl, will show you beyond any doubt this is one of the most heinous murders that ever occurred in the state of Wyoming. That is the guideline that will permit you to view the facts in this case."

The State's attorney also said to the jury in the opening statement:

"The evidence in this case on the heinous, atrocious and cruel nature of this murder is not very pretty. * * *

"What did they do to Jeff Green? Dr. Stahl, a forensic pathologist, Laramie, Wyoming, does a tremendous amount of work with the state crime lab on matters, a little bit out of the ordinary, a very qualified man. You will be impressed by him. He was called in to do the autopsy of Jeff Green and he will tell you, and it's his opinion, that Jeff Green was tortured for the purpose of getting information out of him. He can do that because of his having been involved in other torture murders, and because of his qualifications, and also because of the tracks. He will explain to you that in murder, murderers leave tracks on bodies just like elk leave tracks in the snow. He will testify that in his opinion Jeff Green was tied to a chair or hung up or strung out in some way, evidenced by the fact there's rope burns under both of his arms where actually the meat was torn in because of the pain and torture that man went through in order to get the information from him. He will testify that a knife was held to Jeff Green's throat in three separate places, and they made little slit marks in his throat in an attempt to intimidate him into giving them information. They then held the knife or sharp object to his heart and made another slice across his heart.

"He will then testify that they held his hands out, and with a blunt instrument or even a foot or bat, they smashed his left hand. And then they took cigarettes and in one hand they burned 35 cigarette burns, in the other 37. And when that didn't work, they got a hot iron, perhaps a welding iron or some other hot iron or even a knife heated up, and they started burning up his arms. Deep apparent burns. Not apparent but for sure burns. When that wasn't enough they then started burning behind his ears, which he will explain is a very, very sensitive part of his body. Burnt the back end, the inside of his ears, and when that wasn't successful, started burning along the hairline of Jeff Green. And when that wasn't successful, they started then around his nose, and on his face and they burned T's in his face for traitor. They burned up along his nose and across the top of his eyes and his eyelids. And finally in desperation, they burned the right eye out of the head of Jeff Green. Then they hit him with some type of blunt instrument here in the head and rendered him unconscious. For how long no one knows. They brought him to the interchange by Fort Bridger, walked him out into the sand and shot and killed him, so that would shut his mouth and so it would be a warning to all of the other people who were scheduled to testify in the grand jury proceeding investigating the Vehar murders that was supposed to start in two days.

"I respectfully submit on behalf of the State of Wyoming the evidence will prove not only one aggravating circumstance beyond a reasonable doubt, but all five. And if there's ever been a case, ladies and gentlemen, that justifies the death penalty, this is it. Thank you."

In his closing argument, the State's attorney said:

"The last aggravating circumstance that the State contends is applicable in this case is that murder was especially heinous, atrocious, or cruel. Now, when I talk about that I'll only talk about it once. But you all saw Dr. Stahl's testi-

mony and there is no question. Dr. Stahl has said that it is by far the most heinous—he didn't say by far—he said it was the most heinous, atrocious situation that he had ever been involved in.

"Ladies and gentlemen, the evidence in this case proves beyond any reasonable doubt the existence of each and every one of these aggravating circumstances. And, as the Court has instructed you, the burden of the State, which I recognize and I make no apologies for meeting, only requires us to prove one aggravating circumstance. The evidence in this case proves them all."

Toward the conclusion of the argument, the State's attorney said this about the "especially heinous, atrocious or cruel" aggravating circumstance:

"Then the last aggravating circumstance dealt with the heinous, atrocious, and cruel manner in which this murder occurred. I don't like to even talk or think about what Jeff Green had to go through. Dr. Stahl is fast becoming one of the most noted pathologists in the area. He works with the State DCI. He is able to reconstruct how torture is administered. In this particular instance, you recall his testimony that there were three different—actually, four different modes of torture utilized. The knife. They held it to his throat, three splices on his throat, the two splices over his heart. The cigarette which is painful but relatively minor pain compared to what else he was subjected to. And his hands and arms. Then, when that wasn't successful, a hot iron of some sort where they actually burned, burned his arms and then around his face until they literally burned one of the eyes out of his head. And Dr. Stahl's testimony is that that torture was administered for the purpose of obtaining information and for punishment. They don't do that to Mark Hopkinson and get away with it.

"What information did Mr. Hopkinson want? He asked Jennifer, who was Jeff talking to? What was said? Mr. Hopkinson's mode of dealing with that, if he finds out that the authorities have evidence against him he immediately purchases or manipulates testimony of his own. Perjured testimony on the other side to raise reasonable doubt, to come into a courtroom with a jury such as yourself who has the utmost faith and confidence in every human being and gives them equal credit, not recognizing that there are those among us who have no scruples whatsoever, who will go out and buy and hire and manipulate any type of testimony they deem necessary for their own benefit. But to do that, to do that, Mark Hopkinson had to know what Jeff Green had told the investigators. And so, he had to have him tortured to get that information.

"Then, you know, he could have had him killed, dumped his body in the desert. No problem. But he had to make a statement with the tortured body of Jeff Green. He knew that grand jury was going to convene on May 21st, 1979. If Jeff Green was missing, it really didn't say enough for Mark Hopkinson. He had to make a statement to the people of that valley. He had to attempt to intimidate them further. He had to put them in fear. So, he had Jeff Green marched down behind the pullout just at the entrance of the Valley and had him shot in relatively open sight in an area that was frequented so that his body would be discovered, so it was a statement to all other potential witnesses. Don't mess around with Mark Hopkinson.

"The problem is, the people of the Bridger Valley are decent, honorable people. The killing had to stop. They had enough. Even Mark Hopkinson's friends had had enough. Even Mike Hickey had enough. They came before the grand jury. And the statement with Jeff Green's body was too much for any of them to handle. And they came in and they told the truth. And Mark Hopkinson was indicted and Mark Hopkinson was then brought to trial here in Jackson, Wyoming. And Mark Hopkinson was convicted beyond a reasonable doubt.

"Now, these facts, as I've gone over them with you—Incidentally, the letter from

the affidavit, which is just as good as any other sworn testimony, of V.A. Samples from Lompoc Penitentiary, proved that Mr. Hopkinson was there at the time of the murder of Jeff Green. * * *

* * * * * *

"He had been convicted of the Vehar murders. He was shutting the mouth of Jeff Green. Jeff Green knew it. And murder for hire. And if there is any other murder that was any more heinous, atrocious or cruel, I don't know of any. This case clearly justifies the death penalty."

### The Majority's Handling of the Issue

Having observed that all aggravating circumstances must be proved beyond a reasonable doubt, and that

" * * * the trial judge heeded the admonition of our opinion in the first appeal that any statutory aggravating circumstance unsupported by evidence should not be submitted for consideration by the jury, i.e., § 6–4–102(h)(iii), (iv), and (viii) fn. 7," 664 P.2d at 57.

(a statement with which I cannot agree), the majority opinion in the case at bar then goes on to capsulize the evidence which is considered sufficient to warrant the submission of the questioned aggravating circumstance as follows:

"The extensive evidence relating to the aggravating circumstance that the murder was especially atrocious, heinous and cruel, is of the most convincing nature. The evidence of threats against Green and others, the evidence of the character and disposition of appellant to take care of persons with violence, weapons and explosives, and his inquiry about the availability of welding equipment, *laid a foundation for the capability of appellant to cause the horrible torture of Green which took place.* The photographs of Green's body are expressive even beyond the words of the testimony of the pathologist who detailed for the jury the various brutal wounds inflicted before Green's being put to death.

"The testimony was that there were some 140 burns on the body of Green such as would be caused by cigarette burns and hot metal, thus connecting the welder which could be used as a heating tool. One of Green's eyes was burned out, there was an ugly burn behind one of Green's ears, explained by the pathologist to be an especially sensitive area. There were cuts on the throat and chest. There were bruises on his body consistent with having been caused by kicking with a boot or by striking with a baseball bat or hammer. There were abrasions on Green's body probably caused by his being bound by ropes and resulting from an agonizing struggle during the torture. *This evidence explained this to have been consciousless or pitiless far beyond the normal murder, Hopkinson v. State, supra, which crime, of course by its nature, is possessed of some of the elements of being heinous, atrocious and cruel. But this one was 'especially' so within the meaning of the statutory language. Any rational juror could reach this conclusion beyond a reasonable doubt when viewing the evidence in the light most favorable to the prosecution.*" (Emphasis added.) 664 P.2d at 59.

Further, the court makes this conclusory statement:

"Applying that standard,[21] then, to the three aggravating circumstances,[22] we

---

**21.** The standard referred to is to be found in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), reh. denied 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), where the court says:

" * * * *[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, ANY rational trier of fact could have found the essential elements of the crime beyond a reasonable* doubt. (Emphasis added.) See *Johnson v. Louisiana,* 406 U.S., at 362, 92 S.Ct., at 1624–1625."

**22.** The aggravating circumstances to which the majority here refer are those the defendant contends are not supported by the evidence; they are:

1. Murder was committed for the purpose of avoiding or preventing a lawful arrest.

*find them more than supported by the evidence."* (Emphasis and bracketed material added.) 664 P.2d at 58.

Then, without citing to any facts of record, the court says:

"* * * [H]e [defendant] arranged for hired triggermen to do the execution *and intended that torture * * * be utilized."* (Emphasis added.) 664 P.2d at 58.

The majority go on to observe:

"The evidence fully supported these aggravating factors." 664 P.2d at 86,

(referring to, among others, the especially heinous, atrocious or cruel aggravating circumstances).

And, finally:

"All aggravating circumstances are measured as to the sufficiency of the evidence beyond a reasonable doubt according to the standard set by *Jackson v. Virginia,* supra, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements beyond a reasonable doubt. We hold that, within this standard, there is no reasonable doubt that all five of the aggravating circumstances were proven." 664 P.2d at 86.

Not only does the majority opinion not point to testimony or other facts of record that would support the giving of the "especially heinous, atrocious or cruel" instruction, but the appellee State of Wyoming is unable to find any supportive evidence either.

The State makes the following representation in its brief:

"The jury listed as a mitigating circumstance, in addition to those listed in the statute, 'The torture of Jeff Green may not have been ordered by Mark Hopkinson,' but found that this circumstance was not present. * * * The evidence which supports this finding includes the following.

2. The murder was committed for pecuniary gain.

"While Appellant was incarcerated at Lompoc, California, he made several calls to the Bridger Valley. Generally, the subject of those calls was: the location of Jeff Green; to whom Jeff Green was speaking; that Green was speaking to the special prosecutors on the Vehar murder case; that the grand jury investigating the Vehar case was about to convene; that Green was going to be a witness. On one such call, Appellant spoke to Randy Reinholtz. Appellant wanted to know whether Green had any dynamite boxes and whether Reinholtz' father had any welding equipment. * * *

"Shortly thereafter, Green's body was found with burns which could have been caused by 'some type of a hot iron, a coat hanger, a soldering iron, a heated knife, some such object as that.' * * * Later, the burns were described as being consistent with 'a blow torch used to heat [a] knife * * *.' * * *

"Doctor Stahl testified extensively concerning his opinion as to how the torture was inflicted and the order of the torture. His conclusion was that torture of this sort is utilized 'to punish and perhaps to extract information.' * * *

"From these facts and the opinion of Dr. Stahl, there is substantial evidence in the record to support the conclusion that Appellant did order the torture of Green in order to discover what Green had told the special prosecutors, and what he would be able to tell the grand jury concerning Appellant's role in the Vehar murders. "Therefore, Appellant's suggestion that no evidence was presented regarding Appellant's knowledge and intent is without merit."

In my considered opinion, the prosecuting attorney, the State and this court are not able to point to any evidence which would support the conclusion that Hopkinson ordered the *torture*-death of Green.

The only evidence in the record which the State and the majority of this court can

3. The murder was especially heinous, atrocious or cruel.

arguably point to as supporting the submission of § 6–4–102(h)(vii), is the testimony concerning the welding equipment. The State argues that the evidence that Jeff Green may have been burned by a welding rod and that Mark Hopkinson talked to Randy Reinholtz about welding equipment, is enough for the jury to infer circumstantially that Hopkinson ordered the torture. In my opinion, it is inconceivable to assert that such evidence was sufficient.

Exactly what was the evidence? On direct examination, Randy Reinholtz testified:

"Q. Did he ever ask you anything about welding equipment?

"A. Well, he asked me if my father had a welder and I told him yes and that was the end of the conversation.

"Q. Did he ask you where the welder was kept or anything of that nature?

"A. No, sir.

"Q. Did he ask you to get it for him or anything like that?

"A. No. I just told him yes and that was the end of it.

"Q. Why would he ask you for a welding set?

"A. I don't know."

Dr. Stahl, the medical expert, testified:

"Q. (By Mr. Moriarity) Doctor, those are a more severe degree of burn than the cigarette burns you depicted earlier; is that correct?

"A. Yes.

"Q. Do you have an opinion what they were inflicted with?

"A. A hot iron of some type. *It could have been a heated coat hanger; it could have been a heated knife; it could have been a soldering iron. It's impossible to say exactly because there were so many burns that they're smudged together and the exact imprint is not left on the body.*" (Emphasis added.)

On the basis of this testimony alone, the State submits that the jury could infer, *beyond a reasonable doubt,* that Mark Hopkinson supplied the *killers* with welding equipment so that Jeff Green could be burned and tortured. A reading of the above testimony conclusively proves that such an inference is just not possible, and most of all not lawful. All Reinholtz said was that appellant asked him about a welder—the inferences that can be drawn from such an inquiry are many. The doctor only stated conclusively that Jeff Green was burned, but *with what* he did not know. From this, the jury could only properly infer that Jeff Green was burned by something other than a cigarette. In my opinion, the State asks the jury and this court to cross the canyon without a bridge. Absent some other proof, nothing substantial can be inferred from the evidence with respect to Mark Hopkinson's participation in the torture of Jeff Green.

### Summary and Conclusion

Assuming that the record reveals no lawful evidentiary connection between Hopkinson and the acts of torture against Jeff Green and conceding, as we must, that the language "the murder was especially heinous, atrocious or cruel" contemplates that the evidence must show that it is the defendant who participated in such death-dealing activity as—in law—may be described as "especially heinous, atrocious or cruel" (*Hopkinson v. State,* supra), it follows that the jury was given an unauthorized, highly inflammable nonstatutory aggravating circumstance to ponder in the mitigating-aggravating life-or-death balancing process. This is impermissible by statute, § 6–4–102(h) (i.e., "Aggravating circumstances are limited to the following:") and by law. *Hopkinson v. State,* supra; *Elledge v. State,* supra; *Henry v. Wainright,* 661 F.2d 56 (5th Cir.1981); *Stephens v. Zant,* supra. The trial court's insertion of this nonstatutory aggravating circumstance into the balancing process where mitigating and aggravating circumstances were to be so delicately weighed by the sentencing jury in order that a decision could be reached about whether Hopkinson would live or die must indeed be considered prejudicial. I reach this conclusion because the majority opinion considers the aggra-

vating circumstance in question to have properly been submitted since the record contained sufficient evidence to support it. The majority say:

"The extensive evidence relating to the aggravating circumstance that the murder was especially atrocious, heinous and cruel, is of the most convincing nature." 664 P.2d at 59.

The majority do not, however, point to evidence which associates the "heinous, atrocious or cruel" characterization of the murder with the defendant. This is not surprising because there are no facts of record which will permit such an evidentiary association between defendant Hopkinson and the torture aspects of Green's murder. Circumstantial evidence that Hopkinson ordered the killing?—Yes. That he ordered Green tortured?—No.

We are not concerned here with whether the statute authorizing the "especially heinous, atrocious or cruel" aggravating circumstance is or is not facially constitutional. It is. *Proffitt v. Florida,* supra; *Gregg v. Georgia,* supra; *Hopkinson v. State,* supra.[23] The issue in this appeal is whether or not the statute has been constitutionally applied. In *Godfrey v. Georgia,* supra, the United States Supreme Court held that a statute which embraced an aggravating circumstance describing the offense as "outrageously or wantonly vile, horrible or inhuman" was violative of the defendant's rights under the Eighth and Fourteenth Amendments as construed, even though the same statute had previously been held to be facially constitutional and constitutional as construed in its previous *Gregg v. Georgia* opinion.

There is no doubt whatever that the torture-murder of Jeff Green may—and should, by all accounts—be described as "especially heinous, atrocious or cruel," *Godfrey v. Georgia,* supra. Even so—the law requires that, in order for this type of murder to warrant the submission of the § 6–4–102(h)(vii), supra n. 2, aggravating circumstance to the jury for death-penalty deciding purposes, the record must contain evidence which establishes beyond a reasonable doubt[24] that the defendant was the author of or, in a material way, participated

---

**23.** In *Hopkinson,* supra, the majority said:

"* * * The statute [§ 6–4–102] does *not* fail to properly channel the jury's sentencing decision and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons." 632 P.2d at 153. While it may be the rule in Wyoming that § 6–4–102(h)(vii) is facially constitutional, it is not the rule in California. See *People v. Superior Court of Santa Clara County,* 31 Cal.3d 797, 183 Cal.Rptr. 800, 647 P.2d 76, 78 (1982), where the court said:

"None of these terms meets the standards of precision and certainty required of statutes which render persons eligible for punishment, either as elements of a charged crime or as a charged special circumstance.

* * * * * *

"It seems unlikely, for several reasons, that judicial construction could narrow the scope of the special circumstance on the basis suggested by the People. For one thing, as a discourse between the trial court and the prosecutor made clear, any attempt to determine what constitutes 'necessary' torture—to clarify the meaning of 'unnecessary'—appears to be futile. Furthermore, even assuming that hurdle were overcome, to find the special circumstance to be proved, the jury must agree that the crime was 'conscienceless or pitiless'—terms that only add to the

vagueness problem. As 'unnecessarily' torturous assumes the existence of conduct that is necessarily torturous, so a conscienceless or pitiless first degree murder assumes the existence of such murder performed with conscience or pity. We cannot fathom what it could be.

* * * * * *

"The conclusion is inescapable that the language of subdivision (a)(14) is so vague that men of common intelligence must guess at its meaning, and trial judges and jurors will look in vain for a standard for ascertainment of guilt or, in this case, for determination of the truth of the special circumstance."

**24.** Section 6–4–102(e), supra n. 2. See also: *State v. Dixon,* supra n. 14, 283 So.2d at 9, where the Florida Supreme Court, in commenting upon its statute—after which Wyoming's § 6–4–102(e) was fashioned—said:

"The aggravating circumstances of Fla.Stat. § 921.141(6), F.S.A., actually define those crimes—when read in conjunction with Fla. Stat. §§ 782.04(1) and 794.01(1), F.S.A.—to which the death penalty is applicable in the absence of mitigating circumstances. As such, they must be proved beyond a reasonable doubt before being considered by judge or jury."

in the heinous, atrocious and cruel features of the killing.

Thus we have held—as have the United States Supreme Court and the State Supreme Court after whose legislation our statute was fashioned—that the "especially heinous, atrocious or cruel" aspects of the crime must in fact be shown to be the acts of the defendant and those acts must be such as may be categorized as a special, unusual and atrocious type of murder so that the statute will not therefore be considered "impermissible and vague," *Hopkinson v. State,* supra. It follows that not all acts of murder will fit the "especially heinous, atrocious or cruel" description. Concerning this same aggravating circumstance, the Supreme Court of Florida said in *State v. Dixon,* Fla., 283 So.2d 1, 9 (1973):

> " * * * What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim."

In other words, this aggravating circumstance insists that the jury consider what sort of a mentality it is that presided over the acts with which the aggravating circumstance in question is associated. Was this a person who sought out and killed his victim absent the introduction of attendant emotional or physical pain and suffering [25] —or—is the defendant not only a killer but also a person who is depraved—who tortures without pity—who affirmatively and additionally displays a lack of base human morality—whose method of killing is a shock to the conscience of all who would hear of it? If the evidence indicates that the killer-defendant falls within the latter category—the "especially heinous, atrocious or cruel" aggravating circumstance may be injected into the sentencing process. If it falls into the former classification, it may not, because then the effect would be to apply the statute in a way which would be "impermissible and vague" and thus violative of the defendant's Eighth and Fourteenth Amendments rights as described by the Federal Constitution, as well as his corollary Wyoming constitutional rights. *Godfrey v. Georgia,* supra.

## THE RESUBMISSION OF CERTAIN AGGRAVATING CIRCUMSTANCES AMOUNTS TO DOUBLE JEOPARDY

Appellant also claims that error occurred by reason of the resubmission of two statutory aggravating circumstances during the second sentencing trial which the jury in the first penalty trial had found to be inapplicable to the Green murder.

In the sentencing aspect of the first trial, the State submitted to the jury a total of eight aggravating circumstances which the prosecution urged were applicable to the death of Jeff Green. In returning the verdict of death, the jury found that four of these aggravating circumstances were applicable to the murder of Green.[26] How-

---

**25.** As in *Godfrey v. Georgia,* supra, where the United States Supreme Court held the giving of a similar aggravating circumstance renders the statute vague and overbroad and thus violative of the defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

**26.** In *Hopkinson v. State,* supra, 632 P.2d at 167–168, the jury at the first penalty trial found:

" 'We, the jury, duly empaneled and sworn to try the above cause *do find the existence of the following aggravating circumstances at the time of the murders:* [Emphasis added.] (Check as many spaces and [in] Items 1 through 8 as you find, or check Item 9 only.)

" '1. ( ) The murder was committed by a person under sentence of imprisonment.
" '( ) Applicable to the death of Vincent Vehar.
" '( ) Applicable to the death of Beverly Vehar.
" '( ) Applicable to the death of John Vehar.
" '(x) Applicable to the death of Jeff Green.
" '2. ( ) The Defendant was previously convicted of another murder in the first degree or a felony involving the use or threat of violence to the person.
" '( ) Applicable to the death of Vincent Vehar.
" '( ) Applicable to the death of Beverly Vehar.
" '( ) Applicable to the death of John Vehar.
" '(x) Applicable to the death of Jeff Green.

ever, with respect to aggravating circumstances 5 and 6, which provided that the murder was committed for the purpose of avoiding or preventing a lawful arrest and the murder was committed for pecuniary gain, the first jury found that these aggravating circumstances *were not applicable* to the murder of Jeff Green.

After our reversal of the first death sentence and remand for a new penalty trial, the State chose to submit only five statutorily mandated aggravating circumstances. Included within those submitted were the aggravating circumstances that the murder of Jeff Green was committed for the purpose of avoiding or preventing a lawful arrest (§ 6–4–102(h)(v)), and that the murder was committed for pecuniary gain (§ 6–4–102(h)(vi)). On resubmission, the second sentencing jury found these two circumstances, as well as others,[27] to be applicable to the death of Jeff Green even though the earlier jury had rejected them.

Hopkinson argues that the resubmission of these two statutory aggravating circumstances was error for the reason that the rejection of their applicability by the first sentencing jury constituted an acquittal of those circumstances and the State was forever precluded from proving them again by the proscriptions against double jeopardy contained in the United States and Wyoming Constitutions. I agree.

The proscriptions against double jeopardy are embodied in the Fifth Amendment to the United States Constitution and Art. 1, § 11 of the Wyoming Constitution, supra n. 6.[28] The right guaranteed by these constitutional provisions guarantees that no individual shall be put in jeopardy more than once for the same *offense.* The question to be decided is whether the protections afforded by the concept of double jeopardy

" '3. ( ) The Defendant knowingly created a great risk of death to two or more persons.
" '(x) Applicable to the death of Vincent Vehar.
" '(x) Applicable to the death of Beverly Vehar.
" '(x) Applicable to the death of John Vehar.
" '( ) *Applicable to the death of Jeff Green.*
" '4. ( ) The murder was committed while the Defendant was engaged or was an accomplice in the commission of or an attempt to commit or flight after committing or attempt to commit any robbery, rape, sexual assault, arson, burglary, kidnapping or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb.
" '(x) Applicable to the death of Vincent Vehar.
" '(x) Applicable to the death of Beverly Vehar.
" '(x) Applicable to the death of John Vehar.
" '(x) Applicable to the death of Jeff Green.
" '5. ( ) The murder was committed for the purpose of avoiding or preventing a lawful arrest of [or] effecting an escape from custody.
" '( ) Applicable to the death of Vincent Vehar.
" '( ) Applicable to the death of Beverly Vehar.
" '( ) Applicable to the death of John Vehar.
" '( ) Applicable to the death of Jeff Green.
" '6. ( ) The murder was committed for pecuniary gain.
" '( ) Applicable to the death of Vincent Vehar.
" '( ) Applicable to the death of Beverly Vehar.
" '( ) Applicable to the death of John Vehar.

" '( ) Applicable to the death of Jeff Green.
" '7. ( ) The murder was especially heinous, atrocious or cruel.
" '(x) Applicable to the death of Vincent Vehar.
" '(x) Applicable to the death of Beverly Vehar.
" '(x) Applicable to the death of John Vehar.
" '(x) Applicable to the death of Jeff Green.
" '8. ( ) The murder of a judicial officer, former judicial officer, county attorney, or former county attorney during or because of the exercise of his official duty.
" '( ) Applicable to the death of Vincent Vehar.
" '( ) Applicable to the death of Beverly Vehar.
" '( ) Applicable to the death of John Vehar.
" '( ) Applicable to the death of Jeff Green.
" '9. ( ) No aggravating circumstances."

27. The second sentencing jury also concluded *that the murder was committed by a person* under sentence of imprisonment (§ 6–4–102(h)(i)); the defendant was previously convicted of another murder in the first degree (§ 6–4–102(h)(ii)); the murder was especially heinous, atrocious or cruel (§ 6–4–102(h)(vii)).

28. As previously noted, the double-jeopardy clause of the Fifth Amendment was made applicable to the states through the Fourteenth Amendment. See: *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

are applicable to the present circumstances. To rephrase the inquiry, the question is: Can each aggravating circumstance set out in § 6–4–102(h) be considered *an offense* for purposes of double jeopardy? I am of the opinion that proscriptions against double jeopardy apply to this case and the resubmission of the two aggravating circumstances provided for in § 6–4–102(h)(v) and (vi) violated appellant's rights as guaranteed by the double-jeopardy clauses.

### Basic Principles

Recently, in *United States v. DiFrancesco,* 449 U.S. 117, 127–128, 101 S.Ct. 426, 432, 66 L.Ed.2d 328 (1980), the Supreme Court of the United States set out the underlying concepts of the double-jeopardy clause:

"—The general design of the Double Jeopardy Clause of the Fifth Amendment is that described in *Green v. United States:*

" 'The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.... The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' 355 U.S. [184], at 187–188 [78 S.Ct. 221, at 223, 2 L.Ed.2d 199]."

In *DiFrancesco* the Court reiterated what it said earlier regarding the protections afforded by the double-jeopardy clause in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In *Pearce,* the following observation was made:

" * * * That guarantee has been said to consist of three separate constitutional protections. It protects a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (Footnotes omitted.) 395 U.S. at 717, 89 S.Ct. at 2076.

Both *Pearce* and *DiFrancesco* concerned themselves with questions of the double-jeopardy implications surrounding the sentencing of criminal defendants.

In *North Carolina v. Pearce,* supra, the United States Supreme Court was faced with a challenge by a defendant to the imposition of a longer sentence upon reconviction which came as a result of petitioner's efforts to have his earlier conviction set aside. The question confronting the Court was whether or not the imposition of the greater sentence violated the double-jeopardy clause. In rejecting petitioner's claim, then Justice Stewart noted several principles regarding the double-jeopardy clause and criminal-defendant sentencing:

"Long-established constitutional doctrine makes clear that, beyond the requirement already discussed, the guarantee against double jeopardy imposes no restrictions upon the length of a sentence imposed upon reconviction. At least since 1896, when *United States v. Ball,* 163 U.S. 662, 41 L.Ed. 300, 16 S.Ct. 1192, was decided, it has been settled that this constitutional guarantee imposes no limitations whatever upon the power to *retry* a defendant who has succeeded in getting his first conviction set aside. 'The principle that this provision does not preclude the Government's retrying a defendant whose conviction is set aside because of an error in the proceedings leading to conviction is a well-established part of our constitutional jurisprudence.' *United States v. Tateo,* 377 U.S. 463, 465, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 450. And at least since 1919, when *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103, was decided, it has been settled that a corollary of the power to retry a defendant is the power, upon the defend-

ant's reconviction, to impose whatever sentence may be legally authorized, whether or not it is greater than the sentence imposed after the first conviction. 'That a defendant's conviction is overturned on collateral rather than direct attack is irrelevant for these purposes, see *Robinson v. United States,* 6 Cir., 144 F.2d 392, 396, 397, aff'd on another ground, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944.' *United States v. Tateo,* supra, 377 U.S. at 466, 84 S.Ct., at 1589, 12 L.Ed.2d 450, 451.

"Although the rationale for this 'well-established part of our constitutional jurisprudence' has been variously verbalized, it rests ultimately upon the premise that the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean. As to whatever punishment has actually been suffered under the first conviction, that premise is, of course, an unmitigated fiction, as we have recognized in Part I of this opinion. But, so far as the conviction itself goes, and that part of the sentence that has not yet been served, it is no more than a simple statement of fact to say that the slate *has* been wiped clean. The conviction *has* been set aside, and the unexpired portion of the original sentence will never be served. A new trial may result in an acquittal. But if it does result in a conviction, we cannot say that the constitutional guarantee against double jeopardy of its own weight restricts the imposition of an otherwise lawful single punishment for the offense in question. To hold to the contrary would be to cast doubt upon the whole validity of the basic principle enunciated in *United States v. Ball,* supra, and upon the unbroken line of decisions that have followed that principle for almost 75 years. We think those decisions are entirely sound, and we decline to depart from the concept they reflect." (Footnotes omitted.) 395 U.S. at 719–721, 89 S.Ct. at 2077–79.

Another challenge to sentencing founded on double-jeopardy principles was mounted in *United States v. DiFrancesco,* supra. In this case the government had invoked its right to appeal a sentence imposed by the district court under the dangerous special-offender provisions of the Organized Crime Control Act of 1970, 18 U.S.C. § 3576. 449 U.S. at 117, 101 S.Ct. at 426, 66 L.Ed.2d 328. The statute granted the government a right of appeal and vested the circuit court with the power to increase the sentence imposed by the district court. The Second Circuit Court of Appeals had found the statute unconstitutional, and the Supreme Court granted certiorari to determine whether or not the appeal provision violated the proscriptions against double jeopardy.

In holding that the government's statutory right of appeal was not violative of double jeopardy, the Court extended the rationale underlying the previous decision in *North Carolina v. Pearce,* supra. Basically, the majority opinion, authored by Justice Blackmun, spoke to the proposition that historically and logically the imposition of a sentence has never been given the finality which is afforded to a judgment of acquittal evolving from the guilt phase of criminal proceedings. 449 U.S. at 132–136, 101 S.Ct. at 434–37. The telling thrust of the opinion is that the nature of the sentencing phase is different from the nature of the guilt phase and proscriptions against double jeopardy are generally not offended by further proceedings which seek to assess a proper sentence. The Court reasoned as follows:

"D. The double jeopardy considerations that bar reprosecution after an acquittal do not prohibit review of a sentence. We have noted above the basic design of the double jeopardy provision, that is, as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent. These considerations, however, have no significant application to the prosecution's statutorily granted right to review a sentence. *This limited appeal does not involve a retrial or approximate the ordeal of a trial on the basic issue of guilt or innocence. Under § 3576, the*

*appeal is to be taken promptly and is essentially on the record of the sentencing court.* The defendant, of course, is charged with knowledge of the statute and its appeal provisions, and has no expectation of finality in his sentence until the appeal is concluded or the time to appeal has expired. To be sure, the appeal may prolong the period of any anxiety that may exist, but it does so only for the finite period provided by the statute. The appeal is no more of an ordeal than any Government appeal under 18 U.S.C. § 3731 from the dismissal of an indictment or information. *The defendant's primary concern and anxiety obviously relate to the determination of innocence or guilt, and that already is behind him. The defendant is subject to no risk of being harassed and then convicted, although innocent. Furthermore, a sentence is characteristically determined in large part on the basis of information, such as the presentence report, developed outside the courtroom. It is purely a judicial determination, and much that goes into it is the result of inquiry that is nonadversary in nature.*

"E. The Double Jeopardy Clause does not provide the defendant with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be. Congress has established many types of criminal sanctions under which the defendant is unaware of the precise extent of his punishment for significant periods of time, or even for life, yet these sanctions have not been considered to be violative of the Clause. Thus, there is no double jeopardy protection against revocation of probation and the imposition of imprisonment. See, e.g., *Thomas v. United States,* 327 F.2d 795 (CA10), cert. denied, 377 U.S. 1000 [84 S.Ct. 1936, 12 L.Ed.2d 1051] (1964). There are other situations where probation or parole may be revoked and sentence of imprisonment imposed. See, e.g., *United States v. Kuck,* 573 F.2d 25 (CA10 1978); *United States v. Walden,* 578 F.2d 966, 972 (CA3 1978), cert. denied, 444 U.S. 849 [100 S.Ct. 99, 62 L.Ed.2d 64]

(1979); *United States v. Jones,* 540 F.2d 465 (CA10 1976), cert. denied, 429 U.S. 1101 [97 S.Ct. 1125, 51 L.Ed.2d 551] (1977); *Dunn v. United States,* 182 U.S. App.D.C. 261, 561 F.2d 259 (1977). While these criminal sanctions do not involve the increase of a final sentence, and while the defendant is aware at the original sentencing that a term of imprisonment later may be imposed, the situation before us is different in no critical respect. Respondent was similarly aware that a dangerous special offender sentence is subject to increase on appeal. His legitimate expectations are not defeated if his sentence is increased on appeal any more than are the expectations of the defendant who is placed on parole or probation that is later revoked.

"All this highlights the distinction between acquittals and sentences. *North Carolina v. Pearce* and *Bozza v. United States* [330 U.S. 160, 67 S.Ct. 645, 91 L.Ed. 818 (1947)] demonstrate that the Double Jeopardy Clause does not require that a sentence be given a degree of finality that prevents its later increase." (Emphasis added.) 449 U.S. at 136–137, 101 S.Ct. at 437.

These cases announce basic principles which say that the protections afforded by the double-jeopardy clause are not applicable to the sentencing aspect of criminal proceedings. This rule ascends from the acknowledged concept which recognizes an historical and obvious difference between acquittals resulting from a trial in which the question of guilt or innocence is at issue, as compared to the issues which confront the court when the defendant has been convicted upon the charges that have been lodged against him.

## Double Jeopardy in Capital Sentencing

After the decision in *DiFrancesco,* a glaring question remained which asked whether the rationale supporting *DiFrancesco* and other cases rejecting double-jeopardy sentencing claims were applicable to death-penalty sentencing hearings mandated by *Furman,* supra, *Gregg,* supra, and *Proffitt,*

supra. The Supreme Court of the United States answered a portion of the question in 1981 with the decision in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

In *Bullington v. Missouri,* supra, the Court was asked to answer whether or not the protections afforded by the double-jeopardy clause were violated where a defendant, previously sentenced to life imprisonment by a jury in a capital case, obtained a new trial in which the state attempted to seek the death penalty again. The Missouri Supreme Court determined that double-jeopardy principles did not preclude the imposition of the death penalty at retrial. The United States Supreme Court granted certiorari and held that the double-jeopardy clause barred the reimposition of the death penalty at petitioner's new trial.

In analyzing the question, the majority of the Court revisited its historical position when it said:

"It is well established that the Double Jeopardy Clause forbids the retrial of a defendant who has been *acquitted* of the crime charged. *United States v. DiFrancesco,* 449 U.S. 117, 129, 101 S.Ct. 426, 433, 66 L.Ed.2d 328 (1980); *Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 1354, 51 L.Ed.2d 642 (1977); *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). This Court, however, has resisted attempts to extend that principle to sentencing. The imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed. The Court generally has concluded, therefore, that the Double Jeopardy Clause imposes no absolute prohibition against the imposition of a harsher sentence at retrial after a defendant has succeeded in having his original conviction set aside. See *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

See also *United States v. DiFrancesco,* 449 U.S. at 133–38, 101 S.Ct. at 435–438; *Chaffin v. Stynchcombe,* 412 U.S. 17, 23–24, 93 S.Ct. 1977, 1981–1982, 36 L.Ed.2d 714 (1973); *Stroud v. United States,* 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919)." 101 S.Ct. at 1857.

After suggesting the previous reluctance of the Court to apply double-jeopardy concepts to the realm of sentencing, the majority opinion went on to characterize *Bullington's* case in a different manner.

"The procedure that resulted in the imposition of the sentence of life imprisonment upon petitioner Bullington at his first trial, however, differs significantly from those employed in any of the Court's cases where the Double Jeopardy Clause has been held inapplicable to sentencing. *The jury in this case was not given unbounded discretion to select an appropriate punishment from a wide range authorized by statute. Rather, a separate hearing was required and was held, and the jury was presented both a choice between two alternatives and standards to guide the making of that choice. Nor did the prosecution simply recommend what it felt to be an appropriate punishment. It undertook the burden of establishing certain .facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts. The presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes. "In contrast, the sentencing procedures considered in the Court's previous cases did not have the hallmarks of the trial on guilt or innocence.* * * * "* (Footnote omitted and emphasis added.) 101 S.Ct. at 1858.

The important point for us to note is that the death-penalty sentencing procedures mandated by the Missouri legislature were more akin to a guilt determination trial than they were to a normal sentencing hearing because the prosecution's burden

was to prove its case beyond a reasonable doubt in order to warrant imposition of the death penalty. In the normal sentencing phase the prosecution's only burden was to make a recommendation as to an appropriate sentence.

These procedural differences were enough for the Court to reject the "clean slate" approach urged by the State of Missouri. 101 S.Ct. at 1860–1861. Rather, the Court concluded that by requiring the state to provide proof of the applicability of statutory aggravating circumstances beyond a reasonable doubt, Missouri had chosen to require the death-penalty sentencing jury "to determine whether the prosecution has 'proved its case.'" 101 S.Ct. at 1861. Given this, the Court characterized the first sentencing jury's rejection of the death penalty in petitioner's case as a finding that the prosecution failed to prove its case beyond a reasonable doubt, or, in other words, an "acquittal" of the death penalty. The following conclusions were set out:

"A verdict of acquittal on the issue of guilt or innocence is, of course, absolutely final. The values that underlie this principle, stated for the Court by Justice Black, are equally applicable when a jury has rejected the State's claim that the defendant deserves to die:

"'The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.' *Green v. United States,* 355 U.S. 184, 187–188, 78 S.Ct. 221, 223–224, 2 L.Ed.2d 199 (1957).

"See also *United States v. DiFrancesco,* 449 U.S., at 137, 101 S.Ct., at 437. The 'embarrassment, expense and ordeal' and

the 'anxiety and insecurity' faced by a defendant at the penalty phase of a Missouri capital murder trial surely are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial. The 'unacceptably high risk that the [prosecution], with its superior resources, would wear down a defendant,' id., at 129, 101 S.Ct., at 433, thereby leading to an erroneously imposed death sentence, would exist if the State were to have a further opportunity to convince a jury to impose the ultimate punishment. *Missouri's use of the reasonable doubt standard indicates that in a capital sentencing proceeding, it is the State, not the defendant, that should bear 'almost the entire risk of error.' Addington v. Texas,* 441 U.S. [418], at 424, 99 S.Ct. [1804], at 1808 [60 L.Ed.2d 323]. *Given these considerations, our decision today does not at all depend upon the State's announced intention to rely only upon the same aggravating circumstances it sought to prove at petitioner's first trial or upon its statement that it would introduce no new evidence in support of its contention that petitioner deserves the death penalty. Having received 'one fair opportunity to offer whatever proof it could assemble,' Burks v. United States,* 437 U.S. [1], at 16, 98 S.Ct. [2141], at 2150 [57 L.Ed.2d 1], *the State is not entitled to another."* (Emphasis added.) 101 S.Ct. at 1861–1862.

The decision in *Bullington v. Missouri,* supra, clearly stands for the proposition that, upon a finding by a jury that the death penalty should not be imposed in a capital case, the protections afforded by the double-jeopardy clause preclude the State on a retrial from further seeking to impose death as a sentence. In other words, once a jury has rejected, for whatever reason, the imposition of the death penalty, the defendant is deemed to have been "acquitted" and cannot be retried on the question of life or death.[29]

**29.** Of course, the decision in Bullington was grounded on the statutory procedures required by the Missouri legislature; however, such an

observation is not crucial to the decision since those procedures closely model Wyoming's and those of other jurisdictions.

There is, however, a question not answered by the decision in Bullington that is of concern in the present case. That question, as I previously noted, asks whether or not the double-jeopardy clause precluded the State from resubmitting certain aggravating circumstances at the second sentencing trial where those self-same aggravating circumstances had been found not to have been proven by the first jury which had imposed the death penalty. I am of the opinion that, although left undecided by *Bullington,* the inescapable conclusion is that the reasoning of *Bullington* requires a finding that appellant's rights against double jeopardy were violated by the resubmission of several aggravating circumstances.

### Authority From Other Jurisdictions

Even though a myriad of death-penalty decisions have been handed down by the highest courts in other jurisdictions, following the *Furman* decision of 1972, very few have come to grips with the double-jeopardy issue posed by appellant in this case. The most thorough and detailed analysis of the question is that reported from the North Carolina Supreme Court in *State v. Silhan,* supra, 275 S.E.2d 450.

In *State v. Silhan,* the North Carolina Supreme Court sought to identify what can and what cannot be resubmitted to a second sentencing jury on remand when the first sentencing jury has returned a verdict imposing the death penalty. The opinion first points out that under North Carolina procedures, as is the case in Wyoming, a prerequisite to any jury decision imposing the death penalty is that the State prove the existence or applicability of *the selected aggravating circumstances beyond a reasonable doubt.* 275 S.E.2d at 482. The capital-sentencing procedure was also characterized in the same fashion used to describe the Missouri procedures in *Bullington v. Missouri,* supra—that the death-penalty sentencing trial is more like a guilt-determination phase than the normal sentencing hearing:

"* * * That the jury must find three specific things and must find them be-

yond a reasonable doubt before it can impose the death penalty puts upon the jury in a capital case much the same kind of duty it has in determining a defendant's guilt. The three requirements, in terms of the jury's function, are like the elements of a given criminal offense all of which the jury must find to exist beyond a reasonable doubt before it can return a guilty verdict. This makes our capital sentencing process more like a determination of guilt than like an ordinary discretionary sentencing decision of a trial judge such as that dealt with in *DiFrancesco.* We look, therefore, more to the double jeopardy principles dealing with criminal convictions, many of which were alluded to in *DiFrancesco,* than to the holding of *DiFrancesco* itself. In other words we believe the Double Jeopardy Clause places some limitations on the state in a new capital sentencing hearing ordered because of legal error committed in the hearing from which a defendant successfully appeals." 275 S.E.2d at 482.

After setting out this distinction—the same distinction that is so important to the decision in *Bullington*—the North Carolina Supreme Court concluded that the protections afforded under the double-jeopardy clause placed a number of limitations on the state's power to retry the death penalty following the defendant's successful appeal. The opinion says:

"Applying the Double Jeopardy Clause jurisprudence just discussed, we derive the following principles applicable to our capital sentencing procedure: The Double Jeopardy Clause is a limitation on the state's, not the defendant's, power to proceed. If a life sentence is imposed following conviction for a capital crime, the state may not appeal nor may a new sentencing hearing be ordered on defendant's appeal of his conviction even if the life sentence was the result of trial error favorable to defendant. This would be tantamount to defendant's having been acquitted of the death penalty. If upon defendant's appeal of a death sentence the case is remanded for a new sentencing hearing, double jeopardy prohibitions

would not preclude the state from relying on any aggravating circumstance of which it offered sufficient evidence at the hearing appealed from and which was either not then submitted to the jury or, if submitted, the jury then found it to exist. *The dictates [of] a double jeopardy would preclude the state from relying on any aggravating circumstance of which it offered insufficient evidence at the hearing appealed from. This would be tantamount to the state's having offered insufficient evidence of an essential element of a criminal offense in which case the state, because of double jeopardy considerations, could not retry the defendant even if it had sufficient evidence which could be offered at a new trial. Similarly the prohibition against double jeopardy would preclude the state from relying, at a new sentencing hearing, on any aggravating circumstance the existence of which the jury at the hearing appealed from, upon considering it, failed to find. The jury's failure to find the existence of the aggravating circumstance, after it had considered it, would be tantamount to defendant's having been acquitted of this circumstance.*" (Emphasis added.) 275 S.E.2d at 482.

The restrictions mandated by the double-jeopardy clause according to the decision in *State v. Silhan*, supra, are:

1. Imposition of a life sentence after a death—penalty trial forever precludes the State from seeking death as an appropriate punishment[30] (defendant is deemed "acquitted" of the death penalty);

2. On remand for a new sentencing hearing[31] the State *may* rely on any aggravating circumstance not previously submitted to the jury for which there is sufficient evidence;

3. On remand, the State *may* rely on any aggravating circumstance submitted to the jury and determined to be applicable by the jury for which there is sufficient evidence;

4. On remand, the State *may not* rely on an aggravating circumstance determined to be not supported by sufficient evidence;

5. On remand, the State *may not* rely on any aggravating circumstance previously submitted to the jury, considered by it, and which the jury failed to find as being applicable.

I agree with each and every restriction set out in *State v. Silhan*, supra, because, as the court concluded, they are mandated by the dictates of double jeopardy.

Restriction No. 5 above is the one which is applicable to appellant's case. That restriction says that it was error for the State to rely on the two aggravating circumstances mandated by § 6–4–102(h)(v) and (vi) at the second sentencing hearing because the State had submitted them to the first jury, which had found them inapplicable to the death of Jeff Green. This rejection by the first jury became an *acquittal* of those aggravating circumstances. This conclusion is inescapable because, under the Wyoming statutory scheme (§ 6–4–102), for a jury to impose the death penalty the State must prove beyond a reasonable doubt, and the jury need conclude, the existence of only *one* statutory aggravating circumstance. Thus, each of the aggravating circumstances listed in § 6–4–102(h) is in all respects similar to a *crime or offense* for which there is one element. Therefore, in appellant's first case the State chose to charge and try appellant on eight of the *offenses* listed in § 6–4–102(h), but the jury found appellant guilty of only four of them[32] —each one being sufficient to impose death

**30.** This restriction, of course, is exactly what the United States Supreme Court concluded a short time later in *Bullington v. Missouri,* supra.

**31.** This would arise out of an appellate court decision that trial or legal error had occurred requiring the setting aside of the jury's death-sentence decision, rather than reversal on grounds of insufficient evidence to support imposition of the penalty itself.

**32.** On retrial the State chose not to rely on two other aggravating circumstances found inapplicable by the initial jury.

as a sentence.[33] Under the rules regarding double jeopardy in *State v. Silhan, supra*,[34] which I would adopt in all respects, reversal of appellant's latest death sentence is required because the resubmission of two aggravating circumstances rejected by the prior jury violated the proscription against double jeopardy. This conclusion is mandated by both the Fifth Amendment to the United States Constitution and Art. 1, § 11 of the Wyoming Constitution. We said in *Vigil v. State*, Wyo., 563 P.2d 1344, 1350 (1977):

> " * * * While the respective double jeopardy provisions of the Wyoming State Constitution and the Fifth Amendment to the Federal Constitution are dissimilar in language, they have the same meaning and are coextensive in application."

### The Majority's Erroneous Conclusion

Not meaning to overemphasize my viewpoint that the majority of this court have erroneously rejected appellant's double-jeopardy claim, I must nonetheless comment on the reliance placed on *Knapp v. Cardwell*, 667 F.2d 1253 (9th Cir.1982), which in my judgment bears little if any relevance to appellant's position in the case at bar.

The majority opinion cites *Knapp v. Cardwell, supra*, for the proposition that "[t]here is no such thing as an 'acquittal' from an aggravating circumstance in the penalty phase." The majority fail to note that the rule expressed by the Ninth Circuit pertains to the fact that the contours of double jeopardy are not offended where the state introduces an aggravating circumstance at a retrial of the death-penalty question *that was not submitted to the jury or the court at the first trial.* The following is the language of the court:

> "At the resentencing hearing of at least one of the appellants, evidence of aggravating circumstances was introduced *that had not been introduced at the first sentencing hearing. State v. Valencia,* 124 Ariz. 139, 602 P.2d 807 (1979) (evidence that appellant was convicted of another crime after the first hearing). In light of our finding that the Watson change in interpretation of section 13–454 is procedural and ameliorative, and in light of our finding that *Bullington* is distinguishable, we hold that this does not constitute double jeopardy. A resentencing hearing at which any evidence of both aggravating and mitigating circumstances is received does not violate appellants' constitutional rights, even if the evidence developed or was discovered after the original sentencing hearing or was not introduced there for some other reason." (Emphasis added.) 667 F.2d at 1265.

*Knapp* does not, therefore, stand for the proposition that there "is no such thing as an 'acquittal' from an aggravating circumstance." Instead, *Knapp v. Cardwell* says that when a first jury returns the death penalty, the state can retry that issue on remand and can introduce evidence of aggravating circumstances *not previously relied upon*, all in conformity with the strictures of the double-jeopardy clause. Nowhere in the *Knapp* opinion does the court deal with the issue posed by appellant in this case, and I might add that the holding of *Knapp* is fully consistent with restriction No. 2 above outlined from the decision in *State v. Silhan, supra.*

I am aware that there is authority for the proposition that an appellant's rights against twice being put in jeopardy are not violated by the resubmission of aggravating circumstances in circumstances such as those exemplified by the case at bar.[35]

---

**33.** My conclusions here are not in conflict with and do not in any way temper my earlier discussion of the lack of sufficient evidence to support the "especially heinous, atrocious or cruel" aggravating circumstance.

**34.** I note that the views expressed in *State v. Silhan, supra*, have received some recognition by the United States Supreme Court. See:

*Jones v. Florida*, (denial of petition for writ of certiorari) (dissenting opinion of Justice Marshall) —— U.S. ——, 103 S.Ct. 189, 74 L.Ed.2d 153 (1982).

**35.** See for example: *Godfrey v. Georgia*, 248 Ga. 616, 284 S.E.2d 422 (1981); *State v. Gilbert*, 277 S.C. 53, 283 S.E.2d 179 (1981).

However, a reading of those opinions convinces me that the analysis utilized to support the conclusions is superficial, illogical and contrary to the rationale underlying the decision in *Bullington v. Missouri,* supra. I am convinced that the only treatment of the question which merits consideration is the opinion in *State v. Silhan,* supra. There the North Carolina Supreme Court carefully, logically and conclusively came to a proper resolution of the question.

Unlike the majority of this court, I find that reversible error was committed when the State was permitted to submit to the jury the two aforementioned aggravating circumstances which an earlier jury had rejected after *careful* consideration. To do so violated appellant's right under the double-jeopardy clause of the United States and Wyoming Constitutions.

## THE DEATH PENALTY IS UNCONSTITUTIONAL

My final reason for reversing appellant's death sentence stems from what I said in my first opinion in this case. *Hopkinson v. State,* supra, 632 P.2d at 172. There I fully set out my view that the death penalty is unconstitutional and violative of Art. 1, § 14 and Art. 1. § 15 of the Wyoming Constitution. 632 P.2d at 199–215. I continue to hold those views, and will rely on what I have previously said with respect to the constitutional issue.

## ORDER DENYING APPELLANT'S PRO SE MOTION FOR CONSIDERATION OF PLAIN ERROR

For the reasons stated in Part XI of the court's opinion of this date, it is

ORDERED that appellant's Motion of Proof, For Consideration In Showing Palin [sic] Error Existed, Which Was Not Properly Shown In Briefs Or Argument be, and is, denied.